UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., et al., Defendants.

Civ. A. No. 82–0192.

United States District Court, District of Columbia.

Sept. 10, 1987.

---

526

Charles F. Rule, Acting Asst. Atty. Gen., Barry Grossman, Chief, Communications and Finance Section, Nancy C. Garrison, Asst. Chief, Communications and Finance Section, Edward T. Hand, Asst. Chief, Foreign Commerce Section, Ben Giliberti, Atty., Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for U.S. Dept. of Justice.

John D. Zeglis, Jim G. Kilpatric, Francine J. Berry, Basking Ridge, N.J., Howard J. Trienens, David W. Carpenter, Chicago, Ill.,

Ben W. Heineman, Jr., Sidley & Austin, Washington, D.C., for AT & T.

Thomas P. Hester, John Thorne, Jeffrey J. Kennedy, David P. Boyd, Kirkland & Ellis, Chicago, Ill., Donald E. Scott, Alfred Winchell Whittaker, Katherine C. Zeitlin, Kirkland & Ellis, Washington, D.C., for Ameritech.

Robert A. Levetown, John M. Goodman, James R. Young, Washington, D.C., for Bell Atlantic.

Norman C. Frost, Mark D. Hallenbeck, Atlanta, Ga., Abott B. Lipsky, Jr., King & Spalding, Washington, D.C., for BellSouth.

Raymond F. Burke, Gerald E. Murray, Mary McDermott, Melvin A. Cohen, White Plains, N.Y., for NYNEX.

Robert V.R. Dalenberg, Paul H. White, Kathy A. Hackmann, Richard W. Odgers, Mary Cranston, Pillsbury, Madison & Sutro, San Francisco, Cal., Rex G. Mitchell, Reno, Nev., Stanley J. Moore, Washington, D.C., for Pacific Telesis Group.

Edgar Mayfield, James S. Golden, Mary Whitten Marks, Gregory J. Christoffel, St. Louis, Mo., Liam S. Coonan, Washington, D.C., for Southwestern Bell Corp.

David I. Shapiro, Richard C. Schramm, James vanR. Springer, Joel B. Kleinman, Dickstein, Shapiro & Morin, Washington, D.C. (Laurence W. DeMuth, Jr., Stuart S. Gunckel, David S. Sather, Alan J. Gardner, Cameron R. Graham, of counsel), for U S West, Inc.

Chester T. Kamin, Thomas S. Martin, Michael H. Salsbury, Anthony C. Epstein, Glenn B. Manishin, Christopher S. Vaden, Carl S. Nadler, Jenner & Block, John R. Worthington, Senior Vice President and Gen. Counsel, Washington, D.C., for MCI.

## OPINION

HAROLD H. GREENE, District Judge.

Following the submission of a report from the Department of Justice, in accordance with the Court's Opinion of August 11, 1982 which approved the consent decree,[1] a number of motions were filed which collectively sought removal of all the line of business restrictions embodied in section II(D) of the decree.[2] That section provides as follows:

After completion of the reorganization specified in section I, no BOC shall, directly or indirectly or through any affiliated enterprise:

1. Provide interexchange telecommunications services or information services;

2. Manufacture or provide telecommunications products or customer premises equipment (except for provision of customer premises equipment for emergency services); or

3. Provide any other product or service, except exchange telecommunications and exchange access service, that is not a natural monopoly service actually regulated by tariff.[3]

---

1. *United States v. Am. Tel. & Tel. Co.*, 552 F.Supp. 131, 195 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) (hereinafter referred to as *"AT & T"*, 552 F.Supp. 131). The Department of Justice report, entitled "Report and Recommendations Concerning the Line of Business Restrictions Imposed on the Bell Operating Companies by the Modification of Final Judgment," was accompanied by a document entitled "The Geodesic Network: 1987 Report on Competition in the Telephone Industry," prepared by Dr. Peter Huber, a Department consultant (hereinafter referred to as the "Huber Report").

2. *See* motions of Department of Justice, NYNEX Corporation, U S West, Inc., BellSouth Corporation, Pacific Telesis Group, Ameritech, Bell Atlantic, Southwestern Bell Corporation, and Florida Public Service Commission.

3. The twenty-two BOCs, or Bell Operating Companies, were integrated into seven Regional Holding Companies pursuant to a plan of reorganization of AT & T approved by the Court. *United States v. Western Electric Co.*, 569 F.Supp. 1057 (D.D.C.1983), *aff'd sub nom., California v. United States*, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). This actually was a proceeding in the *AT & T* case, but it bears the *Western Electric Co.* label, as do all subsequent pleadings, orders, and decisions, to accommodate the fiction that the consent decree primarily settled a 1949 lawsuit against the Bell System in the District of New Jersey, which proceeded under the *Western Electric Co.* caption, rather than the instant 1974 action. *See generally, AT & T*, 552 F.Supp. at 135–39.

The Regional Companies inherited the assets, the powers, and the decree obligations of the Operating Companies. *Western Electric Co.*, 569 F.Supp. at 1062 n. 5. The Court will generally

The Court invited interested persons and organizations to intervene in this proceeding and to file responses to the report and the motions, and the parties as well as the intervenors were given the right to file additional memoranda and replies.[4] A total of some 170 organizations and individuals availed themselves of the opportunity to intervene. In addition to submissions from AT & T, the Department of Justice, and the seven Regional Holding Companies (hereinafter referred to as the Regional Companies),[5] lengthy and thoughtful memoranda were also filed by competitors or potential competitors of the Regional Companies, representatives of state governments and state and public regulatory bodies, consumer organizations, labor unions, trade associations, and others.

The Court received a total of about three hundred briefs, totalling some 6,000 pages, including oppositions, responses, replies, and factual appendices, and it heard oral argument for three days from attorneys representing the parties, the Regional Companies, and the major groups of intervenors. This Opinion and the accompanying Order dispose of all the current controversies involving the retention or removal of the line of business restrictions.[6] The Opinion is organized as follows.

There are two introductory sections— Part I, Background; and Part II, Standard for Removal of the Restrictions. The following three sections address specifically

the core restrictions—Part III, Interexchange Services; Part IV, Manufacturing; and Part V, Information Services. The next two sections provide additional information on the removal issue—Part VI, Regulation; and Part VII, Current Anticompetitive Activities and Public Policies. Two sections deal with what may be regarded as non-core restrictions—Part VIII, Information Transmission; and Part IX, Non-Telecommunications Services. The last section, Part X, is the Conclusion.

I

## Background

The present controversy had its genesis shortly after World War II. At that time the government became concerned about apparent violations of the antitrust laws by the Bell System,[7] and in January 1949, an action was brought against that System by the Department of Justice which sought, among other things, the separation of telephone manufacturing from the provision of telephone service. The lawsuit was settled seven years later under circumstances which, in the opinion of the Antitrust Subcommittee of the House Committee on the Judiciary, indicated the presence of political and other corrupt influences. *See* Report of the Antitrust Subcommittee of the House Committee on the Judiciary on the Consent Decree Program of the Department of Justice, 86th Cong., 1st Sess., January 30, 1959 (Committee Print).[8]

refer herein both to the Bell Operating Companies and to the Regional Holding Companies as the Regional Companies. *See also* note 5, *infra.*

4. *See United States v. American Cyanamid Co.,* 719 F.2d 558, 564 n. 6 (2d Cir.1983), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984).

5. The parties and others have also referred to these firms as RHCs, Bell Companies, or Operating Companies. In conformity with the Court's policy to avoid, to the extent possible, initials and expressions not comprehensible to the uninitiated, it will refer to the firms as the Regional Companies, to the local operating firms as the Operating Companies rather than the BOCs, and to the judgment in this case as the decree rather than the MFJ.

6. On December 9, 1986, AT & T filed a motion requesting that the responsibility for screening

requests for individual waivers of the line of business restrictions prior to Court action thereon be transferred from the Department of Justice to the Federal Communications Commission. That motion has since been withdrawn, and it will therefore not be decided or discussed herein.

7. Prior to the 1984 divestiture, the terms "Bell System" and "AT & T" were in the main used interchangeably. To avoid confusion with the present truncated AT & T, the Court will herein generally refer to the predivestiture company as the Bell System.

8. For a description of some of the circumstances surrounding the Department's about face that led to the 1956 settlement, *see AT & T,* 552 F.Supp. at 135–38. The Department of Justice's change of position resulting in that settlement was partially responsible for the enactment of

Not long thereafter another agency of the United States entered into the picture. The monopoly of the Bell System in the provision of telephone service,[9] which theretofore had been regarded as a given fact, had come to be questioned in the wake of the discovery that microwaves could be substituted for copper wires for the transmission of long distance telephone conversations.[10] At the same time, the practice of the Bell System's local Operating Companies to satisfy their huge switching and other equipment needs exclusively from AT & T's affiliate Western Electric, rather than to make use also of outside suppliers, began to be challenged by small, efficient manufacturers with special expertise and special products to sell.

Initially the Bell System brushed off these attempts at competition as bothersome obstacles to its endeavor to provide integrated and efficient telephone service to the American people, but eventually the complaints of the would-be competitors came to be heard by the Federal Communications Commission, beginning with *Carterfone* in 1968.[11] Thereafter, the FCC struggled with one complaint against the Bell System after another. Although after drawn-out proceedings the Commission was able at times to achieve some small successes,[12] it eventually became apparent to everyone, including those in charge of regulation at the Commission, that the FCC, with its relatively small staff and other resources, and its limited authority, would never be able to cope successfully with the Bell System's powerful monopoly position and its ever-changing strategies. *See also* Part VI, *infra.*

The FCC's efforts to regulate the Bell System constituted a major part of the evidence adduced during the eleven-month trial of this case, and many witnesses and a large number of documents pointed to the FCC's lack of success in that regard. Testimony was heard and documents were introduced demonstrating the inability of the regulators to penetrate and evaluate the Bell System's accounting system and its cost and pricing strategies; to determine the utility or lack of utility of devices the Bell System required as a prerequisite to the attachment of competitors' wires to the national telephone network; to assess the legitimacy of the reasons given by the Bell System for making important information available to Bell operational components in advance of its distribution to others; and to reach conclusions concerning other methods employed to disadvantage Bell's competitors.

Among the Department of Justice's expert witnesses who placed some of these problems in perspective were Professor William Melody who testified with respect

---

the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (Tunney Act), which requires court approval of settlements reached in government-initiated antitrust cases. The Congress concluded that the political and economic influences and pressures on the Department of Justice in antitrust cases often are such that the safeguard of a "public interest" finding by a court is necessary as a prerequisite to the entry of any consent decree in such cases.

9. Some of the areas of the country, particularly in the more sparsely populated regions, were served by independent telephone companies. But where the Bell System operated, and that included the major cities and other densely populated areas, it had a monopoly.

10. These wires had been the basis of the Bell System's correct claim that there was no practical alternative to the provision of telephone service by a single entity. It obviously would have been, and it still is, impractical to expend the enormous capital required for the construction of a second or third set of wires connecting all the households and offices of this nation. However, microwaves and subsequently satellites have proved both practical and economically efficient for long distance transmissions.

11. 13 F.C.C.2d 420 (1968). It is generally agreed that *Carterfone* was foreshadowed by *Hush-a-Phone Corp. v. United States,* 238 F.2d 266 (D.C. Cir.1956).

12. *See, e.g., Specialized Common Carriers,* 29 F.C.C.2d 870 (1971). The most significant advance—the decisions to require connection for the competing Execunet service—was brought about by the Court of Appeals for this Circuit rather than the FCC. *MCI Telecommunications Corp. v. FCC,* 580 F.2d 590, 597 (D.C.Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978); *MCI Telecommunications Corp. v. FCC,* 561 F.2d 365 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 780, 54 L.Ed.2d 790 (1978).

to cross-subsidization between the Bell System's regulated and its unregulated activities that "[o]ver the last fifteen years, the Federal Communications Commission has both recognized and attempted to come to grips with this problem ... but its experience has not been a satisfactory one and it has not been able to establish standards and implement them" (Tr. 9347–48). Professor Melody further stated, in response to questions by counsel for the Department of Justice as to whether regulation could be made effective so as to prevent the anticompetitive practices he had described, that it was "very clear on the basis of ... the entire history of the FCC's attempt to deal with the problem, that there is no way to come to grips with the problem operationally, that AT & T's monopoly power, which extends far beyond the scope of the FCC in terms of its regulation, creates a situation where there is just simply no hope that this could ever be effectively done [by regulation]" (Tr. 9512–13).[13]

Similarly, Dr. Nina Cornell, another government witness, testified that she had analyzed the effectiveness of regulation for achieving effective competition in the telecommunications industry from an economic perspective, and she had concluded that "I don't think regulation can achieve effective competition in the industry" (Tr. 10841). In her opinion, regulation is particularly weak in an area such as telecommunications where the pace of technological change is very fast (Tr. 10853–59).[14]

Significantly, even the two officials who, as heads of the FCC's Common Carrier Bureau for the fifteen years between 1963 and 1978, had been in charge of the regulation of the Bell System during that period, agreed with these assessments. Thus, Walter Hinchman, who was chief of the Common Carrier Bureau from 1974 to 1978, said that "I didn't feel that ... we were at all effective in ... controlling competitive practices or creating an environment for really full and fair competition" (Tr. 10469–70), and that, for a variety of reasons, there was a special regulatory void with respect to the Operating Companies (Tr. 10475).[15] Bernard Strassburg, chief of the Bureau from 1963 to 1973, concurred, testifying that the Commission had a limited budget; that it had to rely to a large extent upon the Bell System to supply it with technical information; and that its expertise to go behind the Bell System's representations was also extremely limited (Tr. 17312).

Based upon this and other evidence, the Court concluded following the close of the Department's case, and in accordance with the arguments presented by the Department,[16] that "the Commission is not and never has been capable of effective enforcement of the laws governing AT & T's behavior," and that accordingly AT & T had been able to violate the antitrust laws in a number of ways over a long period of time with respect to interexchange services[17] and the procurement of equipment. *AT & T,* 552 F.Supp. at 168, 170, and nn.

13. According to the witness, the FCC "has undertaken a massive investigation ... and it has attempted to establish and implement standards that would enable it to judge and to regulate on this basis [but] after about twenty years of trying the FCC has now for all intents and purposes, in my judgment, given up on the task" (Tr. 9353). Professor Melody explained in some detail why the relatively small FCC staff was unable to penetrate to the end and in the necessary depth the voluminous and complex Bell System studies, supporting programs, computer programs, and raw data.

14. Other witnesses, and voluminous documentary material, supported these conclusions.

15. In the witness' opinion, telecommunications regulation is inherently ineffective because "many different services, or ... variations on a type of service ... can be satisfied by the same

facilities which ... leads to a very high degree of what are termed common costs of operation, and one of the major problems in regulation is determining how to properly distribute and attribute those common costs to various services" (Tr. 10489).

16. Department of Justice Memorandum dated August 16, 1981, at 46–47, 125 n. *, 161–62, 281–82, 285, and 374.

17. For technical reasons, what is popularly known as long distance service is referred to in the decree and will be referred to herein as interexchange service. Interexchange service does not include long distance calling that takes place within a LATA. For an explanation of that term, *see* pp. 540–41, *infra.*

154, 155; *United States v. Am. Tel. & Tel. Co.*, 524 F.Supp. 1336, 1348–57, 1364–7575 (D.D.C.1981).[18]

It was in the context of the inadequacy of regulation to curb anticompetitive practices that Attorney General William Saxbe authorized, and the Department of Justice filed, the instant antitrust action against the Bell System on November 20, 1974. In the wake of a four-year period of relative inactivity due in substantial part to stays on discovery issued pending the resolution of jurisdictional questions, discovery and other pretrial activity were carried on on an intensive basis beginning in 1979, *United States v. Am. Tel. & Tel. Co.*, 461 F.Supp. 1314, 1337–49 (D.D.C.1978), and the case went to trial on January 15, 1981. After eleven months of trial,[19] at a time when that trial was within approximately three weeks from completion, the parties submitted to the Court for its approval[20] under the Tunney Act (*see* note 8, *supra*) a proposed consent decree.

Following extensive proceedings under that Act, with the active participation of intervenors similar in number and interests to those who are participating in the current proceeding, the Court approved the decree, provided some modifications were made. *AT & T*, 552 F.Supp. 131. One of these modifications, that was accepted by the parties and hence incorporated in the decree, was what is now section VIII(C) of the decree[21]—a provision that is central to the current proceeding.

## II

### *Standard for Removal of the Restrictions*

#### A. *Language of Section VIII(C)*

Section VIII(C) of the decree provides that

> The restrictions imposed upon the separated BOCs by virtue of section II(D) shall be removed upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter.

This provision established the standard to be applied in proceedings such as this for removal of the line of business restrictions imposed by the decree on the Regional Companies.[22]

These line of business restrictions, embodied in section II(D) of the decree, were the necessary counterpart to the divestiture itself. That divestiture removed from AT & T its local Operating Companies, the monopoly bottlenecks which had been the means used by the Bell System as a whole to discriminate against its competitors in the other markets in which it was operating (long distance, manufacturing of telecommunications equipment, information services). In turn, the inheritors of the local monopolies—the Regional Companies—were prohibited from entering the competitive markets which had been, and could be expected to be again, the beneficiaries

---

**18.** The Court noted that the burden was accordingly on the Bell System to refute the factual showings made in the government's case-in-chief. *AT & T*, 524 F.Supp. at 1381.

**19.** Approximately 350 witnesses testified, and tens of thousands of documents were admitted into evidence. The trial record contains over 24,000 transcript pages.

**20.** *See* 15 U.S.C. § 16(e).

**21.** *See AT & T*, 552 F.Supp. at 195.

**22.** While the Court recognized that the usual test applied in proceedings to modify a consent decree is whether changed conditions existed that were "unforeseen" at the time of entry of the decree and that rendered the modification appropriate, *see AT & T*, 552 F.Supp. at 195 n. 266 (relying on *United States v. Swift*, 286 U.S. 106,

119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932)), it noted that the parties in this case had agreed that a restriction could be removed "over the opposition of a party to the decree when the Court finds that 'the rationale for [the restriction] is outmoded by technical developments.'" 552 F.Supp. at 195. The Court concluded that "there appears to be no reason why the decree itself cannot contain provisions governing the expiration of some of its restrictions." *Id.* at 196 n. 266. *See also United States v. Western Electric Co.*, 797 F.2d 1082 (D.C.Cir.1986), *cert. denied*, ⸺ U.S. ⸺, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). If the *Swift* standard were to be applied, it would impose an even heavier burden on those who, such as the Regional Companies, seek the removal of the restrictions, than is the case under section VIII(C) of the decree.

of anticompetitive activities by those in control of those monopolies.[23]

In its Opinion explaining the decree,[24] the Court stated that proceedings addressing the continuing viability of the line of business restrictions

> should be governed by the same standard which the Court has applied in determining whether [the restrictions] are required in the first instance. Thus, a restriction will be removed upon a showing that there is no substantial possibility that an Operating Company could use its monopoly power to impede competition in the relevant market.

*AT & T*, 552 F.Supp. at 195 (footnote omitted).

The rationale for a particular restriction may cease to provide a sufficient basis for continued application of that restriction, if, as the Court stated in 1982, the Regional Companies lost their "ability to leverage their monopoly power into the competitive markets from which they must now be barred." *Id.* at 194. It was anticipated that this would occur when technological developments eliminated the Regional Companies' local exchange monopolies or when substantial changes occurred in the structures of the competitive markets. The Court observed that, upon the happening of such events, the need for the restrictions might be fundamentally undermined. *Id.* Accord, 592 F.Supp. at 858–59, 868; 627 F.Supp. 1090, 1098 n. 26 (D.D.C.1986).

■ It is important, however, to note precisely what it is that section VIII(C) mandates. That provision places a direct burden upon those who request a removal of a line of business restrictions, for it mandates that any such petitioner *must make a showing*[25] that there is *no substantial possibility* that it *could* use its monopoly power to *impede* competition in the market it seeks to enter. As the underlined language indicates, a Regional Company will not be relieved of a restriction if it makes no showing at all,[26] or if it merely

---

23. *See United States v. Western Electric Co.*, 592 F.Supp. 846, 860 n. 51 (D.D.C.1984); oral argument of James P. Denvir on behalf of the Department of Justice ("In a very real sense, the restrictions are simply the opposite side of the divestiture coin, they are an integral part of the divestiture and proceed on precisely the same theory that divestiture proceeds on") (Tr. 25179).

24. Varying views have been expressed by the parties and intervenors concerning the meaning of section VIII(C). To the extent that the language of that provision requires explanation through its history and purposes as well as the circumstances surrounding its inclusion in the decree, the Court is in a more advantageous position to provide such explanations than is usually true in consent decree situations, for several reasons.

First, unlike in the typical consent decree case, this decree was filed after almost all the substantive evidence of alleged antitrust violations had been presented to the Court, rather than in lieu of the taking of evidence. *Compare* 15 U.S.C. § 16(b)(2). Second, unlike in the typical consent decree case, the Court conducted an extensive Tunney Act proceeding in the course of which it heard both on principle and on language from many sources, including the Department of Justice, AT & T, and the chief executives of several of the soon-to-be-established Regional Companies. Third, unlike in the typical consent decree case, where the Court simply ratifies language agreed upon by the parties, the Court here was the author of section VIII(C), the very provision at issue in the present proceeding. Fourth, the Court provided in 1982 an extensive contemporaneous explanation of the decree (*AT & T, supra,* 552 F.Supp. at 131), which no one has questioned as an authoritative interpretation.

25. Anyone attempting to overturn one of the restrictions properly bears a particularly heavy burden because of the strong interest of litigants and the public in the finality of judgments. Many enterprises appear to have made crucial business decisions and invested millions and even billions of dollars in reliance on the ground rules established *inter alia* by the line of business restrictions. *See* Response of United Telecommunications, Inc., at 10, which claims to have invested nearly $2 billion "in reliance on the commitment that the BOCs would not be allowed into the interexchange market so long as they could impede competition." This kind of not unreasonable reliance in light of the language of the decree is a factor supporting the proposition that the restrictions should not be lightly overturned.

26. Thus, the Regional Companies are in error when they approach the issue—as several of them do, *see* pp. 534–35, *infra*—as if if the Court had the obligation to engage in a fresh balancing of considerations in the same manner as would be done in a new antitrust action, or even further from the truth, as if the particular restriction had to be affirmatively justified in this proceeding. The restrictions have already

demonstrates (1) that there is *no certainty* of anticompetitive conduct, (2) that there is no substantial possibility that it *would*[27] use its monopoly power to act anticompetitively, or (3) that its use of monopoly power will not entirely *eliminate* competition in the market it seeks to enter.[28]

Some of the Regional Companies are advocating a variety of other tests, none of them having any basis either in the decree or in the Supreme Court's *Swift* decision which would apply absent the specific decree provision. Thus, among other arguments made to avoid the section VIII(C) standard are the contentions of Ameritech[29] and Pacific Telesis[30] that the market entry restrictions imposed in the decree were an inappropriate way to address possible abuses of monopoly power; those of NYNEX that section II(D)(3) of the decree "never had a true basis in antitrust theory," that the decree's treatment of information services as analogous to interexchange services was not "apt," and that the trial

record is not an appropriate basis for judging the Department's recommendations;[31] and that of Pacific Telesis that the Court had improperly "made no factual findings of regulatory commission impotence or insufficiency."[32]

■ BellSouth, for its part, makes the curious observation that since the actual parties to the decree have agreed to the elimination of the information services restriction,[33] the Court should implement that agreement "without delay," presumably without regard to the section VIII(C) requirements;[34] and U S West, after assuming a (non-existent) commitment by the Court to a *de novo* consideration of the subject at this time, neatly reverses the burden under section VIII(C), claiming that "a strong argument can be made" that the restrictions are to be relaxed unless the evidence "affirmatively shows" a substantial danger of anticompetitive effects. Comments at 25.[35] Like some of the oth-

been found to be legitimate under Sherman Act antitrust principles and as being in the public interest under the Tunney Act. On this basis, they were embodied in a judgment the validity of which was twice affirmed by the Supreme Court. *See United States v. Am. Tel. & Tel. Co.,* 552 F.Supp. 131, 195 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); *United States v. Western Electric Co.,* 569 F.Supp. 1057 (D.D.C.1983), *aff'd sub nom. California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). Clearly, then, the restrictions may be removed only upon an affirmative showing in conformity with section VIII(C) of the decree that they are no longer justified.

27. Thus, a claim or a hypothesis that a Regional Company may not wish to act anticompetitively is not enough; there must be a showing that it would lack the ability to use its monopoly power anticompetitively.

28. *See also United States v. United Shoe Machinery Co.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968).

29. Ameritech Response at 36.

30. Pacific Telesis Response at 35.

31. NYNEX Response at 89, 31; Comments at 15.

32. Pacific Telesis Response at 42. *Compare AT & T,* 552 F.Supp. at 168.

33. Actually, AT & T has only suggested that the Court might pursue either of two routes with respect to the information services restriction. It recommended, first, that the Court postpone any decision regarding this restriction, and entertain requests for waivers or modifications if and when sufficient FCC regulations were in effect. Alternatively, it has suggested that the Court modify the restriction to allow a Regional Company to offer information services within its region, and that it retain jurisdiction to reimpose the restriction if ONA, CEI or cost allocation plans (*see* Part VI, *infra* ) do not prove to be adequate safeguards. AT & T Response at 59–60.

34. Response to Comments at 2. *Compare United States v. American Cyanamid Co., supra,* 719 F.2d at 565. Elsewhere, BellSouth acknowledges that section VIII(C) governs. Response to Comments at 4–7. Indeed, the law is that "the parties [can] not become the conscience of the equity court and decide for all what [is] equitable and what [is] not, because the court [is] not acting to enforce a promise but to enforce a statute," *System Federation v. Wright,* 364 U.S. 642, 652–53, 81 S.Ct. 368, 374, 5 L.Ed.2d 349 (1961), a rule particularly applicable where the decree contains a specific standard for modification or removal of its provisions.

35. Similarly, BellSouth asserts that the Department of Justice does not bear the burden of proof when it seeks to have a restriction eliminated, Response to Comments at 9–10, notwithstanding the decree language that the petitioner

ers, U S West also insists upon treating the current proceeding as if it were a new antitrust action in which no judgment had ever been entered.[36]

█ In view of the fact that what is before the Court is not a new antitrust suit in which the plaintiff would have the burden of proof, but requests for changes in a decree that became final several years ago, these contentions can only be characterized as frivolous. It is plain that collateral attacks on such a decree are inconsistent with the law of the case rule,[37] and equally plain that section VIII(C) does not require full-fledging proof of a new "antitrust injury," but that it speaks only of a "substantial possibility" that a Regional Company "could" impede competition.

More fundamentally, there is not the slighest indication in the record surrounding the negotiation or the approval of the consent decree that, absent the most substantial alteration of market conditions, a judgment that was to end over thirty years of strife in the telecommunications industry and to establish new conditions to govern that industry thereafter, was to be dissolved with respect to one of its two critical elements immediately or almost immediately after entry.[38]

The Department of Justice goes to some lengths to refute AT & T's point that it agreed to the decree so as to prevent litigation and other controversies regarding the leveraging of the monopoly power, and that the Court should not unnecessarily cause the revival of such controversies.[39] In one sense, the Department is entirely correct. Restrictions may not be maintained solely or at all to avoid controversy.

However, the Court cannot help but reflect that one significant reason for the Bell System's agreement to enter into the consent decree was its weariness with constant controversy in the courts, the Congress, before the FCC, and before local regulators, and its willingness to trade those controversies about monopoly bottlenecks for an ability to compete in the interexchange and manufacturing markets without being burdened with the very kind of competition from monopolists that it was just abandoning. *See, e.g.,* AT & T Comments at 7–8; Coll, *The Deal of the Century,* at 300–02. The Bell System could not know, and surely did not expect, that the word of the United States Department of Justice would be good only for as long as

"must make a showing" because, it is claimed, the provision applies only to "the petitioning BOC," not the Department. Even the Department of Justice does not make such a claim. In any event, if the language relied on by Bell-South does not apply to the Department of Justice, that Department may petition for a change in the decree only under the more rigid *Swift* standard.

36. US West Reply Memorandum at 1–17.

37. *DeTenorio v. Lightsey,* 589 F.2d 911 (5th Cir. 1979); *see* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 788 (1981). As MCI aptly observes (Reply at 5): The fundamental unfairness of the Department's and Regional Companies' efforts to relitigate principles already finally resolved in this case might be more apparent if AT & T or MCI responded with a list of all those rulings they found disappointing and wished to relitigate at this time as well. MCI, at least, would be pleased to ask the Court's reconsideration of a range of rulings beginning with the size of the LATAs (*see United States v. Western Electric Co.,* 569 F.Supp. 990, 1003–1008 (D.D

C.1983)), and ending with NYNEX's acquisition of a conditional interest in Tel–Optik (*see United States v. Western Electric Co.,* Civil Action No. 82–0192 (D.D.C. Aug. 2, 1986)) [Available on WESTLAW, DCT database]. But even when limited to issues that have not previously been resolved, this proceeding is sufficiently complex.

38. Claims to the contrary—that the restrictions were justified or intended to apply only immediately after divestiture, *see, e.g.,* Southwestern Bell Comments at 2; FCC Comments at 4—are so devoid of legal and factual support that, were it not for the fact that there appears to be no practical way to sort out a few statements out of many, and the further fact that several assertions by others are likewise close to or below the acceptable line, sanctions under Rule 11, Fed.R.Civ.P., would have been imposed. *See also Western Electric Co.,* 569 F.Supp. at 1090 n. 139, where the Court referred to the successful invocation of section VIII(C) as "an event, if ever" it should come to pass.

39. Department of Justice Response at 20–23.

the individuals then in authority remained in their positions.[40]

### B. *Application of Section VIII(C) Language to the Bottleneck Issue*

Section VIII(C), in effect, mandates a two-part analysis for the determination whether a particular line of business restriction should be removed. The first question must necessarily be whether the Regional Companies have retained monopoly control of an "essential facility," the local switches and circuits. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, *rehearing denied,* 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973); *United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *see also Hecht v. Pro–Football, Inc.,* 570 F.2d 982 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). It was their control of these switches and circuits that gave the Bell System its power over the competition. That control enabled the System to foreclose or impede interconnection to its network of the lines of its long distance competitors[41] and of the equipment produced by its manufacturing rivals. It also made possible the subsidization of one activity with the profits achieved in another. *See generally, AT & T,* 552 F.Supp. at 160–63 and 163 n. 137. As long as the Regional Companies retain these same bottlenecks, the potential for the same or similar anticompetitive conduct is plainly still present.

█ Assuming such continued control, the second question is whether there is a substantial possibility that these companies have the incentive and the ability to use this monopoly power to impede competition in the particular line of business they now seek to enter.[42]

The answer to the first question will not vary with the particular line of business restriction at issue, but may be answered as a threshold matter applicable to all of the restrictions. The answer to the second question may depend to some extent upon the particular restriction under examination, however, and the various restrictions will accordingly be examined in Parts III, IV, and V, *infra,* in the context of the prohibitions that are sought to be removed by the motions. However, as will be seen below, in practical terms the two tests are not likely to differ much. For unless special circumstances are present,[43] as long as a Regional Company maintains monopoly power in an exchange area, it is generally more likely than not that it "could" use that power anticompetitively.

### C. *Bottleneck Control*

In this section of the Opinion, the Court considers the first question; *i.e.,* whether the Regional Companies have retained control of the local bottlenecks, and it answers

---

40. It is of course hardly unprecedented for a new Administration with a new political or philosophical outlook to substitute regulations reflecting that outlook for others previously issued. *Cf. NAACP v. FCC,* 682 F.2d 993 (D.C.Cir. 1982). It is unusual, however, for personnel in the same Administration abruptly to adopt a stance completely at odds with what it had consistently been urging theretofore, and to do so not merely with respect to its own responsibilities—Executive rules or regulations—but regarding a final judicial decree. *See also* notes 25, *supra,* and 108, *infra.*

41. Without such interconnection, the long distance carriers were unable to reach their ultimate customers, the individual possessors of telephones in the homes, offices, and factories of this nation.

42. The Department of Justice is therefore right when it contends that such commenters as AT & T, MCI, Tandy, OPASTCO, and United Telecom are in error when they argue that the restrictions are justified by the mere fact that a monopoly exists in an area. Response at 14–20. Notwithstanding that the Department's reason for this insight is flawed—the Department ascribes it to the Court's rejection of a "quarantine" theory, a term the Court did not use and that does not correctly describe the Court's actions or reasoning with respect to the transfer to the Regional Companies of the ability to market the Yellow Pages and CPE, *see* 552 F.Supp. at 191–94—it is true that, in theory, the mere maintenance by a Regional Company of a monopoly in the local exchange service does not support a restriction: there must also be the ability to use the bottleneck power anticompetitively.

43. *E.g.,* effective regulation.

that question unequivocally in the affirmative.[44]

■ First. Most of the Regional Companies contend that they do not retain their monopoly power over the local bottlenecks. For example, U S West argues that it lacks bottleneck monopoly power because there now exists substantial consumer bypass.[45] Ameritech goes to some lengths to attempt to demonstrate that competition has reduced the Regional Companies' market power: it points to the existence of competitive alternatives for the switching and privatization of telecommunications systems, end user purchase of switches, and a diminished pool of monopoly revenues for subsidizing competitive products and services.[46] Ameritech Comments at 12–14; *see also* Bell Atlantic Comments at 12–14; Bell-South Comments at 37–38; and U S West Comments at 40–41.[47]

There is no basis for any of these claims, and no serious effort is made to undermine

Dr. Huber's findings to the contrary. Almost all the parties and intervenors other than the Regional Companies themselves acknowledge the continued existence of Regional Company monopoly power.[48] The Department of Justice, for example, does not urge removal of the restrictions on the ground that the local exchange has lost its bottleneck characteristics; to the contrary, it concedes that the exchange services continue to be monopolies, and that the Regional Companies continue to retain their monopoly power over "the local exchange bottleneck." [49] As explained *infra*, these assessments are correct; the Regional Companies do retain that power over the local bottlenecks, and there is little "bypass" of their switches and circuits.

The exchange monopoly of the Regional Companies has continued because it is a natural monopoly.[50] Local exchange com-

---

**44.** In making this and other determinations, the Court has fully considered the legal and factual submissions of the parties and intervenors. On the facts, it necessarily relied to a considerable extent upon Dr. Huber's excellent and thorough study, *The Geodesic Network: 1987 Report on Competition in the Telephone Industry,* although it did not agree with all of his conclusions. However, other expert opinions have also been considered, the weight being given to them obviously depending upon such factors as the specific knowledge of the particular individual and the detailed or conclusory character of the affidavits and other papers, as the case may be.

Consideration of the affidavits and other materials revealed differences in emphasis and even differences in ultimate opinions, but on most issues critical to the Court's decisions there is a surprising amount of agreement on the actual facts, as distinguished from argument or conclusions drawn from the facts.

No party or intervenor has suggested that a formal evidentiary hearing be held—quite the contrary, *see, e.g.,* US West Reply Memorandum at 6 n. 3—and in this proceeding, which in a sense is a continuation of the Tunney Act proceeding, and which involves some 175 different parties and intervenors, with a wide variety of interests for possible examination and cross-examination purposes, that would in any event have been both inappropriate and impractical.

**45.** Memorandum of April 27, 1987 at 139–43. Bypass is deemed to exist when a telephone customer is able to reach those with whom he wishes to communicate without the use of the facilities of a Regional Company or its equivalent in the territories serviced by independents. All of these local facilities, both those of the

Regional Companies and those of the independents, are encompassed in the general term "local exchange carrier," or LEC.

**46.** As shown in Part VII–A–2, *infra,* statistics indicate that the Regional Companies have probably subsidized their competitive ventures with monopoly revenues even in the three years since divestiture, and even though their entry into competitive businesses has thus far been necessarily relatively small.

**47.** U S West's report on bypass (Appendix Tab 31) is forced to recognize, however, that those whom it regards as bypassing the Regional Companies are using those companies as the "pipe through which data or voice is transmitted" (p. 5), and that even the traffic of a customer who has aggregated his traffic and uses PBX switching systems is carried over "relatively few" Regional Company access lines (p. 68). *See also* pp. 538–39, *infra.*

**48.** Even some of the Regional Companies do on occasion concede the existence of such power. Ameritech Response at 10–11; Pacific Telesis Further Comments at 15–16, 29; Southwestern Bell Response at 9.

**49.** Department of Justice Response at 15; *see also* letter dated October 2, 1986, from then Assistant Attorney General Douglas H. Ginsburg to Representative John D. Dingell, Chairman, House Committee on Energy and Commerce, at 12.

**50.** *See* Hearing before the Senate Committee on Science and Transportation, 97th Cong., 2d Sess.

petition has failed to develop, not so much because state and local regulators prohibit entry into the market by would-be competitors of the Regional Companies, but because of the economic and technological infeasibility of alternative local distribution technologies.[51] The evidence introduced at the trial of this case clearly demonstrated that duplication of the ubiquitous local exchange networks would require an enormous and prohibitive capital investment, and no one seriously questions that this is still true.

Exchange telecommunications is characterized by very substantial economies of scale and scope: as a general matter, the larger a Regional Company's traffic volume, the lower its unit costs. A Regional Company could easily aggregate the one percent of total calls that represent potentially competitive special access traffic with all of its ninety-nine percent monopoly traffic and achieve lower unit costs than could any bypass system.[52] In other words, objective economic conditions entirely preclude the provision of local distribution functions at a lower or equal economic cost than could the established local exchange carrier. *AT & T*, 524 F.Supp. at 1352–53; Department of Justice Memorandum filed August 16, 1981, at 39, 76.[53]

There is likewise no indication that the Regional Companies' natural monopolies have been eroded by technological changes.

Contrary to the assertions of several intervenors, the advent of the more widespread utilization of private branch exchanges (PBXs)[54] has not significantly, if at all, reduced the efficacy of the Regional Companies' bottlenecks. Some larger businesses have bought PBXs, allowing connection of their telephone lines to those PBXs rather than directly to a local switch controlled by a Regional Company. Huber Report at 2.7. But PBXs, useful as they are for intra-business communications, are not alternatives to the local switches and wires controlled by the Regional Companies. When customers with PBXs place either local or long distance calls to other locations, whether or not a PBX is also available there, the calls must still be carried over Regional Company local loop facilities and switched at one of the Regional Company central offices.

On this basis, if state entry restrictions were lifted today, a "residual core of local exchange service" would remain a natural monopoly. Department of Justice Report at 97–98.[55] However, as will be seen below, the "residual core" of which the Department speaks is almost the entire nation and almost all the local loops and other short haul transmission pathways that connect customers to Regional Companies' central offices and to interexchange carriers' points of presence. *See* AT & T Comments at 46.[56]

59 (statement of Assistant Attorney General William Baxter).

51. Thus, as discussed *infra*, the many arguments predicated upon alleged present or future repeal of state entry prohibitions, *see, e.g.*, Department of Justice Response at 9, 28, 48, are off the mark.

52. Huber Report at 2.20; *see also* Comments of Public Utilities Commission of the District of Columbia at 18–19.

53. Bypass is also unpalatable for many enterprises even if they could achieve it, because in bypassing the Regional Company bottleneck by connection of their equipment directly to an interexchange carrier, they would merely be exchanging one form of captivity for another.

54. PBXs perform switching and processing functions, forming part of an expanded net-

work. Department of Justice Report at 42. PBXs were of course used long before divestiture, although the scale of such use has been increasing, as indeed it had prior to divestiture.

55. Based upon the Huber Report, the Department acknowledges that "[m]ost interexchange traffic still uses local exchange carrier (LEC) facilities, and virtually all customers continue to rely on some LEC facilities in connection with interexchange services." Response at 29. For an explanation of the term "LEC," *see* note 45, *supra*. The Regional Companies themselves still control eighty-one percent of the nation's local access lines. Huber Report at Table G.4.

56. As AT & T correctly points out, the natural monopoly character of the provision of special access lines is proved by the fact that not a single Regional Company has even attempted to provide alternatives to local access services in the territory of another Regional Company. Response to Comments at 29.

Some of the Regional Companies, while conceding that residential and small business users cannot do without the Regional Company monopoly bottlenecks, assert that this is not true with respect to the large users.[57] As the Huber Report conclusively demonstrates, however, that is just not so. The Report notes that even very large private network customers still employ far more switched (*i.e.*, Regional Company) access lines than dedicated (*i.e.*, private) access lines. Huber Report at 3.44–3.46. As the Report further found:

> Users' requirements for a bundle of local and interexchange services can make any discrete focus on alternative high capacity systems misleading. *Control over a single, essential piece of network, even a seemingly small and comparatively inexpensive one ... may give LEC's [i.e., Regional Companies] 'account control,'* that is a guaranteed foot in the door with large customers, a window on their business, and the power to insist on

dealing directly with them (emphasis added.)

Huber Report at 3.45. And Dr. Huber further concluded that fully forty to fifty percent of large business customers' payments for private networks are attributable to access provided by Regional Companies. Report at 3.46–3.49, Figure IX.30, Table IX.31.

To be sure, the Department of Justice and Dr. Huber refer at some length to technological developments,[58] particularly the emergence of a geodesic network.[59] However, they both acknowledge—as they must—that the geodesic network does not now exist, and that all these developments will, if ever,[60] impact the Regional Companies bottleneck control only in the future.[61] Department of Justice Report at 42–43; Huber Report at 2.23, 2.25–26.[62] Indeed, the Department relies on Huber's conclusion on the dispersal of electronic intelligence only for the proposition that it would

---

**57.** *See, e.g.*, BellSouth Comments at 37–38; Bell Atlantic Comments at 10–13.

**58.** The broadening consumption of electronic equipment, for example, does not reduce the need for Regional Company transmission services; it may actually increase it. *See* Comments of Independent Data Communications Manufacturers Association, at 18–19.

**59.** These technological developments form the basis for Dr. Huber's conclusion that the exchange network is being transformed from a "pyramid" to a "geodesic" network. Huber Report at 1.2, 1.6. According to Dr. Huber, in a pyramid network, there are relatively few switches that are arranged in a vertical hierarchy. This vertical switching network was predicated on the allegedly earlier economic reality that switching was very expensive relative to transmission, and the local Operating Companies had a bottleneck monopoly over entry into the network because they controlled the gateway switches. In a geodesic network, according to Dr. Huber, the number of switches and connections between them are much greater, and consequently the processing and control functions are decentralized. Dr. Huber accordingly concluded that transformation to geodesic networks will be due to the decrease in costs of switching and processing brought about by technological innovation. Huber Report at 1.2–1.6. A geodesic network erodes bottleneck control, he contends, because, in contrast to the pyramid which could support only a single integrated provider of telecommunications services, it can

support many interconnected, vertically integrated providers. *Id.* at 1.6–1.7, 1.30.

**60.** AT & T challenges the very premise of Dr. Huber's geodesic network theory, claiming that it rests on a misunderstanding of principles of engineering and network design so basic that they were stipulated to by the parties to the *AT & T* case. AT & T Comments at 50–51 n. *. Since it is clear, as stated *infra*, that, whatever may be its future, the geodesic network does not exist *now*, it is not necessary to resolve that dispute.

**61.** It is thus ingenuous to speak of the geodesic network as if it existed at the present time. *See, e.g.*, Response of NYNEX at 14 ("Thus, as Dr. Huber notes, 'the geodesic network *is* structurally competitive'" (emphasis added)). No such statement can be found at the page cited.

**62.** An analysis conducted by experts in telecommunications economics and regulation for Economics and Technology, Inc., and submitted to the Court by the Ad Hoc Telecommunications Users Committee and the International Communications Association, likewise concludes that "the geodesic model that Dr. Huber has envisioned does not now characterize the U.S. telecommunications system, nor will it do so in the foreseeable future." Analysis at 11. The study also reports that virtually all the available information indicates that business tones are not more likely to be generated by PBXs than by Regional Company central office switches. Analysis at 36–40.

be difficult for the Regional Companies to maintain a monopoly over local switching and transmission "in the long run." Report at 42–43. However, the proper inquiry under the test mandated by section VIII(C) is whether the Regional Companies control bottlenecks now, not whether they will still do so "in the long run." [63]

The complete lack of merit of arguments that economic, technological, or legal changes have substantially eroded or impaired the Regional Company bottleneck monopoly power is demonstrated by the fact that *only one-tenth of one percent of inter–LATA traffic volume, generated by one customer out of one million, is carried through non-Regional Company facilities* to reach an interexchange carrier.[64] Huber Report at 3.9, Table IX.5.[65] To put it another way, 99.9 percent of all interexchange traffic, generated by 99.9999 percent of the nation's telephone customers, is today carried entirely or in some part by the Regional Companies (or their equivalents in the territories served by the independents).[66] *The Department of Justice found only twenty-four customers in the entire United States who managed to deliver their interexchange traffic directly to their interexchange carriers, bypassing the Regional Companies.* Department of Justice Report at 80–81.[67] It is clear, therefore, and the Court finds, that no substantial competition exists at the present time in the local exchange service,[68] and that the Regional Companies have retained control of the local bottlenecks.

### III

### *Interexchange Services*

#### A. *Introduction*

■ Section II(D)(1) of the decree prohibits the Regional Companies from providing "interexchange telecommunications services." *AT & T,* 552 F.Supp. at 227.[69] "Inter-

---

63. At the time of the next triennial review the Court will, of course, consider whether the Huber predictions regarding a geodesic network have, in fact, been fulfilled.

64. More precisely, these figures include all LEC facilities, that is, both the local exchanges controlled by the Regional Companies and those under the control of independent telephone companies. *See* note 45, *supra.*

65. Elsewhere, Dr. Huber indicates that the local exchange carriers hold a 96.6 to 99.8 percent share of the access market. Report at 1.20, Table G.15. The continuing market power of the Regional Companies in the exchange market is evidenced by increases in LEC private line rates and by the willingness of the Regional Companies to price discriminate in tariffing their private line service (*e.g.,* by charging more to connect an end user to an interexchange carrier than to connect two end users). Huber Report at 2.9, 2.19–2.22.

66. Thus, Regional Company contentions to the effect that they "have no bottleneck control" over large customers whose local networks "are now springing up," Bell Atlantic Comments at 13, or that division of the national market among seven entities leaves each without power to impede competition, Ameritech Comments at 8–9, are wholly at odds with the facts.

67. Similarly, Dr. Huber estimates that facilities bypass accounts for only 250 *million* minutes of use per year as compared to 170 *billion* minutes

of use carried by the Regional Companies. Huber Report at 3.8–3.9 (Table IX.4). *See also* the Bypass Report of the National Telecommunications and Information Administration of the U.S. Department of Commerce (NTIA) at 23, which notes that the Regional Companies "have thus far not experienced significant revenue losses" due to competition from bypass providers. According to an analysis performed by Economics and Technology, Inc., only about 1,000 non-LEC circuits are used to connect customers to interexchange carriers versus more than 100 million LEC-provided circuits. Comments of International Communications Association at 8.

68. The lack of any but the most minuscule bypass may also have a bearing upon the FCC's effort, partially crowned with success, to impose access charges upon the ratepaying public. These efforts have been represented as a necessary measure to halt the menace of growing bypass and the resulting abandonment by large users of the regular network, and hence as a necessary defense against a threat to the financial health of the entities managing that network. FCC Memo Opinion and Order in 78–72, August 22, 1983 at 6. The Huber Report demonstrates that the premise for this activity has been largely imaginary. *See Western Electric Co.,* 569 F.Supp. at 1091 n. 147, where the Court noted in 1983 that "[t]here is no reason to believe that bypass on a large scale is imminent."

69. Interexchange services include both facilities-based services and the resale of the services of

exchange telecommunications" is defined as "telecommunications between a point or points located in one exchange telecommunications area and a point or points located in one or more other exchange areas or a point outside an exchange area." *AT & T,* 552 F.Supp. at 229. "Exchange areas," for purposes of the decree, are the Local Access Transport Areas (LATAs), established by the individual Regional Companies with the approval of the Court, *AT & T,* 552 F.Supp. at 229, each of the LATAs encompassing "one or more contiguous local exchange areas serving common social, economic, or other purposes." *Id.* Loosely speaking, interexchange service may be equated with long distance service (although some long distance service occurs within a LATA and is therefore not interexchange service within the meaning of the decree).

The factual predicate for the interexchange restriction was the large volume of evidence presented at the trial demonstrating that (1) the local exchange facilities operated for the Bell System by its twenty-two Operating Companies were essential for any firm that desired to provide long distance service, because without interconnection with the Operating Companies' switches and circuits it had no means of reaching the ultimate customer, the local possessor of a telephone instrument, and (2) the Bell System, through the Operating Companies, had consistently sought, often successfully, to exclude competition in the provision of long distance service by restricting interconnection to these local facilities. *AT & T,* 552 F.Supp. at 161–62; *AT & T,* 524 F.Supp. at 1353–57.

More specifically, the evidence indicated that the Bell System's refusal to provide local interconnection to its long distance competitors, such as MCI, on fair and non-discriminatory terms and conditions, and its manipulation of the exchange access and of the tariff system,[70] precluded meaningful competition in the provision of long distance services. *AT & T,* 552 F.Supp. at 160–63; *AT & T,* 524 F.Supp. at 1358. To put it more directly, the Bell System managed for several decades by a variety of means to stave off significant competition in the long distance market, and to that effort the local Operating Companies and the monopolies they represented were the key component. All of this was done to protect the Bell System's own long distance component—the Long Lines—from outside competition.

In determining what remedy would most effectively protect in the future against similar anticompetitive abuses, both the parties and the Court carefully considered and rejected the alternative of improved FCC regulation. As explained elsewhere herein, federal and state regulation had simply not been capable of preventing the antitrust problems that the decree was to resolve. The Department of Justice argued, and introduced extensive evidence to prove, that the local exchanges are so complex, so technologically dynamic, and characterized by such vast joint and common costs that no set of regulations could realistically prevent competitive abuses. It also appeared that when the FCC did act, its efforts were largely unsuccessful.

For example, the trial record shows that, despite FCC orders to do so entered in 1971,[71] in 1973,[72] and in 1974,[73] the Operat-

---

others. They are not limited to transmission, but in certain contexts include related activities such as interexchange traffic routing, the selection of interexchange carriers through least-cost routing or shared tenant services systems, and the marketing of the services of interexchange carriers. *United States v. Western Electric Co.,* 627 F.Supp. 1090, 1099–1103 (D.D.C.), *aff'd in part and rev'd in part,* 797 F.2d 1082 (D.C.Cir. 1986).

**70.** Tariffs filed with the FCC became effective at once or within a brief period of time of their filing by the carrier, and they are deemed to

have, in effect, the force of law. So many telephone tariffs were and are being filed that the Commission frequently has no time or opportunity to review them in any detail, if at all. Even when they are reviewed and found wanting, the Commission can usually do no more than to suspend them for a brief period. Telephone companies can, and frequently do, file new tariffs just as quickly as old ones are questioned, and the result is that regulatory oversight is in practice often slight.

**71.** *Specialized Common Carriers Services,* 29 F.C.C.2d 870 (1971), *aff'd sub nom. Washington*

ing Companies failed and refused to provide its competitor MCI with the so-called FX and CCSA services that company needed to operate effectively in the long distance market, and that the interconnections necessary for MCI's provision of full-fledged long distance service were not provided until 1978, following the entry of orders of the Court of Appeals for this Circuit in the two *Execunet* cases. *See* note 12, *supra. See also AT & T,* 552 F.Supp. at 172 n. 172. There were also unending struggles regarding protective connecting arrangements,[74] the location of competitors' switching equipment, and other similar and dissimilar anticompetitive problems.

Accordingly, the parties agreed and the Court concluded, based upon the type of proof referred to above and in Part I, *supra,* and upon the more general and broader evidence of the ineffectiveness of regulation, Part VI, *infra,* that regulatory measures would not be effective in ensuring interexchange competition free of coercion by the carrier in control of the monopoly bottlenecks. A judicial, regulatory-type detailed injunction was likewise discarded as probably equally ineffective. *AT & T,* 552 F.Supp. at 167–68. That, then, left the long-discussed remedy of divestiture, and it was chosen by the parties and approved by the Court.

It was on this basis that the decree adopted two closely related remedies: AT

& T would continue to provide long distance service,[75] but it would be stripped of the Operating Companies with their local monopolies, the essential means for anticompetitive acts against other long distance providers. The Regional Companies [76]—the heirs to the local exchange service and hence to the monopoly bottlenecks —would, in turn, be prohibited from exercising the long distance function, thus depriving these companies of the incentive for manipulation or discrimination in the use of the local facilities and of the ability to manipulate or discriminate.[77]

In approving the interexchange restriction contained in section II(D)(1) the Court reasoned that, to have permitted the Regional Companies to provide interexchange services, would have "undermine[d] the very purpose of the proposed decree—to create a truly competitive environment in the telecommunications industry." *AT & T,* 552 F.Supp. at 188. The Court found that, were the Regional Companies allowed to be present in the interexchange market while they also maintained monopoly control of the local telephone markets, they would be able to pursue precisely the same course as had the Bell System: (1) to discriminate in a variety of ways against their non-monopoly competitors through judicious use of the local monopoly; and (2) to "subsidize their interexchange prices with profits earned from their monopoly services." *Id.*

*Utilities and Transportation Commission v. FCC,* 513 F.2d 1142 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

72. Letter from Bernard Strassburg, Chief, Common Carrier Bureau (dated October 19, 1973); *see also Bell System Tariff Offerings of Local Distribution Facilities for Other Common Carriers,* 44 F.C.C.2d 245 (1973).

73. *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers,* 46 F.C.C.2d 413, *aff'd sub nom. Bell Telephone Co. v. FCC,* 503 F.2d 1250 (3d Cir.1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975).

74. These were the devices which the Bell System insisted had to be affixed to any lines or equipment not made by Western Electric as a prerequisite to their attachment to the national telephone network.

75. Other issues, that is, those involving manufacturing and information services, are discussed in Parts IV and V, *infra.*

76. The seven Regional Holding Companies took over the twenty-two Operating Companies.

77. As the Court explained at the time:
 What is significant about these [discriminatory] events is that AT & T was able to adopt the policies described above in large part because of its control over the local exchange facilities. For example, it was because of its ownership and control of the Local Operating Companies—whose facilities were and are needed for interconnection purposes by AT & T's competitors—that AT & T was able to prevent these competitors from offering FX and CCSA services. Similarly, AT & T was able to deter competition by manipulating prices for access to the Operating Company networks (footnote omitted).
 *AT & T,* 552 F.Supp. at 162.

In order to facilitate the growth of a "truly competitive telecommunications industry," the Court therefore approved the proposed decree language prohibiting the Regional Companies from entering the interexchange services market[78] as an integral and vital part of the prophylactic remedy represented by the decree. It is that prohibition that is now again before the Court on the basis of requests for its removal.

### B. *Original Department of Justice Proposal*

In its Report submitted on February 2, 1987, the Department of Justice, in addition to recommending removal of the restriction on mobile interexchange services (*see* Subpart F, *infra*), advocated that the basic interexchange restriction embodied in section II(D)(1) of the decree be sharply cut back. Instead of being prohibited from engaging in interexchange services, each Regional Company would be authorized to render all such services, with the exception only of those interexchange calls that originated or terminated in an area in which the particular company had a legally protected monopoly. Department of Justice Report at 59, 68–76.[79] The Regional Companies by and large initially supported this approach, albeit with substantial modifications.

However, following its study of the comments its proposal had generated,[80] the Department reversed its field. Its subsequent submissions to the Court concluded both that the Regional Companies retained the ability to use their control of the monopoly bottlenecks to impair interexchange competition, and that the in-region out-of-region proposal itself presented insuperable practical difficulties. Accordingly, the Department withdrew that proposal. Response of the United States at 24–28. The Court agrees with both prongs of the Department's present position.

The bottleneck control issue is discussed at some length in Part II of this Opinion, and no purpose would be served by a detailed reiteration of that discussion here. Suffice it only to say once again that the monopoly bottlenecks continue to exist essentially in unchanged scope and form, and that they continue to provide the same basis for anticompetitive activity as they did prior to the Bell System break-up.[81] It is worthwhile, however, to describe briefly the basis for the Court's conclusion, paralleling that of the Department, that it is not practical to lift part of the interexchange restriction so as to permit each Regional Company to offer interexchange services outside but not inside its own region.

The plain and universally recognized fact is that the market for interexchange services is national. Because of that overriding fact, it is unlikely in the extreme that a Regional Company could compete successfully with other interexchange companies (or even exist in the interexchange market) if, unlike its competitors, it were able to offer service in only parts of the country.[82]

---

**78.** The Court also concluded that the Regional Companies would have substantial incentives to subvert the decree's equal access requirements because they would "stand to gain business if other carriers were disadvantaged by poor access arrangements and high tariffs." *AT & T,* 552 F.Supp. at 188.

**79.** The Department reasoned that the bottleneck monopoly power could not be effective if the company vested with that power operated only outside its own region, and it further concluded that any concern existing at the time of divestiture that the Regional Companies would operate as a unified group of local exchange monopolies "has proved unfounded." Report at 74. The Department also stated that the opportunities for cross-subsidization would be limited because the likely geographic separation of facilities and personnel would permit detection of any attempts at such cross-subsidization. Report at 76.

**80.** Of the seventy entities that addressed the Department of Justice proposal, only two supported it completely.

**81.** As National Telecommunications Network (NTN) correctly states, "[f]or example, if Pacific Telesis were permitted to compete with NTN to sell private lines in the eastern United States, it would have an incentive to give NTN inferior access to points in the Pacific Telesis region, and so damage NTN's reputation in the industry for service reliability and other considerations." Comments at 16.

**82.** Few, if any, individuals would subscribe to or use U S West, for example, if they could not use that company's long distance service for

The Regional Companies immediately grasped that flaw in the Department's proposal, and they sought at once to expand it so as to eliminate the conceptually vital in-region exclusion.[83] In short, they asked that the interexchange restriction be eliminated in its entirety—a solution that the Department had properly rejected even in its original submission.

Beyond that, it is clear that it would be technically difficult to determine what Regional Company facilities were being used to carry traffic to and from its in-region as distinguished from its out-of-region facilities, or what marketing, consulting, or administrative activities related only to the permitted out-of-region services. This uncertainty would greatly facilitate violations and evasions of the new standard, a development to be avoided if at all possible.

One inevitable consequence of the telecommunications environment created by the Department's six-region proposal would be to confront the Court with the never-ending task of deciding close, finely-tuned disputes between the Regional Companies and their competitors regarding questions such as those referred to above. The result would be that, instead of phasing out its oversight over a substantial part of the telecommunications industry, the Court would become even more deeply and intrusively involved in that task. None of the parties could welcome such a development. Nor does the Court.

For these reasons, to the extent that the original Department of Justice recommendation still survives in motions filed by others,[84] it must be and it is hereby rejected.

### C. Retention of the Restriction With Liberal Grant of Waivers

The Department now recommends that the interexchange restriction be retained, but that the Court hereafter entertain requests for waivers of that restriction as soon as state and local regulation is lifted with respect to a particular area or locality. Department of Justice Response at 9, 28, 48. That recommendation has even less merit than the Department's original proposal, for a number of reasons.

First. The recommendation proceeds on the basis of the erroneous assumption that repeal of local regulation will open the local exchange monopolies to competition. To be sure, as long as states and localities prohibit outsiders from competing with the local Operating Companies, the monopolies will continue to exist. But the reverse is not true. Even if all state and local regulation prohibiting competitive entry into the local exchange market were to be repealed tomorrow,[85] and anyone were free, as a matter of law, to sell local telephone service, the exchange monopolies would still exist substantially in the same form and to the same extent as they do now. The conditions that caused these monopolies to emerge in the first place—the need for connecting local consumers of telephone service to the telephone company central office switches by means of wires strung or buried in millions of places throughout America's cities and rural areas, and the enormous capital resources required for

---

calls originating or terminating anywhere in the vast area between Arizona and Minnesota. Both the International Communications Association and the Ad Hoc Telecommunications Users Committee have stated that their members would not be interested in purchasing network services that would reach only six of seven regions. ICA Comments at 10; Ad Hoc Telecommunications Users Comments at 73.

**83.** As Ameritech stated, the Department's proposal was "a hollow gesture unless the ... restriction is also lifted for ... private line networks." Ameritech Comments at 49. The Federal Communications Commission agreed. FCC Comments at 36.

**84.** Motions seeking the complete removal of the interexchange restriction include those filed by NYNEX Corporation, BellSouth, U S West, Inc., Southwestern Bell Corporation, and Pacific Telesis Group. Ameritech's and Bell Atlantic's motions request a more limited form of relief from the interexchange restriction, resembling somewhat the Department's original recommendation.

**85.** Several states have recently enacted laws prohibiting local exchange competition. Opposition of Electronic Industries Association and Telecommunications Technologies Group at 16–18.

this project—preclude any thought of a duplication of the local networks.

Only when a practical and economically-sound method is found for large-scale bypass or for connecting local consumers by a different method—as microwaves and satellites were ultimately found to be feasible for handling long distance traffic—can the Regional Companies' local monopoly be regarded as eroded. Accordingly, waivers of the restriction could not be granted based on an absence of state and local regulation unless these regulatory changes were accompanied by substantial changes in telecommunications technology, the economics of the provision of local telephone service, or both.

Second. As experience has shown, to hold out to the Regional Companies the prospect of piecemeal waivers or similar judicial orders under the imprecise conditions suggested by the Department of Justice would (1) serve to encourage their resistance to the grant of full equal access and (2) cause them to redouble their efforts to nibble incessantly at the edges of the restrictions, in the expectation that this would result in their complete entry into the prohibited markets. *See United States v. Western Electric Co.,* 592 F.Supp. 846, 867–68 (D.D.C.1984); *see also* Reply of Competitive Telecommunications Association at 5–8. In fact, executives of and spokesmen for the various Regional Companies rarely miss an opportunity to explain their desire, nay their right, to operate interexchange networks, and the groundwork for such expansion is laid whenever and wherever possible. *See, e.g.,* statement of Thomas E. Bolger, Chairman of Bell Atlantic, *Washington Post,* December 30, 1985, Business Section at 1. The uncertainty, turmoil, and confusion that would be created in the telecommunications industry by implementation of the Depart-

ment's recommendation are as undesirable as they are unnecessary.

Third. As stated above, the Court has for some time sought to find means for phasing out or reducing its "oversight" responsibilities consistently with its responsibilities under the decree.[86] Several of the decisions made today are steps in that direction. *See* Parts VIII and IX, *infra.* However, if the Department's recommendations were adopted, the Court would become involved in detailed regulation of the Regional Companies with a vengeance.

The Court would be constantly reviewing requests for removal of interexchange and information services restrictions on a state-by-state, possibly county-by-county, basis, in order to determine whether local regulation had changed sufficiently to allow such removals in the particular area. In order to carry out that responsibility, the Court would have to review and to scrutinize, on an ongoing and unending basis, the effect, and possibly the purpose, of old and new state and local regulation of telecommunications providers all over the United States.[87] It is difficult to imagine a more systematic and offensive intrusion into local affairs, and on this basis, one intervenor aptly describes the Department of Justice proposal as "an affront to federalism." CP National Corporation Comments at 6.

The task prescribed by the Department of Justice is one that a federal court should undertake, if at all, only if that is absolutely essential for the protection of federal constitutional or other legal rights. Clearly, that is not the situation here, and the Court accordingly declines to enter that thicket.

For these reasons, the Court will not entertain applications for waivers that are predicated only upon changes in state or

---

86. *See, e.g., Western Electric Co.,* 592 F.Supp. at 873–75 (establishing procedure whereby Department of Justice reviews requests for waivers of line of business restrictions).

87. One example is cited by the Utilities and Transportation Commission of the State of Washington which points out that it has permit-

ted local resale and shared tenant services but not the provision of basic local service by more than one telephone company in the same territory, adding, "[i]s the Department suggesting that the Court interpret state law to determine whether the Washington situation is a legally protected monopoly?" Comments at 16.

local regulation. Of course, if *prima facie* showings are made that, for technological or economic as well as legal reasons, competition in local exchange markets is feasible and has, in fact, emerged on a substantial scale, requests for removal of particular restrictions will be both entertained and granted. However, it may well be suspected that this will turn out not to be a piecemeal process as the Department of Justice envisions it, but an eventual broad-scale removal of restrictions as new technology or new market structures emerge on a nation-wide basis.[88]

### D. *Complete Removal of the Restriction*

That leaves, then, the motions filed by the Regional Companies, supported by almost none of the other over one hundred seventy entities that have filed papers in this proceeding except the Federal Communications Commission,[89] that the restriction on the provision of interexchange services be removed *in toto.*

These requests are met initially by the obstacle, discussed *supra*, that, with the exception of the minuscule amount of traffic that bypasses the Regional Companies' facilities, their monopoly bottlenecks are as solid and pervasive as they were when the decree was entered. It is equally clear that nothing has occurred to change the decree conclusion that those in control of the local bottlenecks have the incentive and ability to use their monopoly power anticompetitively in the interexchange market.

In view of the history of past abuse of the bottlenecks in the Bell System's long effort to disadvantage long distance competitors detailed *supra*, and the continuing solidity and pervasive nature of the bottlenecks, a dissipation of the ability to act anticompetitively can be assumed only if some other fundamental change has occurred in the situation—a change that would permit the Court to find that, notwithstanding the continued existence of the local bottlenecks, the risk of Regional Company anticompetitive conduct in the interexchange market has disappeared.

It is suggested by the Regional Companies that changed circumstances have occurred in five respects:[90] (1) more effective regulation by the FCC; (2) the exist-

---

**88.** It is unlikely that, in a nation with vigilant competitors and an absence of interstate barriers to the flow of ideas and commerce, any such development will be confined to a single exchange area or a single region.

**89.** The FCC position does not, in any event, meet the section VIII(C) standard for removal of the restriction. The Commission simply never liked the decree with its restrictions to begin with, and it still does not. Even before the decree was entered, the FCC expressed its view that the restrictions on the Regional Companies were both unnecessary and unwise, Brief of Federal Communications Commission as Amicus Curiae at 30 (filed April 30, 1982), and earlier this year, Mark Fowler, then the Commission's chairman, stated that the Commission "consistently" felt that the decree should not have restricted the Regional Companies. Letter from FCC Chairman Mark Fowler to John Dingell, Chairman of House Committee on Energy and Commerce, at 1 (November 13, 1985). The decree herein is a final judgment of a federal court and thus valid and binding, the FCC's views as to its wisdom to the contrary notwithstanding.

**90.** In addition to arguments concerning these claimed changes, some of the Regional Companies resort to hyperbole having little relationship to the realities. Thus, Ameritech asserts, contrary to hundreds of pages of briefs, that "even the commentators that oppose regional company entry into their markets do not seriously suggest that any regional company could gain market power" over the markets at issue here (Reply at 1–2); that "nothing that any carrier says can obscure . . . the proliferation of bypass options since 1982" (Reply at 26) (*compare* Part II–B, *supra*); and that "after three rounds of extensive briefing by all elements of the industry, involving the filing of 190 briefs comprising approximately 8,000 pages, have the opponents presented *any* evidence of Ameritech abuse of local exchange operations" (Reply at 33) (emphasis in original) (*compare* Part VII–A, *infra*). Such exaggeration does not enhance credibility.

Among the more imaginative additional arguments in favor of removal of the restriction is that of Bell Atlantic which points to the fact that the interexchange restriction has been the source of controversy and litigation before this Court. Memorandum in Support of Motion at 33–35. The Regional Companies cannot bootstrap their way out of the restriction by violating it and then, when someone complains, claiming that the restriction causes controversy.

ence of the seven Regional Companies in lieu of the one Bell System; (3) "substantial implementation" of equal access;[91] (4) the GTE analogy; and (5) the possibility of new antitrust suits.

The issue of regulation, which is common to the disputes involving all three of the core restrictions, is discussed with respect to all of them in Part VI, *infra.* As for the remainder, some of the claimed developments have not, in fact, occurred, and others have not had an effect on the interexchange services market.

### 1. *Division of Bell System Into Seven Companies*

Much is made by the Regional Companies of the circumstance that they are seven while the Bell System was only one. The difficulty with the arguments advanced based upon that undoubted fact is that the independence of the Regional Companies from the Bell System does not constitute a new development; it was mandated in the very same decree that also mandated the interexchange restriction. The decree, in fact, assumed the necessity for that restriction notwithstanding the breakup of the Bell System into seven or more new entities.[92]

During the proceedings that led to the approval and entry of the decree, the Bell System advised the Court that its evaluation of the decree could and should be premised on the existence of seven Regional Companies,[93] and the Court did just that.[94] The record shows without the slightest ambiguity that the consequences

that were to flow from the divestiture and the restrictions were identified and taken into account in 1982 with respect to the post-divestiture Regional Companies, not merely the pre-divestiture Bell System.

That was so because the crux of the problem prior to the divestiture was not so much the size of the Bell System (although that played a part) but its control of the local exchange bottlenecks. Now that the control of these bottlenecks has shifted to seven regional entities, they must necessarily be limited as was the Bell System to prevent their exploitation of these bottlenecks, absent some substantive change. And, as discussed in detail above, there has been no substantive change: the bottlenecks are as pervasive as ever. It is undoubtedly for these reasons that the Department of Justice, too, recognizes that "the fact of divestiture itself" is not "a sufficient changed circumstance" to justify a modification of the restrictions. Reply at 57.[95]

The Regional Companies further argue that now, unlike then, benchmarks exist by which the performance of one of them can be measured against that of the six others.[96] Again, the possibility of the existence of benchmarks was necessarily included in the decree assumption which imposed the restrictions upon the several successors of the Bell System. Beyond that, as discussed in Part VI, *infra,* the Regional Companies are free, by virtue of the regulations proposed by the FCC, to adopt entirely dissimilar accounting and other procedures, making impossible intelligent

---

91. *See also* Department of Justice Report at 68–70.

92. Under the decree the restriction would have applied even if the Bell System had been divided into twenty-three independent entities (AT & T and the twenty-two Operating Companies). The combination of the Operating Companies under the aegis of seven holding companies thus constituted less of a dilution of centralization than the decree allowed.

93. AT & T Reply Comment dated May 21, 1982, at 4–5.

94. *AT & T,* 552 F.Supp. at 142 n. 41, 201, 214 n. 346.

95. The Regional Companies are far from being of a size that can easily be regulated or whose operations can be otherwise be scrutinized without difficulty. The smallest would rank in the Fortune 20 in terms of assets and the Fortune 50 in terms of sales. Comments of Dun and Bradstreet at 40–41. Moreover, their complex organizational structures compared to that of the Bell System further complicates any effective scrutiny of their activities to determine whether they are consistent with the decree. *See* sections V and VI of the decree.

96. *See, e.g.,* Ameritech Reply at 3–7.

benchmark comparisons between and among them.[97]

### 2. *Equal Access*

As concerns the issue of equal access mandated by Appendix B of the decree on which several of the Regional Companies rely as a changed circumstance, it is by no means established that this objective has been achieved. Several motions are pending before the Court in which the question of compliance by the Regional Companies with their equal access obligations is very much contested.[98] These motions raise substantial issues indicating Regional Company violations of their equal access obligations which the Court will have to resolve on their merits.[99] At least pending that resolution, removal of the restrictions could not conceivably be predicated upon an assumed fulfillment by the Regional Companies of their equal access obligations.

More fundamentally, however, even if the equal access requirements had been fully met,[100] a valid basis would not exist for a removal of the restriction on equal access grounds. If equal access had been all that was involved, the decree could have simply mandated the Bell System to provide such access in the same manner as Appendix B to the decree prescribes it for the Regional Companies. Instead, the decree directs the massive divestiture and compliance with the line of business restrictions. It can only be concluded from that choice that equal access was intended to reinforce the decree's basic relief provisions, not to be a substitute therefor.

Finally, equal access is not an objective that, once achieved, remains fixed and cannot be undone. On the contrary; to the extent that the Regional Companies have the incentive, the ability, and the freedom under the decree to do so, they may be expected to chip away at equal access as new configurations, changed technologies, and novel services provide the requisite opportunities.

The Bell System was for decades under various judicial and regulatory mandates not to discriminate with respect to access by competing interexchange carriers, and it managed as consistently to evade these mandates. The bottleneck monopoly provides opportunities for a wide range of means to disadvantage competitors.[101] The Department of Justice has correctly stated that "without significant technological and market structure changes, these dangers will not disappear even after full equal access is achieved, for as the *AT & T* case showed, network standards and information flows can be used by an exchange provider to disadvantage competitors." Reply at 62.

---

**97.** Additionally, the Regional Companies are, of course, quite capable of cooperating with each other, if necessary, to defeat any benchmark-type comparison scheme.

**98.** Furthermore, as the Kentucky Public Service Commission observes, Regional Company conversion plans indicate that many small or rural end offices will not be converted to equal access until into the 1990s or even well beyond the year 2000. Comments at 16.

**99.** That the motions are not frivolous is demonstrated by the fact that several Regional Companies even now object to the grant of equal access to interexchange and information service providers, *e.g.,* Bell Atlantic Response at 2–9; U S West Response at 6–7, 9–10, and that these same companies and several others object to the suggestion of the Department of Justice that they provide equal access with respect to their cellular operations. *See* Subpart F, *infra.*

**100.** As ALC Communications Corporation correctly notes, by any standard, approximately thirty percent of the lines served by the Regional Companies nationally have *not* been converted to equal access. Comments at 14.

**101.** It is alleged that in each of the states that allows intrastate competition, the Regional Companies are disadvantaging their intra-LATA competitors (*e.g.,* by denial of equal access, refusal to permit Centrex to be used to deliver long distance traffic to independent carriers, denial of WATS access). Comments of ALC Communications Corporation at 18–23. If those claims are true in whole or in part—and the Court has insufficient facts at this time on which to base a conclusion—it would not augur well for the future should the restrictions on interexchange be lifted.

### 3. *The GTE Analogy*

Several Regional Companies [102] argue that, inasmuch as the Court approved the antitrust consent decree involving GTE, which does not include line of business restrictions similar to those in the instant decree, consistency requires the removal of the restrictions here. There is no merit to that contention.

In the first place, it cannot reasonably be argued that the adoption of the GTE decree constitutes a change in terms of the section VIII(C) standard of the decree in the instant case. To put it another way, the Regional Companies lack standing to seek a modification of this decree merely because the Department of Justice agreed to a consent decree in another antitrust suit with an entirely different defendant, and the Court approved that decree. The Department of Justice was surely not required under law to insist upon parity in the *GTE* case with the remedy adopted in the *AT & T* case.[103] As for the Court, it was obliged to give, and it did give, considerable deference to the parties and the agreement they had reached when it, in turn, passed on the GTE consent decree. *AT & T*, 552 F.Supp. at 151.[104]

Furthermore, when the Court approved the GTE decree in December 1984, it carefully considered the similarities and differences between the Regional Companies and GTE, and it concluded, agreeing with the Department of Justice, that different treatment was justified, for the following reasons:

To be sure, in some significant respects, particularly size and scope of operations, GTE more or less matches the Bell Regional Holding Companies (at least the smaller ones). In other ways, however, the two types of entities differ to some substantial degree.

Each of the Bell regional companies has a very strong, dominant position in local telecommunications in the area in which it serves; GTE's operations, by contrast, are widely scattered. Moreover, the Regional Holding Companies also have the facilities to provide all the intercity and inter-LATA traffic throughout their regions, while the GTE Operating Companies control little by way of intercity facilities, and what facilities they do have are by and large of the entrance type which do not cover the areas in which the companies operate. (Transcript of Hearing at 40–41). Finally, internal planning documents of GTE and Sprint indicate that Sprint's interexchange network will, even by 1985 or 1986, reach only sixteen GTE cities (Transcript of Hearing at 42), and the Department of Justice has observed that of all access lines in existence, only one or two per cent are in GTE cities, and that Sprint has the fewest of these. (Transcript of Hearing at 41). All these factors suggest that entry by other interexchange carriers into the local markets dominated by GTE is far less likely and the anticompetitive effects of improper GTE actions will be both less probable and more easily detectable (footnotes omitted).

*United States v. GTE Corp.*, 603 F.Supp. 730, 737 (D.D.C.1984). Nothing of significance has occurred since the GTE decree was entered to alter that assessment.

It is also worth noting that, when counsel for the Department of Justice appeared before the Court to defend the GTE settlement, he advised the Court that, should the Court believe that approval of that settlement might in any way cast doubt upon the appropriateness of the restrictions in the Bell System decree, the Department would prefer that the Court disapprove the GTE consent decree rather than to cast any shadow on the Bell System decree, particu-

---

102. *See, e.g.,* Southwestern Bell Comments at 25–27; U S West Comments at 39–40.

103. The fact that one of the seven Regional Companies may or may not be more dispersed than GTE was at the time of the consent decree, *see* U S West Reply at 23 and supplemental Appendix 6, is therefore irrelevant.

104. As indicated above, the decree in the Bell System case basically rests upon the twin pillars of (1) the divestiture of the Operating Companies from AT & T, and (2) the line of business restrictions on the divested companies. The GTE decree involves a different structure and different remedies.

larly its line of business restrictions.[105] The Court approved the GTE decree on that basis.

#### 4. *New Antitrust Actions*

The Department of Justice and several of the Regional Companies argue that the restrictions are unnecessary because, should the companies act in an anticompetitive manner, it would always be possible to remedy the situation by a new antitrust action.[106] The Department of Justice supports that contention, generally when other explanations fail.[107]

The decree restrictions were to constitute a prophylactic measure, one that would prevent future antitrust violations and thus render new antitrust suits or similar actions unnecessary. *AT & T,* 552 F.Supp. at 150. It would be illogical or worse to destroy one of the two pillars of a decree that was adopted after an enormous litigation struggle lasting almost ten years, on the basis of the thin hope that, following the evaporation of the essential relief afforded at the conclusion of that struggle, the Department would bring a new antitrust action to start the cycle all over again.[108] In fact, the Department itself has in the past called the idea of enforcement through a new antitrust action "disingenuous." Department of Justice Reply to Responses to the Department's Proposals Regarding Section VIII–C Waivers, April 5, 1984 at 49.

#### E. *There Is Competition in the Markets*

It is not without significance that competition now exists in the interexchange mar-ket, and that the entry of the Regional Companies into that market is not necessary to give it vitality. To be sure, AT & T still retains the lion's share of that market, but there are now some 530 long distance carriers in the United States, eight of them serving twenty-five or more states. *See* Federal Communications Commission, Summary of Long Distance Carriers, at 2–3 (March 12, 1987); *see also* FCC Comments at 34–35 & n. 39. According to the Department of Justice, AT & T's rivals appear to be making sufficient progress that it would be at least premature to view the entry of the Regional Companies as necessary to preserve interexchange competition. Response at 45. The Court agrees with that assessment.

#### F. *Mobile Services*

■ The Department of Justice still recommends that the interexchange services restriction be lifted completely with respect to cellular radio, paging, and other mobile interexchange services. Response at 54–59. The basic reason given for this recommended modification is that mobile services constitute markets separate from landline interexchange services,[109] and that, as the Department puts it, everyone recognizes that, because of its higher price and limited capacity, cellular radio and other mobile services cannot be substitutes for the landline services, and that such services therefore *constitute a separate market.* Response at 55.[110]

---

**105.** GTE Transcript of November 22, 1983 at 60–61.

**106.** Department of Justice Report at 53; Response at 99, 123–24; AT & T Reply at 51.

**107.** To cite a few representative examples, in discussing possible Regional Company joint ventures, the Department, rather than to analyze their anticompetitive potential in terms of the decree, states that they "would have to be analyzed in each instance under Section 7 of the Clayton Act or Section 1 of the Sherman Act" (Response at 99); in regard to an intervenor suggestion of *de facto* market division by the Regional Companies, the Department observes that any such division "would violate the Sherman Act and be dealt with accordingly" (Response at 120 n. 235); and that, if the companies used Bellcore (*see* pp. 558–59, *infra*) as a vehicle for collusion "the government could

take appropriate antitrust enforcement action" (Response at 123).

**108.** The author of a book on the AT & T divestiture quotes Department of Justice attorneys as wondering whether the relationship between the federal government and the Bell companies is "to become a never-ending cycle of lawsuits, settlements, scandals, and resentments." Coll, *The Deal of the Century* at 230–31 (1986). *See* note 8, *supra; see also* Comments of Information Industry Association at 25 n. 61.

**109.** *See United States v. Western Electric Co.,* 578 F.Supp. 643, 650–51 (D.D.C.1983).

**110.** As for paging, it is said that it cannot compete with landline interexchange service because in any event it operates only on a one-way basis.

The Department's analysis appears to be correct, at least as of now,[111] but that alone does not resolve the issue before the Court. On a purely literal level, interexchange cellular radio is an interexchange service as defined in section II(D)(1) of the decree. As such, it is of course prohibited to the Regional Companies absent developments that would cause the Court to find that, contrary to cellular radio's status at the time of the entry of the decree, its dynamics have changed to the point that there is no longer a substantial possibility that it could be used to impede competition. It cannot reasonably be claimed that such new developments have taken place.

More substantively, the entry of the Regional Companies into the cellular business without individualized scrutiny[112] would raise precisely the same concern that led to the adoption of the interexchange restriction in the first place: the possibility of discrimination against interexchange competitors in the provision of the access needed to reach the cellular customers.[113] A number of developments contribute to the conclusion that such discrimination is not only possible but probable.

In the first place, several of the Regional Companies are not even willing to accede to the minimal Department of Justice recommendation that, should they be allowed into the interexchange market, they grant complete equal access to competing interexchange carriers, included in the intra-LATA portion of the cellular systems.[114]

Moreover, without even having been in the interexchange cellular business across the board, the Regional Companies appear to have engaged in acts of discrimination against other mobile services providers—activities that do not inspire confidence

that, should the companies be permitted to enter the cellular market without limitation, they would treat competitors in an even-handed manner. According to the Huber Report itself—upon which the Department of Justice otherwise heavily relies—the Regional Companies have used their control over the local bottlenecks in a variety of ways to impede competition by providers of mobile service. Some of these anticompetitive activities are catalogued at pp. 580–81, *infra*.

There is also the broader concern that, should the motions be granted, a Regional Company could evade the basic interexchange services restriction itself by the simple expedient of constructing a connection between its mobile telecommunications switching offices and any of their standard end offices, thus providing long distance service throughout the country through a combination of cellular and standard interexchange facilities.

Several of the Regional Companies, *see, e.g.,* U S West Memorandum at 159–60 & n. 171, rely on the grant by the Court of several waivers on a case-by-case basis with respect to interexchange cellular services, contending that such waivers established the principle that the test of section VIII(C) has been satisfied. Not only is that contention entirely erroneous, but it exemplifies the attempts made from time to time by Regional Companies to take advantage of extremely limited precedents as bases for broad departures from the requirements of the decree.

Whenever the Court has granted waivers, it was essentially in the context of representations that highways and automobile traffic patterns (typically in large met-

---

**111.** There are indications that the cost and the price of cellular radio are falling, and that in the future it may become competitive with landline interexchange services.

**112.** Such scrutiny is now provided by the waiver request mechanism.

**113.** For that reason, the Department of Justice in 1983 took precisely the opposite position to that which it is taking now. Memorandum of the United States of May 19, 1983, at 18, al-

though cellular radio then, even more than now, served a separate market.

**114.** In response to the Department of Justice's equal access recommendation, one Regional Company observed that there was no "sound reason why Bell Atlantic should be required to provide equal access to inter-LATA calls completed within an area served by the same cellular switch." Bell Atlantic's Opposition to Conditions Specified in the Department's proposed Order, at 11.

ropolitan areas) were such that the public benefits accruing from slight departures from the strict LATA boundaries to accommodate motorists with cellular phones were so substantial that they outweighed, on this limited basis, the dangers to fair competition. *AT & T*, 578 F.Supp. at 647–48; Memorandum of January 28, 1987 at 3. These waivers are not precedents for the broad relief the Regional Companies seek, and that relief, were it to be granted, would enable these companies to impede competition on a significant scale.

There is no basis under the decree for the removal of any of the restrictions on interexchange services, and the requests for such relief will be denied.

IV

*Manufacturing*

A. *History*

■ Section II(D)(2) of the decree, as amended by section VIII(A), prohibits the Regional Companies from manufacturing or providing telecommunications products or manufacturing customer premises equipment [115] (CPE).[116]

In every significant respect, this restriction mirrors one of the other core restrictions, that on interexchange services: the manufacturing restriction, too, is based on voluminous trial evidence; the local monopoly is as central to the market here as it is to the interexchange services market; and the incentive and ability to act anticompetitively have not been significantly altered by the division of the Bell System into

seven Regional Companies, by FCC regulation,[117] or by any other factor. Indeed, in one respect the consequences of a removal of the manufacturing restriction would be even more visibly and directly counterproductive than a removal of the interexchange restriction: a flourishing, broad-based, innovative industry would be cut back to become one dominated by a small number of muscle-bound giants, possibly dominated by foreign conglomerates.

The manufacturing restriction [118] was based in substantial part on evidence presented by the Department of Justice at the trial of this case indicating that the Bell System had improperly monopolized the market for telecommunications equipment, in that its local Operating Companies purchased such equipment primarily from Western Electric Company, the System's manufacturing affiliate, and "engaged in systematic efforts to disadvantage outside suppliers." *AT & T*, 552 F.Supp. at 190–92. Further, the evidence suggested that, while the Bell System's anticompetitive activities in the long distance market were largely formulated by AT & T headquarters, the discriminatory procurement practices were primarily those of the local Operating Companies.[119]

Since the Bell System accounted for over eighty percent of the nation's central office switching and transmission equipment purchases,[120] only small fractions of the market remained open to independent manufacturers. Specifically, the Department alleged, and it appeared to the Court,[121] that the local Operating Companies had en-

115. *AT & T*, 552 F.Supp. at 227.

116. CPE includes equipment employed on the premises of anyone other than a carrier that is utilized to originate, route, or terminate telecommunications. Section IV(E). It does not include equipment used "to multiplex, maintain, or terminate access lines." Section IV(N) defines telecommunications equipment as "equipment, other than [CPE], used by a carrier to provide telecommunications services."

117. No one reading the trial transcript could seriously refer, as does BellSouth, to "the long and successful history of FCC regulation of equipment network interfaces and related carrier practices." Response to Motion for Relief, at 11. *See also* note 202, *infra*.

118. The entire section II(D)(2) restriction, including that prohibiting the provision (*i.e.*, the marketing) of telecommunications products, will herein generally be referred to as the manufacturing restriction.

119. The evidence was somewhat in conflict on *the question of the degree of direction given in* that regard by AT & T headquarters.

120. *See* Huber Report at 1.15.

121. *See AT & T*, 552 F.Supp. at 190; *AT & T*, 524 F.Supp. at 1371, 1374; *see also* Department of Justice Competitive Impact Statement at 15.

gaged in three general types of anticompetitive conduct with regard to the telecommunications equipment and CPE markets.

First. As testimony and other evidence demonstrated, the Operating Companies managed, by one strategem or other, to purchase Western Electric's products, even when those products were more expensive or of lesser quality than alternative goods available from unaffiliated vendors.[122]

Second. The Operating Companies and Bell Laboratories (the Bell System's central research and engineering affiliate)[123] engaged in discrimination in the dissemination of information and design by granting Western Electric premature and otherwise preferential access to necessary technical data, compatibility standards, and other information about the Operating Companies' needs and requirements and the evolving characteristics of the local exchange. The

delays encountered in these respects by Western Electric's competitors frequently made it difficult, if not impossible, for them to compete for Operating Company business: Western Electric was ready with the products when they were needed, and the competitors were ready several months later. The not unexpected result was a further skewing of procurement toward the Bell System's manufacturing arm and away from independents.

Third. The Bell System subsidized the prices of its equipment with the revenues from the Operating Companies' monopoly services.[124] The effect of this practice, as with respect to cross-subsidization generally, was (1) to permit the Bell System to undercut other producers of equipment (which lacked such a subsidy), and (2) unfairly to burden the consumers with exces-

---

**122.** More specifically, the Court found, commenting on the government's evidence of anticompetitive conduct:

This evidence tended to show that the general trade manufacturers encountered a considerable number of obstacles in trying to design equipment for, and to sell this equipment to, the Bell Operating Companies, and that these obstacles perpetuated a buy—Western bias. For example, the competitors had difficulty in locating the employee in Western or the Operating Companies authorized to negotiate a sale; in obtaining from Bell compatibility specifications (without which general trade products could not be designed for interconnection with the Bell network); and in persuading Bell Labs to complete objective evaluations (which were usually required before sales could be effected). The government's evidence further indicated that Bell did not authorize the purchase of the general trade equipment even if no Bell product of equivalent quality, cost, or technical sophistication was available; instead, crash programs were initiated to develop competing Western products (to the extent that, in one instance, Western literally copied the general trade product so that it did not need to wait for the design and development of its own model). Operating Company employees were under pressure from AT & T officials to buy from Western (even when a general trade product was cheaper or of better quality) or to wait until a Western product comparable to the desired general trade equipment was available, and they were required to provide detailed justifications for general trade purchases which were not necessary for the purchase of Western equipment.

The evidence supporting the seventeenth episode, the "umbrella" package, shows that, despite a stated policy to the effect that the Operating Companies were to buy the best quality equipment at the lowest price regardless of source, the structural relationship among the various components of the Bell System generated a pro-Western, or in-house bias in the Operating Companies' purchasing practices (footnotes omitted).

*AT & T,* 524 F.Supp. at 1371–72.

**123.** Bell Laboratories is a scientific facility that has often been said to be without parallel anywhere in the quality of its scientific achievement.

**124.** The Court described this process in its 1981 Opinion as follows:

... [the government's] experts have testified that a combination of vertical integration and rate-of-return regulation has tended to generate decisions by the Operating Companies to purchase equipment produced by Western that is more expensive or of lesser quality than that manufactured by the general trade. The Operating Companies have taken these actions, it is said, because the existence of rate of return regulation removed from them the burden of such additional expense, for the extra cost could simply be absorbed into the rate base or expenses, allowing extra profits from the higher prices to flow upstream to Western rather than to its non-Bell competition. *See Byars v. Bluff City News Co.,* 609 F.2d 843, 861 (6th Cir.1979); *Six Twenty-Nine Productions v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir.1966); 3 Areeda & Turner, *supra,* ¶ 726, p. 218 (footnote omitted).

*AT & T,* 524 F.Supp. at 1373.

sive rates for the monopoly services they were furnished by the Operating Companies. These rates reflected not only the costs of those services but also the Bell System's need for funds for underselling the manufacturers and providers of non-monopoly products, e.g., those engaged in the business of making or selling telecommunications equipment or CPE.

These various abuses should in theory have been discovered and corrected by federal and state regulators, but the evidence showed that, due to the size, power, and complexity of the Bell System and its Operating Companies compared to the small, inadequately staffed regulating bodies, this rarely occurred. See Part VI, infra. Moreover, when occasionally regulators did issue orders to halt improper activities, the Bell System routinely petitioned for reconsideration or rehearing, sought regulatory or judicial stays, played federal law and regulation against state law and regulation and vice versa, and in other ways delayed action until the regulators, more often than not, lost interest or gave up in frustration.[125]

In approving the restriction on the manufacture of telecommunications equipment and CPE, the Court observed that such equipment, to be of practical use, had to be connected, directly or indirectly, to a local exchange.[126] The Court also concluded that there is a critical interdependence between telephone company equipment and CPE: the standards for one dictate the standards for the other. Since the Regional Companies were free to choose which equipment to locate in their central offices, they were able to dictate the standards to which the CPE had to be designed.

All these problems were exacerbated by the fact that, due to the monopoly power possessed by the Operating Companies in the exchange telecommunications end product market, they lacked the competitive restraints "that ordinarily prevent the typical vertically-integrated company from engaging" in discrimination and cross-subsidization. On this basis, the "Operating Companies ... would be able to pay inflated prices for poor quality equipment and to reflect these costs in their rates without suffering a diminution in revenues." AT & T, 552 F.Supp. at 190; AT & T, 524 F.Supp. at 1368–70. The Court therefore concluded that, inasmuch as there was no competition in the end product market, i.e., exchange telecommunications, and the purchasing decisions of the Operating Companies were largely immunized from competitive pressures, widespread abuses became possible and, in a sense, almost inevitable.

Since the Regional Companies were to become the "heirs" of the Bell System with respect to ownership and control of the local Operating Companies and their facilities, with the identical incentives and abilities as the Bell System in the telecommunications equipment market, the parties agreed on and the Court approved the manufacturing restriction on these companies embodied in section II(D)(2) of the decree. This, the Court decided, would ensure that purchasing and design discrimination and the consequent misallocation of costs would not be re-created. AT & T, 552 F.Supp. at 190–91.[127] And it also concluded that, if after the break-up the Regional Companies were permitted to manufacture CPE or telecommunications equipment or to market such equipment,[128] nonaffiliated

---

**125.** The legality of some of these Bell System actions was considered by the Court in the context of the Noerr–Pennington doctrine. AT & T, 524 F.Supp. 1361–64.

**126.** See also MCI Response at 70.

**127.** The Court also found that the "minimal additional competition" that the Regional Companies could provide to an already competitive CPE market did not "outweigh the substantial possibility that [the Operating Companies] would engage in anticompetitive conduct." Id. at 191. See Subpart C, infra.

**128.** The Court determined that the Regional Companies did not need to be restricted from providing, i.e., marketing CPE, as distinguished from manufacturing it, because any risk of anti-competitive behavior in marketing was minimal due to the necessary participation of independent manufacturers who were unlikely to be partners in an antitrust conspiracy. AT & T, 552 F.Supp. at 191. It also found that to allow the Regional Companies to market CPE manufactured by others could provide a meaningful balance against AT & T's dominance of the CPE market. Id. at 192. For these reasons among

manufacturers would once again be disadvantaged and "the development of a competitive market would be frustrated." *Id.*

B. *Anticompetitive Activity is Probable*

In view of that relatively recent history, the question before the Court is whether a removal of the restriction is justified under section VIII(C) or whether such a removal would present a substantial risk that conditions of anticompetitive activity, concentration of the telecommunications equipment market in a few hands, monopolistic pricing, and a relatively sluggish pace of innovation, will return.

As will be seen *infra*, the short answer to the question about a renewal of anticompetitive activity here, as with respect to the interexchange restriction, is that no changes have occurred in the last three years that would warrant removal of the restriction on manufacturing: (1) the Regional Companies still have an ironclad hold on the local exchanges; (2) collectively they account for the purchases of what may be estimated at seventy percent of the national output of telecommunications equipment, only slightly less than the share of the pre-divestiture Bell System; (3) if the restriction were lifted, the Regional Companies may be expected to act as did the Bell System: they would buy all, or almost all of, of their equipment requirements from their own manufacturing units rather than from outsiders; (4) no measures, regulatory or otherwise, are available effectively to counteract such activities; and (5) in short order following removal of the restriction, a return to the monopolistic, anticompetitive character of the telecommunications equipment market

would be likely, if not inevitable. The Court will now elaborate on several of these conclusions.[129]

The Department of Justice claims that technological and market changes, in addition to the existence of improved federal regulation, have rendered the manufacturing restriction unnecessary,[130] and in this assessment it is of course supported by the Regional Companies.[131] These changes, it is said, eliminate any substantial risk that the Regional Companies could use their monopoly power in the various telecommunications equipment or CPE markets.[132] That analysis is riddled with serious flaws.

First. The Department and the Regional Companies rely in substantial part on "the continued dispersal of equipment consumption, and the steady consolidation of equipment production," *e.g.*, Department of Justice Report at 161, stemming from the creation of the seven Regional Companies. On this basis, they claim that, because each company accounts for no more than a relatively small percentage of the purchases in any particular market, the purchasing decisions of one or several Regional Companies cannot have much impact on competition in the equipment market as a whole.

As explained above, on the most basic and literal level the existence of the seven Regional Companies is not a new development not contemplated when the decree was entered. Those who drafted, submitted, and approved the decree included the restriction on manufacturing at the same time as they provided, in the same decree, for the break-up of the Bell System into as many as twenty-two or as few as seven local units and hence into the corre-

---

others, the Court required modification of the proposed decree to permit the Regional Companies to provide CPE. Section VIII(A).

**129.** One of the issues, the impact of regulation, if any, is discussed in Part VI, *infra.*

**130.** Department of Justice Report at 161–71.

**131.** *See, e.g.,* Ameritech Comments at 7–10, 32–41; U S West Comments at 32–34; Bell South Comments at 19–24; Southwestern Bell Comments at 54–60. The FCC, too, supports the removal of the manufacturing restriction, as it does with respect to all the other restrictions, and as it did from the day they were entered as

part of the judgment in this case. However, as will be seen below, another government agency, the NTIA of the Department of Commerce, expresses serious doubts on that score.

**132.** The Regional Companies have made no effort to show that any particular market to which they refer is a "relevant market or submarket" for purposes of antitrust analysis or that they do not possess market power therein. *See Standard Oil Co. v. United States,* 337 U.S. 293, 299–300 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949).

sponding dispersal of purchasing power.[133] To make sense of the decree as a whole, therefore, it must necessarily be assumed that something more than the seven-fold division of the purchasing decisions is required to constitute the changed circumstances contemplated by section VIII(C) as a prerequisite to a removal of the manufacturing restriction.[134]

It is true, of course, that any particular Regional Company does not, by itself, have a dominant share in the national equipment market. This does not vitiate the substantial possibility, however, that even on its own, such a company could use its monopoly power to engage in anticompetitive conduct in the equipment markets, national or regional.

*The Department of Justice concedes that if the restriction were lifted, each of the Regional Companies would satisfy all or nearly all of its equipment needs from its own manufacturing affiliate.*[135] Dr. Huber estimates that exclusive in-house purchasing by any particular Regional Company will, depending upon the type of equipment, foreclose five to fifteen percent of the United States equipment market,[136] although with respect to some items of equipment that proportion may reach as high as twenty percent.[137]

■ These figures are of course highly significant in and of themselves. Under the law, serious competitive concerns are raised even when relatively small market shares, for example as low as seven or eight percent, would be foreclosed as a result of leveraging of regulated monopolies into a related but unregulated market. *See Otter Tail Power Co. v. United States, supra; Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275–76 (2d Cir. 1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *AT & T,* 524 F.Supp. at 1379 n. 174; *International Tel. & Tel. Co. v. GTE Corp.,* 449 F.Supp. 1158, 1177–83 (D.Hawaii 1978). This leveraging doctrine serves antitrust interests by assuring that more efficient producers are not excluded from the market, and it prevents frustration of public regulation of subscriber rates.[138]

---

133. *See* Part III–C–1, *supra.*

134. When it signed the decree, the Court found that, although the companies would thereafter be functioning independently, they would have the same incentives and abilities to discriminate in the same manner as when they were functioning under the auspices of the Bell System. *AT & T,* 552 F.Supp. at 190–92. The Court approved the manufacturing restriction presented by the parties precisely because of its conclusion that a substantial likelihood existed that, if permitted to manufacture telecommunications equipment, any one or all of the seven Regional Companies could and, considering the existing incentives would, disadvantage unaffiliated manufacturers and foreclose competition in substantial portions of the market.

135. Department of Justice Report at 169–70; *see* Huber Report at 14.13. The Department also speculates that, due to the high costs, risks, and economies of scale, it is more likely that Regional Company entry into production of central office switches would be as part of a joint venture with an existing central office switch manufacturer rather than on an individual basis. Department of Justice Report at 174–77; Response at 107. That may be correct, but it obviously does not support elimination of the restriction. *See* Subpart C, *infra.*

An investigation conducted by the New York Department of Public Service showed that New York Telephone, a subsidiary of NYNEX, made seventy-five percent of its purchases of office supplies, telephone circuit cable, and other such equipment from MECO, another NYNEX subsidiary. Initial Brief at 18. That experience is some indication of what would occur if the Regional Companies had the authority to manufacture telecommunications equipment and CPE.

136. Huber Report at 1.15, 14.8, 14.13–14; *see also* Department of Justice Report at 169–70, 74–75. Although, depending upon the perspective, there may be four or more equipment submarkets, there is sufficient overlap between them that analytical flaws applicable to one type of equipment will not taint the conclusions with respect to the others. Comments of Tandy Corporation at 18.

137. According to figures supplied by one Regional Company, the share of central office switch purchases in 1985 attributable to these companies was seventy-six percent (compared to the Bell System's 1981 purchases of eighty-one percent), and their share of wire cable purchases was seventy-one percent. U S West Appendix, Table 12, at A–3, A–4.

138. The Department of Justice espoused this doctrine throughout the pendency of the *AT & T* proceedings in this Court. *See, e.g.,* Memoran-

Additionally, the cited figures actually fail to present the full measure of the anticompetitive situation since they focus entirely on national and even international markets. *See, e.g.*, Department of Justice Report at 171–72 n. 337, 173. To obtain a realistic picture, one must also evaluate the individual Regional Company power in their regional markets or submarkets. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 324–25, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962). In their regions, these companies occupy positions of unquestionable dominance,[139] and substantial anticompetitive effects would be felt in these regional markets if the manufacturing restriction were lifted.[140]

Suggestions have been made that, at least with respect to some items of equipment, not all Regional Companies would purchase it from their own affiliates. Not only is any such assumption contradicted by the Department of Justice and Huber reports,[141] but experience since divestiture

has been that Regional Companies have entered markets, many entirely foreign to telecommunications, just as quickly as they were legally free to do so by judicial construction, waiver, or otherwise, and occasionally even when they were not legally free to do so. It would be entirely unrealistic to assume that these companies would hereafter fundamentally reverse their pattern of behavior and refrain from entry into the telecommunications and CPE businesses that are allied to enterprises in which these companies are already engaged and that are potentially fertile sources of cross-subsidy skim-offs.

The companies may also be expected to be motivated to enter these markets by the dynamics of the relations among them and the imperatives of the marketplace. Their corporate images will not tolerate their abstention, and a Regional Company that opted out may be found by shareholders and others to have passed up a profitable extension into an adjacent market.[142]

dum in Opposition to Defendants' Motion for Involuntary Dismissal, pp. 72–80, 363; Pretrial Brief for the United States, pp. 48–54, 57–60; Competitive Impact Statement at 9; Reply dated April 5, 1984 regarding section VIII(C) waivers, pp. 7, 14–16. Now, inexplicably, the Department states that antitrust concerns are not raised when monopolies are leveraged into a substantial portion of the equipment manufacturing market. Department of Justice Report at 162, 166, 176. No reason is furnished for this change in analysis.

**139.** Only large central office switches require economies of scale greater than those allowable in one Regional Company area. Huber Report at 16.16–17.

**140.** For example, Dr. Huber has concluded that elimination of the restriction would permit the Regional Companies to keep critical design information from non-affiliated manufacturers. Huber Report at 14.13, 14.20, 16.15, 16.19. Another conceivable course of conduct by the Regional Companies that could have an anticompetitive impact involves the provision of voice-data services that use the local loop simultaneously for voice conversations, data transmission, and other related services. In order for the local loop to be used in that manner, an electronic device is required on each end of the loop. *See* IDCMA Comments at 20–22. If each Regional Company had approximately nineteen million access lines, Huber Report at Table G.4, and each electronic device cost $300 per line, then each such company could control approxi-

mately a $6 billion equipment market within its own region. Translating this statistic to a national focus, more than a $40 billion market could be foreclosed to competition. "Such a development would be the death knell for domestic data communications equipment manufacturers." *See* IDCMA Comments at 20–21.

**141.** *See* note 135, *supra*. The Huber Report goes on to say (at 14.16–17):

A much more plausible scenario would have the RHC entering into a joint venture with one of the established domestic or foreign manufacturers and then using its own captive affiliate to provide a protected sales base from which to attack national and international markets. Most foreign manufacturers are virtually guaranteed profitability in their home markets, by subsidies or captive sales at inflated transfer prices. For them, anything earned in the United States is a windfall. Indeed, many of these manufacturers claim to be aiming for about a 5 to 10 percent share of the U.S. market, which equates to about one RBOC's purchases. Of course, under any requirements contract between a foreign manufacturer and an RBOC, the affiliates would be fairly free to customize switches, develop idiosyncratic standards, and then charge speciality transfer prices for the specialty product provided.

**142.** *See* Comments of North American Telecommunications Association at 11–18.

In any event, as explained above, section VIII(C) of the decree prohibits the lifting of a line of business restriction if a Regional Company merely "could" impede competition in the market it seeks permission to enter; it does not charge the Court with finding that such a company "would" do so. In law, under section VIII(C), and in experience on the basis of Regional Company behavior to date, it is reasonable to assume that all the Regional Companies would enter the manufacturing market; that they would satisfy all or nearly all of their equipment needs from their own manufacturing subsidiaries; and that they would thus foreclose on an average some seventy percent or more of the various equipment markets.[143] This would of course constitute an enormous step back to the pre-divestiture situation.[144]

In addition, Regional Company conduct taken in response to its incentive to purchase equipment from its own affiliate or joint venture partner (*see* Subpart C, *infra*), would tend to create a balkanized, ideosyncratic equipment market in which each manufacturer would sell primarily to the Regional Company with which it was affiliated—a development that would even further shrink, and shrink drastically, the size of the equipment market that was not simply parasitical.[145]

### C. *Joint Regional Company Actions*

These threats to competition would be further aggravated if the Regional Companies acted in concert with respect to manufacturing and purchasing. There has been no showing nor even plausible speculation that the companies could not or would not act in combination (1) by entering into explicit or implicit agreements with each other regarding specifications or interconnection requirements, or (2) by disadvantaging unaffiliated manufacturers by making use of their participation in Bellcore.[146]

It is argued that the Regional Companies are more likely to compete fiercely with each other for the procurement business than to act jointly and in combination. It will no doubt occur to some or all of these companies, however, that each of them would benefit financially if it could manufacture for sale and sell in its own region, all of its manufacturing output, without fear of the only formidable competition—another Regional Company—and thus possess an enormous captive market.[147] Cutthroat competition by all against all in all the regions would not look nearly as attractive from an economic point of view.

It has also been suggested that collusion through the Bellcore connection could be prevented by limiting Bellcore's permitted range of activities. Department of Justice Report at 178. That argument, too, looks far more palatable in concept than it does when the necessary details of implementation are examined. No proponent of the Bellcore-limitation approach has suggested, either generally or specifically, how that entity's activities should or could be limit-

---

**143.** Assuming a conservative ten percent share of the national market per Regional Company.

**144.** The Court does not agree with the implication of suggestions, such as those advanced by Ameritech, that, because the Regional Companies purchased about eighty percent of the metal cable sold to telephone companies, this was "only a part of the total market for metal cable" and purchasing power was therefore dispersed. Comments at 35 n. 27.

**145.** This need not occur immediately. As has been pointed out, it is self-evident that, over time, each of the Regional Companies will not forego the opportunities to confer competitive advantages on its "house" brand of CPE, and manufacturers will soon learn that it is more

profitable and less troublesome to affiliate with a Regional Company rather than to attempt to market CPE on a nationwide basis. Opposition of North American Telecommunications Association at 9.

**146.** Bellcore was originally known as the Central Staff Organization. *Western Electric Co.,* 569 F.Supp. at 1113–18. For an explanation of the Bellcore functions, *see* below. For some reason, the Department of Justice did not analyze the competitive effect of joint Regional Company purchasing decisionmaking, although it does concede that Bellcore could function to disadvantage the Regional Companies' competitors. Response at 124.

**147.** *See* note 140, *supra*.

ed.[148] The reason for that reticence is simple.

Bellcore has responsibility under the decree to prevent the technical fragmentation and hence the deterioration of the national telephone network; to perform the technical and engineering responsibilities that must be performed on a centralized basis if there is to be a single functioning system; to set the technical and performance standards for network equipment; and to act as a central liaison between the civilian telephone system and the military's and other emergency functions. *AT & T*, 552 F.Supp. at 208–09; *Western Electric Co.*, 569 F.Supp. at 1114–18. To decentralize or otherwise to limit the responsibilities of Bellcore so as to prevent its use as a vehicle for anticompetitive action by the Regional Companies would inevitably fragment and frustrate Bellcore's centralizing responsibilities which, notwithstanding the divestiture, permit the nation's telecommunications systems to continue to function on the basis of one national network with one national quality standard. It would also undermine Bellcore's ability to act as the critical link between the civilian telephone systems and the national defense communications networks.[149]

The Bellcore problem thus resembles the squaring of the circle. If Bellcore's powers are cut back to safeguard against Regional Company collusion in manufacturing, marketing, and purchasing, it will be deprived of the capacity to perform its national coordinating and standard-setting functions; if its powers are left intact, it will stand as a suitable vehicle for joint Regional Company action with respect to the manufacture of telecommunications equipment and CPE.

D. *Effect of Removal on Innovation*

Not only is there no basis for concluding that the conditions that caused the establishment of the manufacturing restriction in the decree have ceased to exist, but the removal of that restriction at this juncture would arrest or nullify significant positive developments that have occurred since then.

As discussed above, it cannot be seriously disputed that the Regional Companies' local exchanges continue to be monopolies; that a Regional Company that was permitted to enter manufacturing would satisfy its equipment needs exclusively or primarily from its own affiliate; and that such activities would contravene the very purpose of the decree—to prevent leveraging of Regional Company local exchange monopolies so as to foreclose independent manufacturers from a very substantial part of the telecommunications market. For these reasons, retention of the manufacturing restriction is supported by consumers,[150] interexchange carriers,[151] independent local exchange carriers,[152] cellular carriers,[153] manufacturers, suppliers, and servicers,[154] labor unions,[155] and state regulators.[156]

---

**148.** The Department of Justice relies on its old standby for situations presenting no answer consistent with its position—the possibility of a new antitrust action. Response at 124. *See* note 107, *supra*.

**149.** *Western Electric Co.*, 569 F.Supp. at 1113–15.

**150.** *E.g.*, Consumer Federation of America Comments at 2, 36–40; Ad Hoc Telecommunications Users Committee Comments at 11–12; International Communications Association Comments at 11–12.

**151.** General Electric Communications and Services Comments at 30–33; MCI Response at 70–79.

**152.** United Telecommunications Comments at 24–25; Taconic Telephone Corporation Comments at 14–17.

**153.** McCaw Communications Comments at 17–19.

**154.** Electronic Industries Association Comments at 18–22; North American Telecommunications Association Comments at 7–42; IDCMA Comments at 14–62; United States Telecommunications Suppliers Associations Comments at 17–53; Tandy Corporation Comments at 10–30; CBEMA Comments at 29–33.

**155.** Communication Workers of America Comments, Appendix at 6–9.

**156.** Public Service Commission of the District of Columbia Comments at 27–29, 36–38; Kentucky Public Service Commission Comments at 23–25, 28.

The Regional Companies argue in response that the negatives, both in regard to substance and to opinion in the marketplace of ideas, are outweighed by the fact that research, innovation, development of new products, and improvements in quality assurance would be inhibited unless they are permitted to participate in the various aspects of the manufacturing cycle.[157] One problem with that argument is that it precisely mirrors the points advanced by the Bell System at the trial of this case—that the efficiencies of integration outweigh such independent competition as might occur as a consequence of freer entry into the market, and that research and development would wither if the Bell System were broken up—and that were squarely rejected by the decree, as they had to be on these facts under the antitrust laws.[158] Almost by definition, these same arguments cannot qualify as changes cognizable under section VIII(C).

Another, equally compelling answer is that the Regional Company argument has already been proved to be factually wrong: there has been a flowering of research, development, innovation, introduction of new products, and quality assurance; new firms have entered the market; prices of equipment have declined dramatically [159] (according to some by as much as fifty percent in some categories);[160] and competition flourishes in a market that had seen relatively little of it before. The equipment market now consists of some six or eight very large firms, one to two hundred medium-sized firms, and hundreds of still smaller, vigorous, and inventive firms,[161] some of them in profitable relationships with one or more of the Regional Companies.[162]

If the restriction were removed, there would be a serious risk of a return to conditions of anticompetitive activity, concentration of the telecommunications equipment market in few hands, monopolistic pricing, and a relatively sluggish pace of innovation. According to a distinguished outside observer, the Regional Companies would then become "central vigorous players in the equipment market, buying many of the smaller [firms], integrating services and equipment sales, and developing into seven smaller versions of what once was AT & T."[163]

Certainly the emergence since entry of the decree of a dispersed equipment market characterized to an unprecedented extent by innovation [164] is proof that the fruitful competition the decree sought to establish is here. If this nation is serious about the need for competing effectively with ever more ingenious foreign producers, especially in a high technology market such as telecommunications, the sources of invention and innovation represented by competition and by competitors that do not rely

157. *See, e.g.,* NYNEX Comments at 43–47; BellSouth Comments at 22–23; Ameritech Comments at 36–40; Southwestern Bell Comments at 55; U S West Comments at 33–34.

158. Vertical integration is not unlawful as such; but it can be anticompetitive under certain circumstances where there is a mix of regulated and unregulated operations. *AT & T,* 524 F.Supp. at 1369, 1373.

159. Department of Justice Report at 162–63, 171–73.

160. U.S. Telecommunications Suppliers Association at 12–13.

161. Salomon Brothers, Stock Research on Telecommunications Equipment, the United States Market, at 11 (Feb. 1987); Electronic Industry Association at 2.

162. One Regional Company argues that the restriction "'quarantine[s] the unique capabilities and knowledge the [companies] gain from de-

signing, operating, and maintaining the local network.'" U S West Memorandum at 87 (quoting Stantel Telecommunications Comments at 24). Not only does this argument simply repeat points made over and over during the trial by the Bell System with singular lack of success, but it is also factually erroneous. The restriction merely prevents the Regional Companies from once again exploiting knowledge gained by virtue of their privileged monopoly franchises for their sole benefit and for anticompetitive purposes; it does not prevent that knowledge from being disseminated among and used by manufacturers for the benefit of the telecommunications system, the industry, and the public.

163. Salomon Brothers, Stock Research on Telecommunications Equipment, *supra,* at 11 (Feb. 1987).

164. *See* note 330, *infra.*

on fixed rates of return as the principal source of their income must not be shut off.

· In any event, insofar as this Court's obligations under the antitrust laws and under the decree are concerned, it is not prepared to halt the progress that has been made by independent manufacturers and sellers, large and small, toward a genuinely competitive environment in the telecommunications equipment market, by modifying the decree so as to turn back the clock toward domination of the market by the Bell monopolists.

### E. Foreign–Dominated Firms Crowding Out Specialized Manufacturers

The Regional Companies finally contend that such factors as the economies of scale involved in manufacturing, the increasing standardization of interconnection requirements, and the vigor of the existing competition will prevent them from becoming regional monopolists should they be allowed into the manufacturing market. That contention, too, lacks merit.

In the first place, several of the assumptions underlying this contention are not correct. For example, although economies of scale apply to some types of equipment, they do not to others. Likewise, the trend in interconnection requirements for such items as data communications equipment has actualy been toward less uniformity.[165]

Beyond that, while the competitive nature of the equipment manufacturing business depends to an extent upon the type of market that is at issue, the fact that competition is presently healthy and strong in many markets does not diminish the ability of the Regional Companies to leverage

their monopoly power should they be allowed into manufacturing.

The Department of Justice acknowledges that removal of the restriction will be followed by the displacement of many of the competitors, postulating that increasing concentration in the equipment markets is inevitable. Report at 171–76. However, trends with respect at least to some types of equipment have been precisely in the opposite direction, and whatever inevitability there is to greater concentration would flow primarily from the effects of the removal of the restrictions. See pp. 561–62, infra. The Department's position contemplates, with what may only be characterized as remarkable equanimity for an antitrust enforcement agency, the ready destruction of many high-quality firms producing high-quality goods that have emerged since divestiture, and that are performing important service to the economy. Indeed, according to another government agency, the Commerce Department's NTIA, the most innovative and efficient American businesses are rarely the largest or the most highly integrated but smaller, specialized firms.[166] NTIA Trade Report: Assessing the Effects of Changing the AT & T Antitrust Consent Decree at 17–18 (February 4, 1987).[167]

Moreover, the Department of Justice lack of concern regarding concentration ignores the effect such concentration will have on the survival of competition itself in several equipment markets, and the threat that will be posed by the ensuing manufacturing monopoly or oligopoly involving foreign firms. According to NTIA, the most plausible scenario in at least one telecommunications market is that, in the event of

---

**165.** While economies of scale are present in central office switch manufacturing, they are not in the data communications equipment industry. Compare IDCMA Comments at 30 with Department of Justice Report at 171–76 and Huber Report at 14.14. The trend in interconnection requirements has been toward less uniformity with respect to data communications equipment. IDCMA Comments at 42–43.

**166.** The manufacture of some products, such as data transmission equipment, including modems, digital data sets, multiplexers, and net-

work management systems, is today highly decentralized, involving many small firms.

**167.** NTIA goes on to comment that "It is no secret that large U.S. corporations have not always proven successful when confronted with aggressive foreign-based ... competition ... [F]irms such as AT & T ... did not quickly develop the ability to function in competitive markets because for years the company did not need to, and devoted its resources to satisfying 'captive' Bell System requirements." NTIA Trade Report at 17–18.

a removal of the decree restriction on manufacturing, the Regional Companies will join forces with mammoth manufacturing empires,[168] most likely foreign,[169] and that this will pose a substantial risk of destruction of the United States central office equipment manufacturing industry. NTIA Trade Report at 125–26.[170]

These predictions are plausible. Dr. Huber's survey has found that affiliations between central office switch manufacturers and telephone service companies have tended to develop around the world wherever structural restraints are absent. Huber Report at 14.21–23. This is not surprising. Manufacturers have strong incentives to seek market share "guarantees" in the form of an affiliation with large exchange service providers such as the Regional Companies; and these companies, in turn are attracted by the acquisition of expertise and, more importantly, the minimization of risk embodied in partnerships with huge manufacturers with ample capital.

Because of their size, capital, and assured source of income from the ratepayer-supported telephone affiliates of the Regional Companies, these international giants will have the market power to adjust price almost at will to achieve market share, to the inevitable detriment of independent domestic producers. In short, the effect of the Justice Department's scenario is likely to be the displacement of small, efficient American firms by a few huge syndicates composed of foreign company and Regional Company components whose survival and domination in this environment will have been achieved by factors unrelated to efficiency or quality of performance.

Among its many other undesirable consequences, such a development would further reduce competition in this country, if only because the combination of foreign capital and the Regional Company monopoly position [171] with a captive market amounting to some seventy percent of the total market will prove fatal to whatever independent or smaller producers still survived. Another likely consequence would be a strong detrimental effect on the international competitiveness of the American telecommunications industry and the employment opportunities of American workers. NTIA Trade Report at 108–09.

In sum, not only has no change occurred in telecommunications and CPE manufacturing since 1982 that would justify the removal of the restriction under the section VIII(C) standard, but the opposite is true: a removal of the restriction would be likely to extinguish or substantially curtail the healthy competitive domestic market that has emerged in the last three years. There is no justification for removing the manufacturing restriction, and the requests for such removal will be denied.

## V

### Information Services

■ Section II(D)(1) of the decree prohibits the Regional Companies from providing "information services." *AT & T*, 552 F.Supp. at 227.[172] An information service is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information which may be conveyed via telecommunications." *AT & T*, 552 F.Supp. at 229.[173]

---

168. NTIA Trade Report, *Assessing the Effects of Changing the AT & T Antitrust Consent Decree* at vi (February 4, 1987).

169. Notably, one of the few intervenors to support removal of the restriction is Stantel Telecommunications, Inc., the U.S. subsidiary of Great Britain's Standard Telephone and Cable plc. Comments at 2.

170. *See also* Huber Report at 1.16, 1.17, 14.25.

171. The eagerness of the Regional Companies to combine with foreign manufacturers is exemplified by BellSouth's passionate argument in fa-

vor of such ventures. Response to Comments at 39–40.

172. A somewhat related provision, section VIII(D) of the decree, prohibits AT & T from providing electronic publishing, a type of information service, for a period of seven years from the date of entry of the decree. *AT & T*, 552 F.Supp. at 231.

173. The Department of Justice claims to have some difficulty in distinguishing between exchange services and information services. Report at 106, 116. This claim is somewhat puz-

While the decisions on interexchange services (Part III) and on manufacturing (Part IV) are not particularly difficult, because no persuasive case has been or can be made that the particular restrictions are eligible on any reasonable basis for removal under section VIII(C) of the decree, the problem is more difficult with respect to the information services restriction which is discussed here and in Part VIII, *infra*.

If the Court were to consider only the request of the Regional Companies and of the Department of Justice for a complete removal of the restriction on the provision of information services, without distinction between content and transmission, that decision, too, would plainly have to be in the negative, for the information services restriction is supported by the same factors that require retention of the interexchange and manufacturing prohibitions.

As the Court stated in the 1982 Opinion explaining the provisions of the decree:

> All information services are provided directly via the telecommunications network. The Operating Companies would therefore have the same incentives and the same abilities to discriminate against competing information service providers that they would have with respect to competing interexchange carriers. Here, too, the Operating Companies could discriminate by providing more favorable access to the local network for their own information services than to the information services provided by competitors, and here, too, they would be able to subsidize the prices of their services with revenues from the local exchange monopoly.

*AT & T*, 552 F.Supp. at 189 (footnote omitted).

The Court went on to say at the time that, if the Operating Companies were excluded from the information services market, they would have an incentive to design their networks to accommodate the maximum number of information service providers on account of the earnings they could expect to receive from these providers in terms of access fees. On the other hand, if these companies were permitted to provide their own information services, their incentive would be "to design their local networks to discourage competitors, and thus to thwart the development of a healthy, competitive market." *AT & T*, 552 F.Supp. at 189–90 (footnote omitted).

Based upon these considerations, the Court has consistently upheld the restriction as incorporated in the proposed consent decree submitted by the parties. Thus, it explicitly rejected the suggestion, made early on, that the Regional Companies could "most efficiently provide information services by taking advantage of various economies," for example by the use of the same equipment for exchange telecommunications and information services. *AT & T*, 552 F.Supp. at 189 n. 238. The Court concluded that it would be impossible to determine whether such an advantage was due to inherent efficiencies or to efficiencies resulting from the deliberate design of the network in a discriminatory fashion. *Id.*[174] Similarly, in response to a 1984 request by the Regional Companies for a waiver of the line of business restrictions in section II(D)(1) of the decree, the Court reaffirmed that removal of the information services restriction would have to await "significant technological or structural changes" that would substantially reduce the dependence of information service providers on the local exchange networks. *AT & T*, 592 F.Supp. at 868. And the Court found that, as of that time, no such changes had occurred.[175]

zling, for it was the Department that made the distinction when it drafted the decree.

**174.** As explained above, network design is never complete; particularly where as dynamic a market as that for information services is involved, redesigns are not merely optional, they are often mandatory.

**175.** While competition in the various information services markets has substantially increased, *see* Part VIII, *infra*, these services vary widely with respect to concentration and ease of entry. Some markets, such as those for telephone answering services, public announcement services, and alarm monitoring, for example, are easy to enter and, in most geographic areas, unconcentrated. Others, including legal

### A. The Regional Company Bottlenecks

There still has been no significant, relevant change in the situation. As discussed in Part II–B, *supra,* the Regional Companies continue to possess bottleneck control over the local exchange facilities, and these are the facilities upon which competitive information providers, like the Regional Companies' competitors in the interexchange and the manufacturing markets, depend.[176] As then Assistant Attorney General Douglas J. Ginsburg stated in a September 19, 1985 letter, to John D. Dingell, Chairman of the House Committee on Energy and Commerce, at pp. 5–6:

> [t]he Decree's basic restrictions on the BOCs' ability to provide information services are based on the BOCs' control of access to telephone customers through the local exchange network ... should conditions change to the degree that the BOCs no longer possess bottleneck monopolies over the local networks, it would be appropriate to consider removal of the information services restriction.

Competition in the local exchange markets is foreclosed now as it was then, because of the economic infeasibility of alternate local distribution technologies on a substantial scale. To be sure, information services can bypass the local monopoly bottlenecks controlled by the Regional Companies to a slightly greater extent than can interexchange services. However, as will now be seen, the various additional bypass technologies do not provide meaningful channels to the information service providers who, by the very nature of their business, must seek to reach large, dispersed audiences over reasonably priced, interactive facilities. NTIA, *Competition in the Local Exchange Telephone Services Market* at 29.

Thus, the physical transport of media through computer disks or CD–ROMS [177] is not comparable in functionality to on-line database services. The CD–ROMS are essentially storage mediums; they do not provide transactional capabilities, and they have largely fixed user costs. Another possible alternative, satellite transmission, is unsuitable for all except possibly some of the very largest users because (1) the general public itself could not be reached by way of satellite communications but only the Regional Companies' own facilities, and (2) satellite transmission is used efficiently primarily for a continuous, high volume stream of one-way data.[178] And while cable networks are not dependent for transmission on the local exchange network, they do depend on permission from the Regional Companies for attachment of their cables to the telephone companies' poles and the sharing of their conduit space.[179] In any event, regardless of the nature and scope of cable dependence on local exchange facilities, ubiquitous cable networks have yet to be developed,[180] and cable, too, generally provides only one-way data.

In short, there does not exist any meaningful, large-scale alternative to the facilities of the local exchange networks, and the information service providers remain as dependent upon those facilities, and those who control them, as they did in 1984 and as interexchange providers do at the present time.

Dr. Huber, the Department of Justice's expert, not only recognizes this conclusion throughout his report,[181] as does the

---

database access and retrieval, and transaction processing, are more highly concentrated. Department of Justice Report at 112; Huber Report at 6.50–6.51, 6.15–6.16, 7, 8, 10, 12–13.

**176.** *See generally* Analysis dated May 19, 1987, by Dr. Lee L. Selwyn and W. Page Montgomery on behalf of Teconomics and Technology, Inc., attached to the Reply of the Ad Hoc Telecommunications Users Committee.

**177.** CD–ROM stands for compact-disk read-only memory.

**178.** *See* Huber Report at 6.20–6.21.

**179.** Warner Cable Communications Comments at 12–14; *see also* National Cable Television Association Comments at 28–34.

**180.** Warner Cable Communications Comments at 15.

**181.** Although on the topic of information services, as on other topics, Dr. Huber endorses the general Department of Justice positions, the facts he reports on not infrequently support conclusions at variance with those positions.

NTIA,[182] but he correctly emphasizes that, because of their very nature, information services are especially vulnerable even to slight manipulation and discrimination, as they are also to small degradations in transmission quality. For that reason, he correctly concludes that the various examples of non-access-dependent services cited by the Department of Justice are not real substitutes, especially for "time-sensitive information services, [whose] competitive health ... depends strongly on continuing non-discriminatory access to [Regional Company][183] services and facilities." Report at 6.23. In another section in his report, he notes that

> [c]ompetition among database providers and electronic publishers is critically dependent on reliable fast delivery at a reasonable cost. The telephone network provides a critical link between many providers and their customers. The possibility of [Regional Company] entry into these information markets therefore raises the familiar concerns about the possibility of discriminatory access to [Regional Company] facilities.

Report at 7.7.

Again, according to Dr. Huber, the national value added networks "depend heavily on the [Regional Companies] to provide transparent access to end user's data traffic." Report at 5.13. In sum, while in his view new transport technologies are "on the horizon, the [Regional Company] still provides critical links in the transport pyramid." Report at 7.15.[184]

## B. *Incentive and Ability to Discriminate*

It is necessary next to determine whether, with respect to the provision of information services, the incentive and ability of the Regional Companies to engage in anticompetitive conduct remains the same as it was when the decree was entered. The answer is plain. There has been no change whatever in this respect since 1984, and no demonstration that now, unlike then, there is no substantial possibility that the Regional Companies could not, and indeed would not, use their monopoly power to impede competition in the information services market.

The Regional Companies argue at some length that they have no incentive to discriminate against competitors in the information service market because to do so would diminish use of the network and hence a reduction in their revenues.[185] But in any market where the Regional Companies are in competition with independent information service providers, their economic interest lies in manipulating the system toward use of their own services, rath-

---

**182.** A technical analysis performed by NTIA likewise makes clear that the characteristics of alternatives relied on by the Department of Justice are incompatible with the needs of most information services: (1) private microwave systems require unobstructed line-of-sight transmission paths, and typical cost per small system is $12,000 to $38,000; (2) as to fiber optic systems, only thirty-three users of local fiber systems have been cited, targeted customers use either 24 or 672 voice grade equivalent channels, and primary use is for interexchange access or private networks; (3) only a small number of cable television systems have the costly equipment needed for two-way operations; (4) cellular radio systems are not generally appropriate for nonmobile service; costs make cellular service undesirable as a substitute for local service at this time; and long talking times could degrade service quality; (5) cost of digital termination systems may be higher than for microwave systems, over $7,850 per voice channel according to Bell Communications Research; and (6) satellite systems are most cost-effective for high traffic volume, long haul

(greater than than 200 miles) applications, and cost per voice channel is as high as $2,000. NTIA, *Competition in the Local Exchange Telephone Services Market* at 29, 30–34, 37–38.

**183.** The Huber Report generally uses the broader term "LEC," but as indicated *supra,* the vast majority of local exchanges companies are Regional Company exchanges and, in any event, for purposes of this analysis, there is no relevant distinction.

**184.** Additionally, under the FCC's *Computer III* order, the Regional Companies may install information services equipment in their central offices, but their competitors must locate comparable equipment elsewhere, where, as General Electric Communications and Services Company emphasizes, Opposition at 23, their more expensive interconnections can be subject to delay and other manipulation.

**185.** NYNEX Response at 32–33; U S West Memorandum at 42.

er than in encouraging maximum use of the network by their information service competitors. Only ten to twenty percent of the total cost of an information service is accounted for by Regional Company usage costs, Huber Report at 6.29, and a Regional Company would therefore earn far more from a customer base through use of its own information service than it would through network usage by calls made by and to its information service competitors.

That the ability for abuse exists as does the incentive, of that there can also be no doubt. As stated above, information services are fragile, and because of their fragility, time-sensitivity, and their negative reaction to even small degradations in transmission quality and speed, they are most easily subject to destruction by those who control their transmission. Among the more obvious means of anticompetitive action in this regard are increases in the rates for those switched and private line services upon which Regional Company competitors depend while lower rates are maintained for Regional Company network services; manipulation of the quality of access lines; impairment of the speed, quality, and efficiency of dedicated private lines used by competitors; development of new information services to take advantage of planned, but not yet publicly known, changes in the underlying network; and use for Regional Company benefit of the knowledge of the design, nature, geographic coverage, and traffic patterns of competitive information service providers.[186]

Dr. Huber, too, has recognized that the Regional Companies are able to discriminate in the provision, maintenance, and restoration of private lines, access or timing of new basic transmission services, and misuse of customer and competitor information, Report at 7.10, and furthermore that costs can be shifted to regulated business on a large scale.[187] Huber Report at 12.16, 11.18, 10.23, 13.11, 9.9, 8.12, 7.15; *see also* Comments of Information Industry Association at 13–15.

Even now, when the opportunity for improper activity by the Regional Companies is minimal compared to what it would be if the restriction were lifted, danger signals have begun to appear. For example, Dun & Bradstreet complains that in the Yellow Pages directory market BellSouth is duplicating the Bell System pattern of refusals to deal with competitors, protests of willingness to do so being followed by bad faith negotiation, and further delay. That particular dispute appears to be pending in the courts. Comments at 35–36 n. 15.

Similarly, Metscan, an automatic meter reading and monitoring system, claims to have been treated with respect to its connecting jacks just as the Bell System treated equipment competitors—delays, excessive charges, and difficulties in achieving satisfactory access of necessarily interconnection devices. Comments at 7–8.

To the extent that it is possible for them to do so, the Regional Companies may even now be engaged also in improper cross-subsidization. For example, a study undertaken by the staff of the California Public Utilities Commission of Pacific Bell's relationships with its affiliates found evidence that: (1) Pacific Bell and its ratepayers were not adequately compensated for the loan or transfer of skilled personnel to

---

**186.** *See* Comments of ADAPSO at 21–28; Opposition of General Electric Communications and Services at 21.

**187.** That report notes at 7.15 that "[c]ross-subsidy is possible for some major cost categories"; at 8.12, that the "[Regional Companies] retain a very strong hold on [information service provider] access to [Public Announcement Services] customers through 976 services"; at 10.21, that "[i]f the BOCs were allowed to enter the market for [Voice Storage and Retrieval] service, they might be able to compete unfairly by shifting the costs of unregulated VSR service into their regulated accounts, thus reducing their apparent costs of providing service"; at 11.18, that "[i]f a BOC offered electronic mail service, about 70 percent of the costs of the service bureau would be potentially shiftable to the BOC's regulated accounts"; at 12.7, "[i]f the BOCs were allowed to enter the transactions processing market, they would have an incentive to hinder their competitors in that market by denying them access to inputs over which the BOCs had control"; at 12.16, "substantial potential for cross-subsidy appears to exist"; and at 13.11, "the [Regional Company] still provides critical links for alarm providers".

unregulated operations; (2) Pacific Bell provided legal and training services to competitive operations at below market value and Pacific Bell employees performed unbilled work for unregulated affiliates; (3) properties were transferred from Pacific Bell to unregulated operations at below fair market value; (4) technology was transferred to competitive operations from Pacific Bell on an uncompensated basis; and (5) PacTel unregulated operations were gratuitously benefiting from their affiliation with Pacific Bell. California Public Utilities Commission, *A Report on Pacific Bell's Affiliated/Subsidiary Companies,* Proceeding No. A.85–01–034 (June 3, 1986).

Perhaps even more telling is the Department of Justice's recognition that "[o]ne cannot be as definitive with respect to to the potential competitive effects of a [Regional Company's] provision of information services that use [its] local exchange facilities" as with respect to those that do not.[188] Report at 122.[189] As discussed above, almost all information services must and do use the Regional Companies' local exchange facilities.

In short, the reasons cited by the Court in 1982 and in 1984 are as valid today as they were then. There is no question but that the Regional Companies would have the same incentives and the same abilities attributed to them at that time, and that to open up the information services market to its full extent, as requested by some, would be to take the very risks [190] that neither the Department of Justice nor the Court were willing to take three years ago, and that the decree plainly forbids. The restriction

on the sale by the Regional Companies of information content will accordingly be maintained. With respect to the issue of information transmission, *see* Part VIII, *infra.*

## VI

### *Regulation*

The Regional Companies and the Department of Justice argue that, unlike during the period prior to the entry of the decree, FCC regulation can now be depended upon to keep those in control of the local exchanges from engaging in anticompetitive activities, whether in interexchange services, in manufacturing, or in information services. The Court has carefully considered these arguments as well as the regulations on which they are based. Upon such consideration, the Court has concluded that there is no reasonable basis for assuming that the regulations will solve the antitrust problems presented by this case.

#### A. *General*

First. As discussed in Part I, *supra,* despite the decades-old requirements in the Communications Act, 47 U.S.C. § 202(a), and various FCC regulations requiring nondiscrimination, equal access, and proper cost allocations, and notwithstanding the Commission's own persistent and dedicated efforts for a number of years, the FCC was unable to prevent or to remedy major anticompetitive abuses by the Bell System achieved through the activities of its local affiliates.

A substantial part of the trial of this case revolved around the ever-changing Bell

---

**188.** Up-to-date information and constant availability are the features most sought by subscribers. Comments of Leghorn Publishing Company at 5.

**189.** The status of FCC regulation and its lack of present effectiveness are of course no different in the information services market than they are with respect to interexchange services and manufacturing (*see* Part VI, *infra* ), and the division of the Bell System into seven Regional Companies and what progress has been made with respect to equal access have likewise no greater weight here than they have in the other contexts discussed above.

**190.** As the Committee of Corporate Telecommunications Users notes, there are also important privacy considerations at stake when, for example, a Regional Company, having control of its customers' lines of communication, will also have access to their lines of credit, travel plans, credit card expenditures, medical information, and the like. Comments at 17–19. On the basis of a subscriber's telephone calling patterns with respect to information, a Regional Company could easily pinpoint that subscriber for the sale of Regional Company-generated information and the sale of other products and services connected therewith, to the point where that company would have a "Big Brother" type relationship with all those residing in its region.

strategies and the Commission's largely futile efforts to cope with these strategies. The Department of Justice argued, and at the trial it introduced voluminous expert testimony and other evidence in support of its argument, that the local exchanges are so complex and so technically dynamic, and that they comprehend so many and such complex joint and common costs, that regulation could not prevent anticompetitive activities.[191] The Department accordingly stated in its Response to Public Comments on the Proposed Modification of Final Judgment, 47 Fed.Reg. 23,320–336 (May 27, 1982), at the time the consent decree was under consideration that:

> At the heart of the government's case in *United States v. AT & T* was the failure of regulation to safeguard competition in the face of the powerful incentives and abilities of a firm engaged in the provision of both regulated monopoly and competitive services. Neither of these problems [cross-subsidization and discrimination] has thus far proven amenable to successful regulatory solution. Indeed, the very basis for divestiture is that the anticompetitive problems inherent in the joint provision of regulated monopoly and competitive services are otherwise insoluble. Thus, permitting BOC entry into competitive markets would undermine the rationale for the divestiture that is the central remedial mechanism of the modification.

The Department went on to say that there was "little possibility" that regulation would be capable in the future of detecting or preventing discrimination by the Regional Companies. Response of the United States to Public Comments, *supra*, 47 Fed. Reg. at 23336.[192]

Second. At the time of the drafting of the consent decree, the parties also considered several detailed "regulatory" injunctions, in lieu of the more drastic solution finally adopted. These proposals were appropriately labelled by the parties "Quagmire I" and "Quagmire II." Department of Justice Competitive Impact Statement at 51–53. Ultimately, the Department concluded that regulatory measures could not "approach even remotely" the effectiveness of the more decisive decree that was submitted to the Court, *id.* at 53, and the Court endorsed that position. *AT & T*, 552 F.Supp. at 166–68.

There cannot be the slightest doubt, therefore, that as of the time of the entry of the decree, the parties [193] and the Court had concluded that regulation would not and could not be made to work, and that only the divestiture and the concomitant imposition of the line of business restrictions on the Regional Companies could be depended upon to prevent a resumption of anticompetitive activities.

Third. Given that record, reliance could properly be had on regulation as a basis for the removal of the decree restrictions only upon a showing of a reduced need for

191. *See, e.g.,* Department of Justice Memorandum of August 16, 1981, at 46–47, 125 n. *, 161–62, 281–82, 285, 374; Department of Justice Pretrial Brief at 24–25, 79–84.

It was the Bell System's position at the trial, just as it is the position of the Regional Companies now, that regulation is an effective instrument for preventing and curbing any possible anticompetitive activities. The decree implicitly rejected that position.

Prior to the entry of that decree, the FCC, like the Bell System, and unlike its own two long-time chiefs of the Common Carrier Bureau (*see* pp. 531–32, *supra*), contended that the regulations were adequate to prevent anticompetitive abuses. *See, e.g.,* Amicus Curiae Brief of FCC dated April 20, 1982, at 35–37. The Court instead accepted the contention of the Department of Justice, buttressed by the voluminous trial record, that the regulations could not solve the problems, and the decree was entered on that basis. *AT & T*, 552 F.Supp. at 187 n. 229; Department of Justice Response of May 20, 1982, at 57.

192. The basic problem was then what it still is today: the FCC was attempting, without significant success (1) to define various rights of access to the monopoly switches and to enforce these rights, and (2) to allocate what are inherently almost unallocable joint and common costs of the Operating Companies.

193. The Bell System did not concede, and the Court was not called upon to find, that violations of the antitrust laws had occurred. *See AT & T*, 552 F.Supp. at 210–11. However, the decree proceeds on the basis of an implicit assumption to that effect. *See also AT & T*, 524 F.Supp. at 1336–1381.

regulation or a substantial improvement in the regulatory language and practice.[194] Yet neither has occurred since 1982.

If anything, the need for the line of business restrictions is greater today than it was before the Bell System breakup. At least in theory, and to an extent in practice, the Bell System was regulated in almost all of its structures and operations.[195] By contrast, many of the current operations of the Regional Companies take place in unregulated markets. This complex mixture of regulated and unregulated activities provides these companies both with a powerful temptation and with ample opportunity to commit anticompetitive abuses in the competitive markets and to subsidize their competitive operations with profits earned in the monopoly markets.[196] In view of the fact that, when compared with the Bell System, the organizational state of the Regional Companies is much less rigid and far more complex—with their subsidiaries, partnerships, joint ventures, and other enterprises, some regulated, some unregulated, some regulated in part [197]—discrimination against competitors and cross-subsidization are far more difficult to detect, prevent, and rectify through regulation now than they were in 1982.[198]

Fourth. To the extent that there has been any recent change in the regulatory picture itself, it has been to weaken the regulations governing telecommunications carriers, not to strengthen them. This is shown most dramatically by the FCC's repeal of the separate subsidiary requirement for Regional Company competitive enterprises—a requirement that it had theretofore regarded as its most effective regula-

194. Several Regional Companies would stand the relationship between the decree and regulation on its head, contending that criticism of the efficacy of various FCC rules "are in reality rearguments of issues already presented to and rejected by the Commission." *E.g.,* Reply of Pacific Telesis at 42–45; *see also* Reply of Southwestern Bell at 21–23. The decree in this case was premised in substantial part upon the inadequacy of regulation as a means for dealing with practices that violated the Sherman Act. It is absurd to maintain that, if the same or similar regulations are still inadequate and that the decree's removal standard therefore cannot be met, the restrictions should be eliminated anyway because the Commission has not seen fit to adopt more effective regulations, and rearguments have either not been made or were made and have failed. The governing law of the case here is the decree, not FCC decisions.

Furthermore, the FCC is of course not charged with the duty of enforcing the antitrust laws; indeed, the Commission has suggested that it is quite prepared to ignore or override antitrust concerns. FCC Response in Opposition to AT & T Motion at 4–5.

In sum, the Regional Company arguments constitute simply one more attempt to reverse the burden of proof, evidently because of the realization that they could not satisfy the section VIII(C) standard. *See also* notes 26, 35, 38, 90, *supra.*

195. However, the FCC had no direct regulatory responsibility over Western Electric or Bell Laboratories. Department of Justice's Third Statement of Contentions and Proof at 1846.

196. *See also United States v. AT & T,* 627 F.Supp. 1090, 1095–96 (D.D.C.1986).

197. In addition, the Regional Companies are frequently changing their organizational structure. *See Washington Post,* July 8, 1987, at Fl, regarding an apparently fundamental change in the corporate structure of Bell Atlantic with substantial implications for the monopoly and competitive operations.

198. Since each of the Regional Companies operates in several states, the state and local regulatory bodies likewise have a very difficult job, for none of them is likely to be aware of the entire financial and operational status of a Regional Company. Thus, as the Colorado Public Utilities Commission points out, in a number of states the Regional Companies "are essentially unregulated although they absolutely and deeply affect the public interest," to the point where the Commission "cannot even look at the books and records of U S West," the Regional Company in that area. Comments at 2. *See also Louisiana Public Services Commission v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

Several Regional Companies rely upon *Southern Motor Carriers v. United States,* 471 U.S. 48; 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), apparently for the proposition that the Sherman Act does not preempt state regulation. Reply of Pacific Telesis at 28–30. But the Supreme Court held in that case only that collective ratemaking activities are immune from antitrust liability under the state action doctrine enunciated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). That principle and that holding have no relevance to the instant lawsuit, let alone the instant proceeding.

tory tool.[199] The FCC has also announced that it will preempt any state from attempting to require structural separation or otherwise to institute stricter safeguards for Regional Company CPE operations than its own. *CPE Decision*, 2 FCC Rcd at 158–61; BOC Structural Relief Order at ¶ 112.[200]

Fifth. Between the 1950s and the early 1970s, the FCC was committed, as was the nation generally, to vigorous regulation of a variety of business enterprises, especially those with public utility characteristics. Much of that has changed. The FCC and individual members of the Commission have repeatedly expressed themselves in favor of wide deregulation.[201] The Court of course does not express any judgment on the wisdom of that policy; that is beyond its jurisdiction. However, a regulatory body that is committed in principle to

as little regulation as possible can hardly be cited at the same time in support of the proposition that it will probably regulate more vigorously and more effectively than its predecessors which wanted to engage in tight regulation and operated in a general governmental environment that regarded strict regulation as a positive goal.[202]

Sixth. The FCC now has fewer resources with which to regulate telecommunications carriers than in the past, particularly in the difficult and complicated area of cost allocation that was a central issue in the trial and that is central to the issue of cross-subsidization today. Since the time of the entry of the decree, the FCC's budget and manpower have decreased significantly. In 1980, the FCC had an authorized ceiling of 2,103 employees; this had fallen by 1987 to 1,855 employees, and the Commission was apparently short by 120

**199.** Strong cost allocation controls were in existence on paper long before the decree was entered, but they proved to be consistently ineffective. *AT & T*, 552 F.Supp. at 160–65; Department of Justice Response at 79–82. As noted above, FCC officials themselves conceded that the Commission could not prescribe cost allocation standards for the Bell System, and when that body began formulating the rules that would apply after divestiture, it concluded that *no measures short of structural separation* could prevent the Regional Companies from exploiting their monopoly power to gain unfair advantages in unregulated markets. *Policy and Rules Concerning the Furnishing of Customer Premises Equipment and Enhanced Services and Cellular Communications Services by the Bell Operating Cos.*, 95 FCC 2d 1117 (1983), *aff'd sub nom. Illinois Bell Telephone Co. v. FCC*, 740 F.2d 465 (7th Cir.1984), *aff'd on reconsideration*, FCC 84–252, 49 Fed.Reg. 26,056 (1984), *aff'd sub nom. North American Telecommunications Ass'n v. FCC*, 772 F.2d 1282 (7th Cir.1985). Curiously, in light of that history, one of the first steps taken by the Commission to "strengthen" the regulations was to eliminate the separate subsidiary requirement.

On a related point, the Ohio Office of Consumers' Counsel aptly remarks that, in considering cross-subsidization issues, it is well to keep in mind that the "local" network is in significant respects a "long distance" network because it has been constructed to meet the requirements of long distance service. Comments at 8. Fiber optic loops, for example, are classified as a basic exchange service cost even though they are not needed or particularly beneficial for basic local telephone service. *See* NASUCA Comments at 12.

**200.** The suggestion is made by some, including the Department of Justice, Response at 81, that the public is protected from excessive weakening of regulatory supervision by the availability of judicial review of FCC action. However, that review is in some respects quite limited. The Court of Appeals may not interfere with FCC decisions not to reject carrier-sponsored tariffs. *Aeronautical Radio, Inc. v. FCC*, 642 F.2d 1221, 1234 (D.C.Cir.1980). Even where a rate investigation is instituted, ratepayers have little judicial recourse. 47 U.S.C. § 204(a). And it is claimed by some that the Commission at times incorporates serious legal issues into ongoing investigations while permitting the challenged rates to go into effect so as to insulate them from judicial scrutiny. Comments of Aeronautical Radio, Inc., at 18–19.

**201.** Former FCC Chairman Mark J. Fowler last year carried this policy to its logical end when he proposed that "a three-year trial of total deregulation of telecommunications would be implemented in states willing to undertake such experiments." Fowler, Halprin & Schlichting, *"Back to the Future": A Model For Telecommunications*, 38 UCLA Com.L.J. 145, 194 (1986).

**202.** The lack of urgency with which the FCC approaches competitive issues is also exemplified by its bland comment that it had terminated an earlier proceeding on the equipment procurement practices of the integrated Bell System, although it "[stood] ready to revisit the issue...." FCC Comments as Amicus Curiae (March 13, 1987) at 27.

employees of even that lower ceiling.[203] According to former FCC Chairman Fowler, this "severe reduction of our staffing level, if allowed to continue, will limit our ability to meet the demands of our ever increasing workload in a timely and responsive manner." Testimony before Subcommittee on Commerce, Justice, State, the Judiciary, and Related Agencies, U.S. House Committee on Appropriations, February 18, 1987, at 2–3.

## B. *Cross–Subsidization*

The Court will now examine in more detail current regulations relied upon by those who claim that there has been a change and who, on that basis, advocate removal of the restrictions. This examination is conducted under two headings: regulations designed to deal with improper cross-subsidization; and regulations designed to prevent discriminatory interconnection. As will be seen *infra,* none of these regulations provides support for the cause of removal, for one of two reasons: (1) the particular regulation predates the decree and thus had addressed the problems on paper, but unsuccessfully, for many, many years; or (2) the regulation does not yet exist in effective form but is only on the drawing boards.

### 1. *General*

The cross-subsidization problem is as acute now as it ever was. The Huber Report states on the subject of cross-subsidization that (1) seventy to ninety percent of the costs underlying the interexchange access charges are joint and common; (2) the list of information provider costs that might overlap with exchange operating exchange costs is long and cross-subsidization opportunities are extensive; (3) there are substantial cross-subsidization opportunities in the Yellow Pages provision; (4) more than half the costs of a VSR service bureau (excluding network usage costs) are at least potentially shiftable; (5) seventy percent of electronic mail costs are potentially shiftable; (6) forty-four to seventy-eight percent of electronic credit card transaction services are potentially shiftable; and (7) seventy to ninety percent of alarm services costs are highly susceptible to misallocation.[204] What changes have occurred from the situation revealed by the trial record have been toward the existence of more problems in regulatory oversight rather than fewer.

It is intrinsically difficult for a relatively small group of regulators to prevent cross-subsidization within several multi-billion dollar entities, particularly if the entities are as complex internally and as fluctuating organizationally as the Regional Companies. Not only does each of these companies, as noted, represent a complicated mix between regulated and unregulated affiliates and operations, but the products, too, lend themselves easily to such a practice. As Dr. Huber observed, "... regulatory requirements that [Regional Companies] buy equipment competitively crumble quickly when the product being purchased

---

**203.** The Commission recently eliminated three auditors, comprising one audit team, in its Common Carrier Bureau.

**204.** Report at 3.49, 6.35, 6.36, 9.7–9.9, 10.22, 11.18, 12.5, and 13.10. According to some of the Regional Companies, the Huber Report has concluded that cross-subsidy concerns are not weighty. *See, e.g.,* Bell Atlantic Comments at 7. What Dr. Huber actually said was that "cross-subsidy through the shared use of resources that are *not* inherently common to regulated and unregulated operations is amenable to fairly straightforward regulatory supervision ... Resources that are common to two classes of operations are another matter entirely. *The regulatory history of separating costs between local and interexchange businesses is one of rampant and often deliberate cross-subsidy, blessed if not actually required by various regulatory bodies."* Hu-

ber Report at 3.53 (emphasis added). Professor Hausman, an expert retained by AT & T in its litigation against MCI, who now supports Pacific Telesis, contradicts this conclusion, but he is able to do so only by ignoring the lessons of the government's and the private *AT & T* litigation. Affidavit of Jerry A. Hausman, attached to Motion of Pacific Telesis Group for Waiver of the Line of Business Restrictions. Similarly, the opinion of Bruce E. Stangle that vertical integration is pro-competitive under the circumstances here (Affidavit of Stangle attached to U S West Reply Memorandum, App.Tab 12, pp. 15–19) is both wrong and it cannot overcome the contrary conclusion reached by the Court when the judgment was entered (and when the Bell System's motion to dismiss was denied), that is the law of the case.

is technically complex and readily differentiated." Huber Report at 14.13.

An additional problem arises from the large disparity in size between the two types of affiliates. A subsidy that may be vital to the operations of a relatively small, unregulated entity operating in the competitive marketplace, is likely to be impossible to detect on the books of the larger, regulated (telephone) entity. Huber Report at 16.23. And of course it is to the books of the regulated affiliate that regulators would be looking.[205]

### 2. Joint Cost Order

As discussed above, previous regulatory programs did not succeed in preventing cross-subsidization in the Bell System with its far less complicated and less obscure structure. There is only one new FCC regulation of any significance to deal with this subject now,[206] the so-called Joint Cost order.[207] It is said to be the purpose of this

order to ensure that carriers engaged in both regulated and unregulated activities will not improperly burden ratepayers or gain an anticompetitive advantage by assigning costs of unregulated activities to the regulated activities. Whatever may ultimately be effectiveness of that order (see infra), it cannot, in any event, serve as a substitute for the decree restrictions now because it is not yet finalized or in force and is not scheduled to become effective until some time next year, if then.

When the Department filed its Report in favor of the removal of some of the restrictions, based in significant part upon the Joint Cost order, the FCC had not even released the text of the order, and the Department's conclusions with respect thereto were reached on the basis of an FCC news release.[208] But even the regulation that was ultimately issued is far from being in final form.[209]

---

**205.** Ameritech argues that cost shifting is held in check by the "persistent political and other regulatory pressures to hold rural residential and small business exchange rates below cost." Comments at 32 n. 24. There surely is some such pressure. But the submissions from the state regulators and others suggest that, due to their visible and powerful presence in every area of the country, it is the Regional Companies that, by legacy from the Bell System, have inherited the latter's political influence.

**206.** The possibility of cross-subsidization is of particular concern in equipment markets with high research and development costs, since the greatest possibility for cross-subsidization is in research and development. See Huber Report at 17.14; Department of Justice Report at 205. The risk of cost misallocation also is particularly great in markets, such as central office switch and PBX manufacturing, where there are substantial common costs between the provision of local exchange services and the particular equipment manufacturing market. Department of Justice Report at 179; Huber Report at 16.22. Yet the FCC is not even actively engaged in regulating the procurement of equipment. Department of Justice Report at 174; Huber Report at 14.13; see note 202, supra.

**207.** See Separation of Costs of Regulated Telephone Service from Nonregulated Activities, CC Docket No. 86–111, FCC 86–564.

**208.** Report No. DC–723, Mimeo No. 1246 (December 23, 1986) (Notice of Proposed Rulemaking).

**209.** In its current configuration, the Joint Cost order would provide that until a Regional Company files and obtains FCC approval of the newly required cost allocation manual, it must continue to conduct any CPE or enhanced services in accordance with the Computer II structural separation rules. Amendment of Section 64.702 of the Commission's Rules and Regulations (Second) Computer Inquiry), 77 F.C.C.2d 384 (Computer II Final Decision), modified on reconsideration, 84 F.C.C.2d 50 (1980) (Computer II Reconsideration Order), further modified on reconsideration, 88 F.C.C.2d 512 (1981) (Computer II Further Reconsideration Order), aff'd sub nom. Computer and Communications Indus. Ass'n v. FCC, 693 F.2d 198 (D.C.Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983), aff'd on second further reconsideration, FCC 84–190 (released May 4, 1984).

The FCC's Computer II rules, adopted shortly before the decree was proposed, allowed AT & T and the Operating Companies, which were then AT & T subsidiaries, to provide CPE and enhanced services only through subsidiaries separate from their operating telephone companies. The FCC later determined that these rules should apply to the Regional Companies. Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies, 95 F.C.C.2d 1117 (1983) (BOC Separation Order), aff'd sub nom. Illinois Bell Tel. Co. v. FCC, 740 F.2d 465 (7th Cir.1984), aff'd on reconsideration, CC Docket No. 83–115, FCC 84–252, 49 Fed.Reg. 26,056 (1984) (BOC Separation Reconsideration), aff'd sub nom. North American Telecommunications Ass'n v. FCC, 772 F.2d 1282 (7th Cir.1985).

. As presently drafted, the order would require each of the Regional Companies to adopt a cost manual in accordance with cost allocation standards,[210] and there would be rules for transactions with affiliates said to be designed to protect against cross-subsidization.[211] The Regional Companies had until September 1, 1987 to file their proposed cost allocation manuals. These manuals will hereafter each be subject to public comment and subsequently to review by the FCC for final approval. Based on normal regulatory schedules, some substantial period of time will elapse before this process is completed, and implementation of such manuals as are approved will obviously take some additional time. Finally, there is the delay inherent in petitions for reconsideration, *see* p. 574, *infra*, and the ever-present likelihood of requests for judicial review.

The problems with the *Joint Cost* order do not end with the timing of its issuance in final form; they also relate to substance. As stated above, and as experience has amply shown, cross-subsidization is easy to achieve by firms engaged in both regulated and unregulated business but difficult to detect and to remedy. If regulations are to

have any hope of success, they must facilitate such detection to the maximum extent possible. The *Joint Cost* order is not likely to accomplish this objective. To the contrary, it complicates the process of detection by allowing each Regional Company (1) to adopt a manual different from the others; (2) to choose its own cost allocation procedures, (3) to select its own accountants to review and certify the manual,[212] and (4) to use its own reporting categories and terminology.[213] In short, there will be no common denominator. Additionally, the rules will apply only to interstate services, while much of the Regional Company business, mixed and interrelated though it is, is technically intrastate in nature.[214]

The Commission had its own good reasons for adopting this particular system,[215] and the choice of regulatory means is obviously a matter for decision by that body, not this Court. But the issue before the Court is whether changes have occurred since 1984 to render obsolete the line of business restrictions of the decree. To pass on that issue, the Court must necessarily consider the efficacy of the regulations that have been suggested as one such significant change. It is difficult to escape

---

**210.** These standards are based upon a fully distributed costing methodology, with emphasis on direct assignment of costs based on causation to the maximum extent possible.

**211.** The affiliate transaction rules would generally require that transactions between the Regional Companies and their affiliates be recorded on the books at market price at such price can be determined from a price list or tariff. In the absence of a list or tariff price, assets transferred from a Regional Company to its nonregulated affiliate are to be recorded at the higher of netbook cost or fair market value, while assets transferred from the nonregulated affiliate to the Regional Company are to be recorded at the lower of these two figures. Services for which there exists no list or tariff price are to be valued in accordance with the cost allocation standards.

**212.** As one intervenor correctly points out, much of the application of the FCC's rules to the billions of dollars in expenses and investment is a matter of policy rather than pure accounting, and certificates by the Regional Companies' own auditors therefore cannot serve as an effective check. Western Union Telegraph Company Comments at 3.

**213.** All these differences and potential inconsistencies dash any hope of achieving the kind of "benchmark" comparisons which, it is argued by some (*e.g.*, Ameritech Comments at 8–12; NYNEX Comments at 8–9; U S West Comments at 36–37) will make anticompetitive actions easier to detect.

**214.** *See* U.S. Sprint Comments at 30. Accurate auditing is further complicated by the fact that the Commission declined to require reporting at relatively precise intervals; that it authorized the allocation to regulated accounts of "incidental" expenses for up to one percent of a Regional Company's entire revenues (or approximately $100 million per year); and that it required the companies to keep their records for only one year. FCC Joint Accounting Order at ¶¶ 182, 185, 77, 186.

**215.** As the Commission stated (*Joint Cost Decision*, FCC 86–564 at ¶ 120 n. 225:

> We did not propose to prescribe a manual because we believed that the mix of nonregulated activities and the organizational structure would vary widely from carrier to carrier, and that a single manual would not adequately encompass all possible variations.

the conclusion that, even if the *Joint Cost* order were actually in effect now—which of course it is not—it could not be regarded as a more effective regulatory instrument with respect to cross-subsidization than existed when the decree restrictions were adopted.[216]

A final cloud is cast upon the *Joint Cost* order by the fact that at least four of the Regional Companies—which incidentally rely in this Court on the existence of that order to support their motions for removal of one or more of the decree restrictions— have petitioned the FCC for reconsideration of the order.[217] CC Docket No. 86–111, 62 Rad.Reg. (P & F) 163 (1987).

### 3. *Self-Help*

In the absence of effective regulation now, and with like prospects for the future, there is the suggestion that self-help is the answer. The Department of Justice believes that the line of business restrictions are not necessary even if regulation is absent or not particularly effective because, at least with respect to equipment manufacture, most of the leading competitors could respond in kind by cross-subsidizing on their own.[218]

That argument is not only in stark and fundamental opposition to the Department's position for the ten-year period when the *AT & T* case was pending in the courts prior to the entry of judgment; it also loses sight of the function of the antitrust laws.

There is not the slightest reason to conclude that Congress believed that antitrust violations should be remedied, not by resort to law, but by retaliatory self-help measures. More particularly, there is no evidence that the laws, the courts, and the regulators were intended by the Congress that enacted the Sherman Act, and by successive Congresses and Presidents that endorsed that statute as fundamental to American economic life, to be silent spectators at cross-subsidization battles between large corporations, some of them—like the Regional Companies here—already under Sherman Act judgment. The congressional purpose throughout has been to see antitrust violations remedied in the courts under the rule of law, not through ordeal by combat or by survival of the fittest, or perhaps the least scrupulous.[219]

### C. *Interconnection*

Just like the regulations involving cross-subsidization, those which, it is claimed, will prevent discrimination in the installation or maintenance of interexchange transmission lines and the interconnection of lines or equipment, either predate the decree or are not in final form. Thus these regulations, too, fail entirely to provide assurance against such discrimination.

### 1. *Part 68*

The scene is appropriately set by the Department of Justice's 1982 defense of the decree, as follows:

Particularly in a technologically dynamic industry such as telecommunications, there is little possibility that regulation is capable of detecting or preventing the very subtle forms of discrimination that would be available to the BOCs. Thus, even were it possible to prescribe in detail the appropriate technical parameters of interconnection under current techno-

---

216. Western Union Telegraph Company, which conducted a study of the FCC's efforts to date to regulate the Regional Companies' access rates, found that "the FCC is no closer than it was 3½ years ago, when the first special access tariffs were filed, to determining whether the Regional Companies properly allocate costs to special access rate categories." Comments at 5–6.

217. The petitioners include Ameritech, U S West, Southwestern Bell, and Bell Atlantic. According to the Consumer Federation of America, actually six of the seven Regional Companies have filed for reconsideration, seeking a methodology that would more easily permit a shifting of competitive costs to the ratepayers. Reply Comments at 5–6.

218. Department of Justice Report at 205 n. 434, 189.

219. The suggestion that the law should view with passivity the use of monies extracted from ratepayers pursuant to governmental public utility regulation as subsidies for the utilities' unrelated competitive enterprises would have startled not only Theodore Roosevelt and Thurman Arnold but also Adam Smith and Milton Friedman.

logical conditions, regulators would have to have sufficient foresight to determine in advance the discriminatory potential inherent in tomorrow's technology ... Even if it were possible, moreover, effectively to monitor the technical aspects of interconnection in an evolving technological environment, there would remain still more subtle means of discrimination in operational activities, such as the timely provision, maintenance, testing and restoration of facilities. In short, the BOCs, if permitted to engage in competitive activities, would have substantial ability to frustrate regulatory attempts to prevent discriminatory conduct.

Response to Public Comments at 58.

The Department of Justice now asserts that the FCC regulations that provide the requirements for the connection of terminal equipment to the local network, the so-called Part 68,[220] limit the risk of interconnection discrimination. *See, e.g.,* Department of Justice Report at 187–88 n. 379, 163–64.

Reliance by the Department on Part 68 is truly ironic: these regulations were adopted in 1975, 1976, and 1977; they had become fully operational long before divestiture; and, most notably, they were the subject of much testimony and argument adduced by the Department during the trial of this case, all of it designed to demonstrate that they were ineffective. In 1982, the Department noted that "the very basis for divestiture is that the anticompetitive problems inherent in the joint provision of regulated monopoly and competitive services are *otherwise insoluble.*" Response of the United States to Public Comments (May 20, 1982). Even if the technical aspects of interconnection were susceptible to regulatory monitoring, "there would remain still more subtle means of discrimination in operational activities such as timely provision maintenance, testing, and restoration of facilities." *Id.* The trial evidence did, in fact, demonstrate the FCC's lack of success in the enforcement of these regulations,[221] and neither the Department nor any Regional Company has pointed to any developments indicating that these enforcement problems could be or have now been overcome.[222]

### 2. *Regulations Not Yet Adopted*

The proponents of a removal of the restrictions contend with somewhat more confidence that the FCC's *Computer III* decision[223] would impede the Regional Companies' ability to discriminate with respect to interconnection. That decision permits the Regional Companies to provide enhanced services, *i.e.,* generally speaking, information services[224] without the structural separation that was required by the earlier *Computer II* decision, provided that those entities comply with newly developed Comparably Efficient Interconnection (CEI)[225] and Open Network Architecture

---

220. 47 C.F.R. § 68 (1986).

221. The Department of Justice observes with wry understatement that the "regulations predated the [decree], but the FCC initially had difficulty enforcing them against AT & T." Report at 164 n. 323.

222. Even if these regulations had now, somehow, become more effective, it would not advance the arguments of its proponents by very much. Part 68 does not apply to many services, including analog private lines (to which approximately seventy-five percent of all high-speed business modems are connected), new digital service, and new data-over-voice services, and it also fails to prescribe the standards necessary to ensure that CPE will effectively operate in conjunction with the transmission service to which it is connected.

223. *Amendment of Section 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry),* CC Docket No. 85–229, F.C.C. 86–252 (released June 16, 1986) (*Computer III*).

224. Nothing comparable to the *Computer III* rulemaking has been undertaken regarding equipment procurement. Dr. Huber and the Department of Justice accordingly agree that "the discretion afforded management in purchasing decisions by regulators is quite broad." Huber Report at 14.13, 14.17.

225. CEI requires the Regional Companies to offer to enhanced service providers, with some exceptions, the same interconnection features on an unbundled basis and at the same price, as are enjoyed by these companies for their own equivalent services. *Computer III,* 104 F.C.C.2d at 1039–43, 1046–53.

(ONA)[226] requirements. These requirements are claimed to have been designed to ensure equal access to network facilities,[227] and both the Department of Justice and the Regional Companies contend that a Regional Company's ability to discriminate will be limited by the "open architecture" switches. *See, e.g.,* Department of Justice Report at 177 n. 352.

Just as is true of the *Joint Cost* order, reliance on the requirements of ONA and CEI is at a minimum premature. At this juncture, ONA is only a "developing concept," and "full implementation of ONA is several years away."[228] The ONA plans of the Regional Companies are not even scheduled to be filed until February 1, 1988,[229] and the FCC will then receive public comment on these plans. After studying the comments and adjusting the regulation in accordance with this new information, the Commission will then presumably take further action of an as yet unspecified nature.[230]

These rules have already experienced extended and bitter controversy, and submission of the ONA plans by the Regional Companies is likely to engender further delay and dispute. Indeed, just as it true of the *Joint Cost* rules, ONA, too, is under challenge before the FCC by the very entities that rely in this Court on its requirements as making unnecessary the decree restrictions in this case.[231]

The Department of Justice itself concedes that it is "unclear just what the impact of ONA on the potential for discrimination will be and how those effects will vary from market to market." Report at 177 n. 352. In fact, the Department also acknowledges that stronger controls were in effect before the decree, and that these controls were ineffective. Report at 164 n. 323.

In short, since ONA has neither been fully defined nor adopted or tested in the real world,[232] it is impossible to evaluate its effectiveness in preventing discrimination in interconnection[233] or, obviously, to rely

**226.** ONA would theoretically unbundle the components of exchange services and permit the purchase of each component or "basic service element" under tariff on an "equal access" basis. *Computer III,* 104 F.C.C.2d at 1019–20, 1063.

**227.** *Computer III* ¶¶ 4, 97; Department of Justice Report at 29–30. Interestingly, the Department of Justice believes that it was the prospect of scrutiny by this Court that was a substantial factor in motivating the Regional Companies to suggest ONA to the FCC in the first place. Department of Justice Report at 140 n. 278.

**228.** Department of Justice Report at 142 and n. 282.

**229.** *Computer III* ¶ 114; Department of Justice Report at 141.

**230.** As Cox Enterprises, et al., puts it "[g]iven its complexity, lack of definition, and the likelihood that ONA will be subject to a period of trial and error (if not further refinement) once implemented, the Department's reliance on ONA as an effective and reliable protective shield against anticompetitive behavior is premature and speculative." Joint Intervenors Comments at 12; *see also* Comments of GTE Corporation at 12.

**231.** Southwestern Bell, which contends in this Court that the ONA plans are effective and not vague (apparently because representatives from

that company held meetings on ONA with information providers and attended a national forum on ONA (Response at 44)), has filed a petition for reconsideration with the FCC challenging its authority to impose ONA requirements. Petition for Clarification and Limited Reconsideration, CC Docket No. 85–229, Phase I, at 4–11 (filed August 4, 1986). Challenges to ONA have also been filed by Bell Atlantic, BellSouth, and U S West.

The California PUC has also petitioned for reconsideration on the different ground that the *Computer III* decision improperly preempts the states' authority. Consumer Federation of America Comments at 16. The FCC represents that these petitions, as well as others, have been mooted by its adoption of orders addressing those petitions and issues at its meeting of March 26, 1987. The FCC does not state, however, how these issues have been mooted or resolved, stating only that those decisions will be released "in the very near future...." FCC Response at 37 and n. 79.

**232.** The Department of Justice concedes that "[i]t is not clear that the FCC possesses the authority to require the [Regional Companies] to make extensive and expensive network design changes" (Response at 74)—changes which may well be necessary if ONA is to work at all.

**233.** Even small transmission problems can greatly affect the viability of competitive providers. *See* U S West Response, Tab 1, at p. 8.

on it as ensuring, in the words of section VIII(C) of the decree, that there is no substantial possibility that the Regional Companies could use their monopoly power to impede competition.[234]

### 3. ONA Suffers From Significant Defects

Additionally, here again, even if these regulations were fully in force and effect, they would not be likely to have a decisive impact, for several defects in such standards as have been announced are already apparent.

First, as several intervenors[235] note, ONA will apply only to digital switches—switches that serve only one-fourth of all access lines available. Second, ONA will not assure equal access or equal cost since it will not require the Regional Companies to provide colocation of competitors' enhanced services within the Regional Companies' central offices.[236] Third, the Regional Companies will have no incentive to provide equal access for rival enhanced service providers, for with respect to these potential competitors, the Regional Compa-

nies will not be disinterested parties if the restriction is lifted. Fourth, ONA, as it stands now, will not address problems that will arise with new technical developments, but it applies only to conditions that pertain to current technology and those that are plainly anticipated now.[237] Fifth, the only Regional Company to have filed its CEI plan as of May 1987—Bell Atlantic—has submitted what may be a flawed product, for it eliminates outside plant and transport costs for its own service, while charging standard tariffs for competitors' access. Reply of Consumer Federation of America at 7.[238]

### 4. Other Standards

The Regional Companies and those who support their requests also place some faith in national and international standards for interconnection.[239] But not only is it not at all clear that across-the-board, uniform national standards even exist,[240] but what standards there are have in part been established by private organizations, some of them dominated by the Regional Companies themselves.[241] Furthermore,

---

**234.** The Centralized Operations Groups (COGs), which process, coordinate, and schedule orders for CPE interconnection, are also claimed to reduce the possibility of discrimination, particularly with respect to installation, repair and maintenance of CPE. Department of Justice Report at 164. COGs are not, however, the exclusive means by which CPE vendors place their orders. For example, a Regional Company's own CPE vendor does not have to place its orders through this mechanism. BOC Structural Relief Order at ¶¶ 82–83. The COGs were developed primarily for orders placed by PBX and key system vendors and have rarely been used for orders placed by data communications equipment vendors. It is not clear whether a Regional Company manufacturing CPE would have to place orders for interconnection of its own CPE through the COGs. Furthermore, the COGs are not required to handle maintenance. BOC Structural Relief Order at ¶¶ 82–83.

**235.** E.g., Compuserve Comments at 31; MCI Response at 56.

**236.** Comments of Consumer Federation of America at 15; U S Sprint at 30; IDCMA at 53–54.

**237.** While the Regional Companies' ONA plans must allow all competitors to obtain "unbundled and equal" access to "basic service functions," see Department of Justice Report at 141,

the Regional Companies retain control over the degree of unbundling, the development of new basic service functions, and the price for access to these functions. Thus, whenever a competitor's product or service will require novel and specialized access requirements, the Regional Companies' will have a further opportunity to discriminate in the form of access.

**238.** As for the CEI requirements, they provide very little protection against discrimination because there are numerous possible interpretations of CEI, MCI Comments at 55 n. 161, and because a Regional Company need not provide CEI until it decides to offer an enhanced service. United Telecommunications Comments at 21–22. The Computer III rules require that a Regional Company seeking to provide a particular enhanced service on an unseparated basis first obtain FCC approval of a plan providing CEI for other enhanced service providers. Computer III ¶ 190. 104 F.C.C 2d at 1054–55.

**239.** See, e.g., Department of Justice Report at 164.

**240.** Compare Department of Justice Report at 196 with IDCMA Comments at 42 n. 101.

**241.** For example, the T–1 Committee, administered by the Exchange Carriers Standards Organization, is said to be dominated by the Region-

the existing standards are strictly voluntary and could be ignored by the Regional Companies if they wished:[242] to deploy a new service, a Regional Company need only file a tariff.

International standards, developed in the Consultative Committee on International Telephone and Telegraph, have already proved not to be effective constraints, for although they have been in place for several years, the United States government and American corporations have generally ignored them.[243]

### D. *Network Design Information*

FCC regulations require the Regional Companies to disclose, reasonably in advance of implementation, information regarding the introduction of new network services or changes in existing network services as well as additional marketing information, when such information is provided to their separate subsidiary.[244] This regulation, too, was in existence and governing at the time of divestiture, and it did not prevent Bell System anticompetitive conduct based on the timing of disclosures. *See AT & T,* 524 F.Supp. at 1371–76.

Moreover, the FCC has actually weakened the disclosure requirement since that time.[245] *See BOC Structural Relief Order* at ¶¶ 50–51. As a result of that order, the disclosure obligation is triggered only when the Regional Company makes a decision to "make" or "buy" a product that relies on the new or changed network characteristic.

In addition, even when the trigger point for disclosure is reached, information is made available only to those manufacturers who enter into nondisclosure agreements with the Regional Companies.

Consequently, a Regional Company is now able to use network information to design its new equipment or CPE device as soon as the information is finalized by the network planners, while other manufacturers must be furnished the information necessary to engage in similar design activities only when the Regional Company is actually ready to fabricate its new product. Most of the time this will be so late, given time needed for the design phase, that independent manufacturers will be unable to compete. The FCC itself has previously recognized that disclosure at this period would sometimes be "too late." *See Disclosure Order,* 93 F.C.C.2d at 1224.

Additionally, the regulations do not require disclosure of information necessary for the design of equipment that will meet the specifications of the Regional Companies' exchange networks; they only require the disclosure of network changes that affect "intercarrier interconnection or the manner in which customer premises equipment is attached to the interstate network." 47 C.F.R. § 64.702(d)(2). That being so, the data communications market will be especially susceptible to discrimination.

---

al Companies. The Court has considered the lengthy Skizypczak affidavit submitted by NYNEX regarding that Committee; it has also considered, however, that the Committee has apparently yet to issue a single standard. Bell Atlantic's claim that standards "are now set" by the T–1 Committee, Memorandum in Support of Motion at 12, thus appears to be incorrect.

**242.** Huber Report at 16.19. Regional Companies have ignored national standards when it suited their purpose, as evidenced, for example, by Pacific Telesis' Project Victoria, which involves a non-standard version of an integrated services digital network and which required AT & T to redesign a certain type of its switched digital service to provide for dedicated access. Similarly, data-over-voice equipment designed for connection to BellSouth services in Florida will not work with NYNEX services in New York. IDCMA Comments at 42–43.

**243.** IDCMA Comments at 42 n. 102

**244.** 47 C.F.R. § 64.702(d)(2); *Computer and Business Equipment Manufacturers Association,* 93 F.C.C. 2d 1226 (1983) *(Disclosure Order).* In addition, the FCC has required carriers that are not subject to structural separation to disclose such information reasonably in advance of implementation. *Computer II Reconsideration Order,* 84 F.C.C. 2d at 82; *see also* 47 C.F.R. § 68.110(b) (1985).

**245.** The weakening changes of the disclosure requirement have been adopted predominantly for the Regional Companies' marketing of CPE, matters addressed in CC Docket No. 86–79. *See Furnishing of Customer Premises Equipment by the Bell Operating Companies and the Independent Telephone Companies,* CC Docket No. 86–79, FCC 86–529 (released January 12, 1987) *(BOC Structural Relief Order).*

Data communications equipment requires careful attention to and coordination with all the parameters of the transmission facilities with which it is to be used, because such equipment is operable only if the equipment at the customer's premises mirrors that at the exchange carrier's serving offices—the standard for one dictates the standard for the other. Thus, any disparity in access to information about the characteristics of existing, changed, or new transmission services can result in substantial differences in equipment design, characteristics, and costs. Since the FCC regulations do not require the disclosure of network requirements, their effect is likely to be to leave independent manufacturers hopelessly behind.

The FCC has also issued regulations that are claimed to prevent a Regional Company from obtaining an unfair head start over CPE rivals. These regulations would in theory prevent a Regional Company from using its local exchange status to utilize customer proprietary information unavailable to rivals in a dependent competitive market. 47 C.F.R. § 64.702(d)(3) (1986); BOC Structural Relief Order at ¶ 70. *See* Department of Justice Report at 164–65; Response at 113. However, that regulation, too, contains at least one very large loophole.

The regulation addresses only the use of customer proprietary network information for CPE marketing; it is not concerned with CPE manufacturing even though manufacturing information could and no doubt would also be used to gain advantage in that market. It is generally understood that it is highly important for anyone attempting to decide what new products to develop to have access to information regarding customers' network configurations, traffic patterns, and current equipment capabilities. The Department of Justice, for one, recognizes this defect but overcomes it by "presuming" that the FCC "would impose customer information rules that would prevent a BOC from discriminating...." Report at 187–88 n. 379. This speculation is an insufficient foundation upon which to base the removal of a restriction that effectively and *presently* reduces the possibilities of discrimination.[246]

In sum, the regulations relied upon by the Regional Companies and the Department of Justice to curb discrimination by the Regional Companies against their putative competitors in the markets they seek to enter are entirely inadequate: they either predate the decree and were found at the trial to be ineffective; they are not sufficiently comprehensive; they contain large loopholes; or they are a long way from being promulgated, let alone being implemented.

## VII

### *Regional Company Activities and Public Policies*

In addition to the factors discussed in the preceding sections of this Opinion upon which the Court's decision denying the motions for removal of the core restrictions is based, there are several other considerations much mooted by the parties and intervenors. Since these considerations are argued at some length by parties and intervenors, and since the Court also refers to them at times, they are discussed herein, albeit not at great length or detail. How-

246. The FCC regulation also permits Regional Company CPE personnel to have access to the CPNI of only those multiline business customers that have provided the Regional Companies with written authorization for such access; such information will be available to competing CPE vendors only if the customer takes affirmative action to permit them to have access. BOC Structural Relief Order at ¶ 70. Even though some CPE users may be sufficiently alert to seek competing bids from both Regional Company and non-Regional Company CPE vendors, the phenomenon of inertia and the inherent limitations on the dissemination of information will probably create an additional inequality between CPE vendors affiliated with a Regional Company and those that are not. IDCMA Comments at 39; *cf.* Department of Justice Response at 114; FCC Comments at 18. As Dr. Huber concedes, the effectiveness of these regulations will in practice be difficult to ascertain. Huber Report at 16.22. *Accord* CBEMA Comments at 17–27; Consumer Federation of America Comments at 5–16; ICA Comments at 5–6; MCI Comments at 54–62; NASUCA Comments at 8–24; Tandy Comments at 28–29; USTSA Comments at 46–49; Washington PSC Comments at 23–24.

ever, it should be noted that, with the exception of the topics discussed in Parts VIII and IX, *infra,* these considerations do not have an actual impact on the Court's decisions.

## A. *Current Anticompetitive Activities*

The Regional Companies are of course limited in the breadth and scope of the anticompetitive activities in which they are able to engage inasmuch as the most effective vehicles for such activities are beyond their reach due to the existence of the core restrictions of the decree. What is startling, however, is given the relative paucity of the field available for such acts, in how many ways these companies appear [247] nevertheless to have managed to discriminate and to cross-subsidize.

### 1. *Individual Companies*

Dr. Huber observes in his report that the Regional Companies [248] are continuing to use their monopoly power "to discriminate among users in the prices they charge for functionally identical switched lines." Huber Report at 2.9, 2.18–2.19, so as to impede competition in the intrastate toll markets. For example, the companies "have generally priced private lines so that (1) those terminating at AT & T facilities cost the most, (2) until April 1986 private lines terminating at other carriers' facilities were somewhat cheaper, and (3) lines terminating at LEC facilities or at private nodes remained the cheapest" (footnotes omitted). Report at 3.34; *see also* Report at 3.48 and n. 153. Similarly, the Depart-

ment of Justice states that the complexities of access charge pricing give the Regional Companies ample opportunity to manipulate these prices to their advantage, and that "such discrimination is not easy to remedy." Response at 34.[249]

More specifically, the Huber Report observes that, in the mobile services field, where because of the peculiar nature of the industry and the services a closer relationship exists between permitted and prohibited activities than is true elsewhere, Regional Companies have already (1) denied technically efficient interconnections to competing cellular carriers; (2) filed tariffs which set higher rates for competing cellular carriers than were offered for their own interconnections; [250] (3) imposed unreasonable and non-cost-based charges for interconnection; (4) threatened to discontinue service to competing cellular carriers if they did not accept whatever interconnection contracts were offered to them; and (5) refused to provide compensation to carriers that terminate or originate cellular calls on behalf of a landline carrier. Dr. Huber therefore concluded that "direct competition between [Regional Companies] and non-wireline mobile carriers does raise serious questions about discriminatory access." [251]

Regional Company efforts, similar to those of the Bell System in its heyday, to escape regulatory scrutiny seem also to be continuing. In September 1986, a commit-

247. In view of the disposition of the motions on other grounds, it is not necessary for the Court to reach definitive conclusions with respect to these Regional Company activities, although much circumstantial evidence supports the necessarily largely anecdotal conclusions discussed herein.

248. According to the report, this is also true of other LECs.

249. The Department cites, *inter alia,* its experience with attempting to resolve an AT & T complaint about U S West's allegedly discriminatory access pricing in connection with services to the General Services Administration, where nearly a year after the filing of the initial complaint with the Department, definitional and remedial issues still remain unresolved. Response at 34–35.

250. Further, as one intervenor suggests, the interconnection charges paid by a Regional Company through its wireline carrier will typically go into the pockets of that same Regional Company's telephone subsidiary, thus rendering the Regional Company itself immune from unreasonable, non-cost based interconnection rates. Radiophone, Inc. Response at 3.

251. Huber Report at 4.9–4.19. Dr. Huber also found that, among the ways in which the Regional Companies may gain anticompetitive advantages over the non-wireline carriers are discriminatory provisioning and maintenance of service; alteration of network standards; access to non-wireline business and growth plans; access to customer proprietary information; joint marketing activities; and cross-subsidies. Huber Report at 4.18, 4.21 n. 76, 4.22.

tee of the National Association of Regulatory Utility Commissioners (NARUC), issued a report based upon audits of five Regional Companies—Bell Atlantic, Bell-South, U S West, Ameritech, and Pacific Telesis. The committee found that (1) during the audit process, the Regional Companies consistently attempted to block access to accounting and cost allocation records; (2) the information provided was frequently of poor quality; (3) the audit revealed that customers of several Regional Companies had improperly been forced to subsidize the activities of competitive subsidiaries of these companies; (4) valuable lines of service (e.g., Yellow Pages) were transferred from the telephone companies to unregulated subsidiaries; [252] and (5) the Regional Companies tended to transfer virtually all telephone income to the parent Regional Companies, with minimum infusions of equity from these companies to the telephone subsidiaries.[253] Comments of Washington Utilities and Transportation Commission at 3–5, citing "Summary Report on the Regional Holding Company Investigations," National Association of Regulatory Utility Commissioners, Washington, D.C., September 18, 1986. Similar findings were reported by the staff of the California Public Utilities Commission with respect to Pacific Telesis.[254]

Further, in actions that likewise remind the Court of much of the evidence adduced during the trial regarding the Bell System's manouvers toward competitors' requests, Bell Atlantic claims that it is technically impossible to provide equal access for mobile calls originating and terminating in the Washington/Baltimore area (Opposition to Conditions at 11–12); BellSouth says that it cannot do so for calls terminating at a mobile phone in certain cellular service areas (Response at 9); and according to complaints filed with the Department of Justice, Bell Atlantic, NYNEX, and Southwestern Bell have all refused to furnish to interexchange carriers access to information, such as the mobile service customers' names, that is a necessary prerequisite to the marketing of the carriers' services. Dun & Bradstreet Corporation Comments at 34–37; Phonequest, Inc. Comments at 15; ALC Communications Corporation Comments at 29–30; Huber Report at 3.30 & n. 105.[255]

A number of other allegedly anticompetitive acts of Regional Companies have been brought to the attention of the Court, the Department of Justice, the FCC, or the public by various segments of the telecommunications industry. See, e.g., pp. 566–67, and note 101, supra. These individual complaints will no doubt be resolved in due course, and in any event, no purpose would be served by a catalogue here. Such a listing would be bound to leave out some meritorious claims, and it is equally probable that it would include others that will ultimately be determined to be unfounded. It may be useful, however, to examine the recent performance of the Regional Companies from a somewhat broader perspective.

### 2. Statistical Analysis

Following the divestiture, the telephone Operating Companies controlled by the Regional Companies requested and were awarded large rate increases almost every-

---

**252.** The lack of restraint practiced by some Regional Companies is illustrated by those actions. The Court required an amendment of the proposed consent decree to provide for the transfer of the Yellow Pages to the Regional Companies, in significant part as a means for subsidizing local telephone rates. AT & T, 552 F.Supp. at 194. Notwithstanding that history, Yellow Pages profits now frequently go elsewhere (although it appears that, in some instances, transfers of the directory businesses to non-telephone affiliates were halted after state-initiated court battles).

**253.** No procedures are prescribed, or even under consideration, by the FCC for identifying

the cost of the access services that the Regional Companies would have to provide to themselves in furnishing interexchange services. Such a task would appear to be immense.

**254.** California Public Utilities Commission, A Report on Pacific Bell's Affiliated/Subsidiary Companies, Proceeding No. A.85–01–034, Exec. Summary at 2–3 (June 3, 1986).

**255.** The Department of Justice has declined to take action, but the Court is considering the matter. See Order of May 19, 1987, ordering the Department to file a report.

where in the nation,[256] even though their profits substantially exceeded those of comparable corporations. Regional Company return on equity amounts to 14.0 percent compared to an all-industry composite of 10.9 percent.[257] At the same time, in addition to their twenty-two telephone Operating Companies, the Regional Companies have created some one hundred-fifty corporations, partnerships, subsidiaries, and other entities having sometimes but a remote relationship to telephone operations. *Business Week* has estimated that the Regional Companies spent $1.2 billion in 1985 acquiring real estate, financial services, software, publishing companies, and the like. The companies are publishing Yellow Pages in Australia, they are building cellular phone networks in Costa Rica, and they are selling real estate in Dallas. "The Baby Bells Take Giant Steps," *Business Week*, December 2, 1985.

An observer might well be justified in concluding that the participation of the Regional Companies in these far-flung enterprises is bound to diminish their management's interest in and attention to the local telephone business—that, after all, was these companies' raison d'etre, and that is still the aspect of their operations most vital to the public since, under present conditions, if the Regional Companies do not attend to local telephone service, no one will or can.

More to the point of the present discussion, however, what is wrong from an antitrust point of view with the combination of (1) telephone rate increases and (2) Regional Company outside ventures is that these ventures appear to have been funded from and are being supported, at least in part, by the local phone rates. The following table compares the performance of the Regional Companies' telephone operations with those of their nontelephone subsidiaries and affiliates engaged in competitive enterprises.

| | Income from Telephone Operations[258] | Income or Loss From Competitive Subsidiaries |
|---|---|---|
| Ameritech | 1820 | -65 |
| Bell Atlantic | 1828 | -59 |
| BellSouth | 2435 | -4 |
| NYNEX | 1776 | -79 |
| Southwestern Bell | 1630 | -36 |
| Pacific Telesis | 1799 | -47 |
| U S West | 1684 | -180 |

Thus, during the period in question, the Regional Companies had a total operating income from their telephone operations, paid for by the ratepayers, of almost $13 billion, and a loss from their competitive enterprises amounting to close to one-half billion dollars.[259] These figures suggest that the rise in local telephone rates during the past several years[260] may be due in some significant part to cross-subsidization, that is, the diversion of ratepayers' monies to finance the Regional Companies' ambitions to become full-fledged players in conglomerate America.[261]

The Regional Companies are now requesting entry into far broader competitive fields of endeavor than any in which they were permitted to function during the last three years. Based upon their performance during that three-year period, it would not be unreasonable to assume that cross-

**256.** The rate increases were frequently requested based on the fact of the AT & T divestiture although divestiture had nothing to do with them.

**257.** Cooper and Kimmelman, "Divestiture Plus Three: Still Crazy After All These Years," 9, Consumer Federation of America, December 1986. Accordingly, arguments such as those of Ameritech, echoed by other Regional Companies, that the entry of the Regional Companies into interexchange services is "essential to [their] financial health ... and the viability of their networks" and that unless this is done, they "face a bleak future" (Comments at 48, 50), ring hollow, to say the least. Their lack of substance is underlined by the fact that profits are not being channelled to the local telephone networks but away from them. *See infra.*

**258.** Figures in millions of dollars. SEC Forms 10Q reflecting operating income or loss for 1985 through the third quarter.

**259.** The actual figures are $12 billion 972 million, and $470 million respectively.

**260.** For an evaluation of trends in local and long distance rates, *see* note 328, *infra.*

**261.** *See* Electronic Industries Association Information and Telecommunications Technologies Group Opposition at 31–32; NACUSA Comments at 21, 39, 41.

subsidization would also take place with respect to these new markets, and that it would occur on a far wider and more destructive scale than heretofore. That is so if only because cross-subsidies are much more easily concealed where—as between local exchange service and interexchange, telecommunications manufacturing, and information services—there are many common costs that can be attributed, almost at the companies' unfettered choice, to any of the various activities, than where cross-subsidization is attempted between exchange service and ventures foreign to telecommunications (see Part IX, infra).

One likely consequence, then, of Regional Company entry into the interexchange, manufacturing, and information services markets would be to give these companies the ability to undersell their rivals in these markets because they would have at their disposal an ever-replenishing fund with which to subsidize their competitive operations—the monies contributed pursuant to regulatory compulsion by the nation's local ratepayers.[262] The decree was, of course, aimed in significant part at the avoidance in the future of such practices.

### B. *Other Public Policies*

A number of well-defined public policies were considered by the Court when it approved the proposed consent decree. As the Court then stated, while the issues of competition and the effects of competition or obstances to free and fair competition are "at the heart of the antitrust laws," and must therefore be deemed matters of paramount concern with respect to the decree, *AT & T,* 552 F.Supp. at 150, "when choosing between effective remedies, a court should impose the relief that impinges least upon other public policies." *Id.* at 150–51. As elaborated on below, the Court took account at that time of such interests as ratepayer protection, the congressional mandate of universal service, and the First Amendment, among others, *AT & T,* 552 F.Supp. at 183–88, and so did the Department of Justice. *See, e.g.,* Competitive Impact Statement, February 10, 1982, at 47.

Entities such as AT & T and MCI now argue for consideration of the same types of factors as were considered before, AT & T Comments at 63; MCI Comments at 92–95, while the Department of Justice and the Regional Companies contend that the Court is precluded from doing so. *See infra.* As indicated in Part II, *supra,* the same standards may be applied in proceedings addressing continued viability of the restrictions as were used in determining whether the restrictions were to be imposed in the first place.[263] The positions of the Department and the Regional Companies with respect to the consideration of such factors are not only at odds with that test, they are also inconsistent with the views these entities have expressed in the past and some that they are expressing even now.

**262.** It is relatively easy, at least in some states, for the large and powerful Regional Companies to secure rate increases from the relatively small, understaffed local regulators who, moreover, are confined jurisdictionally to substantially smaller geographic areas. *See* note 198, *supra.*

According to the Ohio Office of Consumers' Counsel, Bell of Pennsylvania offered $100 million for state economic development in exchange for deregulation legislation. Reply at 13. A recent comprehensive report of the operations of NYNEX complains about the inability of regulators over the opposition of NYNEX to secure financial data, to halt the diversion of economies achieved by the regulated segment to the benefit of non-regulated operations, and similar problems. New York State Department of Public Service, *Report on NYNEX Corporation and Affiliates* (March 1987). And the trade press reported recently that U S West informed state regulators in its area that the location of its planned research laboratory would depend upon the fate of deregulation legislation or upon requested rate increases, a charge that U S West has denied. *CommunicationsWeek,* August 3, 1987, at 1.

**263.** CyberTel Corporation suggests, with some justification, that removal of restrictions should appropriately encompass the Tunney Act public interest standard that governed approval of the decree and that was responsible for the inclusion of the very section VIII(C) at issue here. Comments at 4. *Cf. FCC v. RCA Communications, Inc.,* 346 U.S. 86, 93, 73 S.Ct. 998, 1003, 97 L.Ed. 1470 (1953). Unless this is done, the imposition of restrictions and their removal may be governed by disparate tests—a situation that could result in severe logical and practical difficulties.

First. The Department of Justice and the Regional Companies contend repeatedly that the Court may not consider the effect of its actions or its failure to act with respect to the restrictions upon the rates the public may be required to pay. The Department, indeed, baldly states that "neither Congress nor the state legislators have granted the Department or federal antitrust courts the responsibility of protecting ratepayers from ... overcharges." Report at 166.[264]

The antitrust laws do not operate in a vacuum or as instruments of interesting and stimulating intellectual exercise their basic purpose is to protect the consuming public, in this instance those paying the rates that support telephone service, from artificially inflated prices. R. Bork, *The Antitrust Paradox*, 61, 90–91, 104, 108, 405 (1978).[265]

 Nevertheless, as indicated, the Department of Justice contends that the Court should not consider the fact that those subject to the Court's decree may be overcharging the public, perhaps systematically, when it is called upon to decide whether to retain in force decree provisions designed to protect the public from such practices.[266] To be sure, the Department seeks to distinguish between unreasonable rates in the abstract and such rates arrived at through cross-subsidization. But the objectives of affordable rates and universal service (*see infra*) complement the goal of an industry free from anticompetitive action, and they thus mirror the prohibition on cross-subsidization (*see* p. 553, *supra*);

it is the Department's insistence on judicial unconcern regarding unreasonably high rates that is contradictory of antitrust principles.

Interestingly, the view of the Department of Justice was not always so narrow. Five years ago, the Department explained to the public that the decree would be guarding against inflated intra-enterprise transfer prices, thereby to preclude the frustration of public regulation of subscriber rates. Competitive Impact Statement, February 10, 1982, at 39; *see also* Response to Public Comments, May 20, 1982, at 3–6. Similarly, in its briefs and during the trial, the Department claimed again and again, and it placed witnesses on the stand in support of its claim, that the Court *should* consider the interests of the ratepayers to be free from such practices as cross-subsidization which impacted on their rates.

To confuse matters even further, the inconsistency is not merely historical; it exists even now. For contrary to the above-cited statements against consideration of consumer interests in the context of the *retention* of restrictions on the Regional Companies, when the Department argues in favor of a *removal* of restrictions, it finds the interests of consumers to be far more relevant. Thus, its Report states that it had "examined the extent to which the decree restrictions may harm consumers, especially smaller users of telecommunications services," Department of Justice Report at 5, and further that "consumer welfare would be harmed by any failure to modify the restrictions...." Report at 47.

---

**264.** Others are even less circumspect. Thus, Ameritech contends that the Court should not concern itself with conditions designed to ensure the financial health of the local telephone companies, arguing that the interests of the public and the ratepayers in the continued existence of a viable, functioning telephone service are none of the Court's business. Comments at 5–6, 48. The Regional Companies owe their very existence to the decree's purpose to establish them as enterprises for the provision of reasonably priced local telephone service. It would indeed by an anomoly if, when passing upon requests for dissolution of provisions of the decree, the Court could not even consider the contemplated sacrifice of such service.

**265.** As Judge Bork stated, "[t]he legislative history of the Sherman Act ... displays the clear and exclusive policy intention of promoting consumer welfare". R. Bork, *The Antitrust Paradox* at 61.

**266.** It is quite true that, as the Department of Justice and others contend, the Court has no jurisdiction to determine the appropriate levels of telephone rates. But the Court does have jurisdiction, in this antitrust proceeding, to take the overall effect on ratepayers into account when restrictions imposed for the protection of these ratepayers (as intended beneficiaries of free and fair competition) are sought to be removed.

*See also* Department of Justice Report at 166; Response at 9, 99.

The protection of consumers is a foremost objective of the antitrust laws, and their protection was a prime objective of this lawsuit when it was brought and prosecuted by the Department of Justice for a number of years. The Court continues to regard consumer protection as such an objective.[267]

■ Second. A related issue is that of the relevance of the goal of universal telephone service. There, too, inconsistencies abound. The Department contends that the decree restrictions may not be maintained to further the universal service goal. Response at 13. Yet Ameritech, its ally on these issues, chastizes the Department for proposing conditions respecting only partial removal of the interexchange restriction on the ground, *inter alia*, that this would "interfere with legitimate social objectives, such as universal service." Comments at 56.

Universal service has been explicitly declared by the Congress to be a paramount national objective,[268] and the courts may be expected to avoid taking actions, if that can legitimately be done, that are inconsistent with this objective.

Whatever others may do,[269] the Court will continue to decline to regard divesti-

ture as an end in itself, as a mere deregulatory gesture for the sake of deregulation. Divestiture and the line of business restrictions have as their basic purpose the removal of anticompetitive impediments, to the end that the rates consumers must pay will be reasonable and unimpeded by unfair competition, and that all segments of society, including the poor, the old, the infirm, and those living in isolated rural areas will in consequence have access to necessary telephone service. That is consistent with the basic purposes of the antitrust laws—purposes that the Court expects to continue to respect.

■ Third. Insofar as, more specifically, the information services restriction is concerned, in addition to the competitive concerns discussed in Part V, *supra,* that stand squarely in the way of a removal of that restriction, and that alone and without more justify its retention, there is also the threat such removal would pose to First Amendment values that would lead to the same result.

It is a purpose of the First Amendment to achieve "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). The diversity principle has been repeatedly recognized by the Supreme Court.[270] Considera-

---

**267.** As indicated above, the Court's decisions on the core restrictions do not turn on the factors of protection of ratepayers from price gouging or that of universal service. But there should be no misunderstanding regarding the continuing relevance of congressionally-mandated policies. *See also AT & T,* 552 F.Supp. at 149–51.

**268.** 47 U.S.C. § 151. The Department of Justice repeatedly contends that its proposed removal of the restrictions would not intrude on the regulatory authority of the states. Report at 102. Yet it is noteworthy that the states are making every effort to keep rates for the consumers low so as to foster universal service, *see, e.g.,* Comments of Washington Utilities and Transportation Commission at 9; Comments of the Public Service Commission of Wisconsin at 2–3; an objective that would be undercut by a removal of the core restrictions. The state commissioners are divided on the question of the removal of the restrictions but not on the issue of universal service.

**269.** *AT & T,* 552 F.Supp. at 224. The Regional Companies did not utter any complaint that this decree interest in affordable local rates involved the consideration of improper factors, nor have they expressed any adverse reaction to the Court's action since that time. Again, there was no objection from these companies when the Court noted in 1983 that, in taking action favorable to the Regional Companies with respect to such matters as the Bell name and logo and the availability of Bell System patents, it considered, among other factors, the protection of the principle of universal telephone service. *Western Electric Co.,* 569 F.Supp. at 1091, 1120–21. And of course none of the companies is offering to relinquish those benefits.

**270.** *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978); *Red Lion Broadcasting v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964); *United States v.*

tion of the policies embodied in the First Amendment is particularly appropriate here, as it was in the earlier *AT & T* proceedings, because "in promoting diversity in sources of information, the values underlying the First Amendment coincide with the policy of the antitrust laws." [271]

A review of these principles led the Court to conclude in the original proceeding that AT & T should be prohibited after divestiture from entering into electronic publishing. Control by one entity of both the content of information and the means for its transmission raises an obvious problem and, in fact, the Court concluded in 1982 that AT & T's control of a large part of the interexchange network would enable it to disadvantage and to discriminate against rival electronic information providers and thus to pose a substantial threat to

the First Amendment diversity principle. *AT & T,* 552 F.Supp. at 184–85.

The same considerations are applicable to the provision by the Regional Companies of information content, the only difference being that AT & T could have displaced other information providers throughout the entire nation while each of the Regional Companies could use its control of the local exchanges to reduce or eliminate competition in electronic publishing, or conceivably in publishing generally,[272] in its own region only.[273]

Fourth. There is also the question whether the effect of retention or removal of a restriction on the position of the United States in international trade may be considered. The indications are that removal of the restriction on manufacturing, in particular, is likely to injure the position

*Storer Broadcasting Co.,* 351 U.S. 192, 201–04, 76 S.Ct. 763, 769–71, 100 L.Ed. 1081 (1956). As this Court noted in the Opinion accompanying the decree, "the media serve 'one of the most vital of all general interests: the dissemination of news from as many different sources, and with as many different facets and colors as possible.'" *AT & T,* 552 F.Supp. at 183, *quoting United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943), *aff'd,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

**271.** *AT & T,* 552 F.Supp. at 184, *citing FCC v. National Citizens Committee for Broadcasting, supra,* 436 U.S. at 800, n. 18, 98 S.Ct. at 2114, n. 18.

**272.** It is not inconceivable that, because of the speed with which news and information can be transmitted electronically, it could, in time, displace much conventional publishing.

**273.** There is no merit to the contention raised by some, *e.g.,* BellSouth Response to Comments at 29–30, that the information services restriction infringes the Regional Companies' own First Amendment rights. Like all business establishments, those engaged in, or those that, as the Regional Companies here, consider engaging in, publishing are subject to the antitrust laws. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 697–98, 98 S.Ct. 1355, 1368–69, 55 L.Ed.2d 637 (1978); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *FCC v. National Citizens Committee for Broadcasting, supra,* 436 U.S. at 801, 98 S.Ct. at 2115; *Savage v. Commodity Futures Trading Commission,* 548 F.2d 192, 197 (7th Cir.1977); *United States v. NBC, Inc.,* 449 F.Supp. 1127 (C.D.Cal.1978); *see also* Pub.L. 98–549 § 613(b)(1), 98 Stat. 2779 (1984). More-

over, common carriers are quite properly treated differently for First Amendment purposes than traditional news media. *FCC v. Midwest Video Corp.,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).

A consent decree was entered into in this case pursuant to the antitrust laws prohibiting the Bell System and its successors from engaging, *inter alia,* in the information services business. The decree did not constitute an infringement of First Amendment rights any more than would have a decree to that effect entered by the Court without consent, after full litigation. Under the decree itself, that restriction may be removed only if the Regional Companies are able to make a certain showing, again mandated by the decree, one that they have not made and could not make at this time.

These companies, which have never been publishers, thus cannot bootstrap their own failure to make the showing necessary for the relief of their obligations under an antitrust decree into an infringement of their First Amendment rights. And of course the decree in this case, which long ago became final with affirmance of this Court's decision by the Supreme Court, which applies to the Regional Companies, *Western Electric Co.,* 797 F.2d at 1087–88, and pursuant to which they received billions of dollars in assets and other valuable rights, is the law of the case, *DeTenorio, supra,* not only as to the benefits to the Regional Companies but also as to the restrictions. That decree cannot be collaterally attacked in this proceeding. *See* Stone, *Content Neutral Restrictions,* 54 U.Chi.L.R. 46 (1987); and *see also* Comments of U S West at 31 n. 28.

of this nation in that regard, in that the telecommunications equipment market—like the television and automobile markets today—will increasingly become the preserve of foreign-dominated firms. *See* pp. 561–65, *supra.* The Regional Companies, once again, argue that this is not a matter for judicial concern; yet these same companies have loudly advocated in many forums, including this Court, Bell Atlantic Comments at 5, that the decree stands in the way of an improved American international trade position.[274] The companies' position that the Court may not consider the probable deleterious effect of a restriction removal on American foreign trade is not only bad policy; it is also bad law. *See United States v. United States Steel,* 251 U.S. 417, 457, 40 S.Ct. 293, 301, 64 L.Ed. 343 (1920); *FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. 84, 98 (N.D.Ill.1981); *United States v. LTV Corp.,* 1984–2 Trade Cas. 66,133 (D.D.C.), *appeal dismissed,* 746 F.2d 51 (D.C.Cir.1984).

Fifth. Although the Department of Justice insists that the Court's inquiry must be restricted to competitive injury to the exclusion of all other factors, it does find a cost-benefit standard in section VIII(C) of the decree, when that supports its position. *See, e.g.,* Department of Justice Report at 46. The Court has considered costs versus benefits where this can appropriately be done without undue risk to competitive considerations. *See* Part VIII (information transmission) and Part IX (catch-all restriction) *infra.*

## VIII

### Transmission of Information Services

Although the Court is denying the requests for removal of the information services restriction insofar as they relate to the provision of information content (Part V, *supra* ), a separate analysis is required to determine whether so much of that restriction should be lifted as to enable the Regional Companies to acquire and operate the infrastructure necessary for the transmission of information services generated by others.[275] Before considering the competitive issues raised by that suggestion, it is useful to describe first what such action would mean in practical terms.

### A. *Videotex Industry*

The term "videotex" refers to a wide variety of easy-to-use interactive data services. "Videotex arranges information in a text or graphic format on a video display with user input through a keyboard." Huber Report at 1.29 n. 46. Videotex applications cover an entire spectrum of services, ranging from mere database access to such sophisticated services as teleshopping, electronic banking, order entry, and electronic mail. *Id.*

The videotex industry has grown slowly in the United States, particularly with respect to the home videotex market, and consumer-oriented videotex services on a substantial scale remain largely in the future. Several efforts to provide videotex services have failed. In March 1986, Knight–Ridder Newspaper Inc.'s Viewtron service, which provided home subscribers in several markets with news, stock prices, and shopping information, folded without having made a profit. Around the same time, the Times Mirror Company's Gateway videotex services closed down after losing approximately $30 million. *Washington*

---

274. The Regional Companies' stance is wrong even in that respect. The Court has not denied a single waiver request for international operations. To be sure, the Regional Companies are precluded by section II(D)(2) of the decree from manufacturing telecommunications equipment but, as shown at pp. 560–61, *supra,* American telecommunications manufacturing is stronger today than it was under the monopoly conditions to which the Regional Companies want to return.

275. Among those who have requested such relief are U S West and Videotex Industry Associa-

tion. Some intervenors argue that the decree even now permits the Regional Companies to transmit information services. However, in view of the breadth of the information services definition in section IV(J) of the decree, and the inclusion therein of such terms as "acquiring," "transforming," "processing," "utilizing," and "making available," that construction must be rejected. Moreover, as will be seen below, the transmission of such services actually involves the performance of a number of services that by any fair reading of the term "information services" would be included in that definition.

*Post,* "Videotex's Timing Is Questioned," March 20, 1986, section E1.

Approximately five companies in the United States and two independent telephone companies [276] are currently offering videotex services. Two of these companies, Compuserve and The Source, have provided videotex services for most of this decade. Trintex, owned by IBM and Sears, is a more recent, multibillion dollar venture offering electronic information and transactional services. General Electric Information Services and Quantum Computer Services each owns a national consumer videotex system that has recently entered the market. The two independent telephone companies, the Chillicothe Telephone Company and the Commonwealth Telephone Company, offer network-integrated videotex services, but only on a very limited basis to very few customers. In spite of the existence of these videotex providers, some of which do make available a considerable variety of information services, only about 1.1 percent of United States households use consumer videotex.[277]

### B. *The Experience Abroad*

Videotex is currently being provided in France on a far more extensive scale. The French authorities started what is called the "Teletel" system initially in order to reduce the high cost of paper telephone directories by replacing them with an electronic directory service. Teletel has since grown to provide consumers with more than 4,000 information services through some 2.3 million "Minitel" terminals in homes and businesses.[278] The French system distributes both business services and general public services.[279] *See* pp. 589–90, *infra.*

The Minitel is basically a "dumb" or passive terminal, a black and white monitor, far less sophisticated and thus less expensive than an ordinary computer terminal, with a keyboard which may be used to address both the network and the databases maintained by the independent information providers through the network.[280] Minitel calls are routed to the information providers over France's Transpac packet-switched [281] network. The interface between the regular telephone network and Transpac is provided by videotex access points (VAPs) widely dispersed throughout that network. The French state-owned telephone company, the Direction Generale des Telecommunications (DGT), owns the VAPs. However, all information content, as well as information storage, indexing, retrieval, and presentation, are controlled by the information providers,[282] not the telephone company; the DGT provides basically only a content-neutral transmission and switching conduit.[283] The telephone company also bills users directly for both transmission and provider services, and it reimburses the providers for a portion of the fees.[284] The French government con-

---

**276.** While Dr. Huber states that the Southern New England Telephone Company also provides videotex, this service does not appear to be integrated with that company's public network. Compsuserve Comments at 20–21.

**277.** VIA Comments at 8–9; *cf.* Compuserve Comments at 22.

**278.** To achieve a level of penetration equivalent to 2.3 Minitel terminals in France, United States consumers would have to have 10 million terminals. By 1990, over six million Minitels are scheduled to be installed in France. U S West Response, App. Tab 1.

**279.** U S West Memorandum at 20. U S West filed with the Court the January 1987 Teletel catalogue of services called "Listel" that is over 630 pages in length, and describes 2,335 services.

**280.** A "dumb" terminal simply displays information and acts as a conduit for input commands; more sophisticated personal computers, by contrast, perform some data or command processing functions internally.

**281.** This system involves the breaking down of messages into smaller units, packets, which are then individually addressed and routed through the network. Similar service is available in the United States from GTE Telenet and Tymnet, but not from the Regional Companies.

**282.** ANPA Comments at 29.

**283.** However, the DGT does provide an electronic telephone directory service.

**284.** ANPA Comments at 29–30.

trols the Teletel system through the DGT, and it also subsidizes the system by giving away the Minitels free to all households.[285]

Videotex is also available, but on a much more limited scale, in Japan and, to some extent, in Great Britain.[286] The Japanese telephone company functions as a hardware-software vendor to a number of local emergency medical information systems that monitor, among other things, the availability of hospital beds and blood and serum inventories. Huber Report at 1.29 n. 47, Table G.18. The Japanese Automated Meterological Data Acquisition System collects weather data continuously from 1,400 reporting stations, Huber Report at Table G.18; a voice-mail system was instituted in Japan late in 1986, Bell Atlantic Comments at 54 n. 113; and Nippon Telephone & Telegraph makes available to customers a number of dial-up services, including news, weather, golf and ski conditions, travel, insurance, taxis, hotels, cooking, music, and English-language services. Huber Report at Table IS.21. Like the French company, the Japanese telephone company functions essentially only as a supplier of conduit, not of content.[287]

## C. *Importance of Widely–Available Information Services*

As indicated, no videotex service on a similar scale exists in the United States. Before inquiring into the reasons therefor and into practical means for remedying the relative scarcity of such services without at the same time creating the risk of anticompetitive actions, it is appropriate to consider first whether and why the wide availability of information services through videotex might be beneficial.

It is a cliché to state that we live in an Information Age, but it is also true. Information is today as central to the service economy which increasingly prevails in this country as iron and coal were to England around the turn of the century. Whatever causes the more efficient, rapid, inexpensive dissemination of specifically needed and requested information[288] to all segments of the population, is likely to give this nation and its economy a significant advantage over countries not similarly equipped. More specifically, affordable videotex—the instantaneous availability to millions of Americans of needed information at low cost—could be expected to benefit the economy by providing increases in efficiency in information management and hence also in productivity. Outside the economic realm, broad and relatively inexpensive videotex would, of course, offer significant social benefits.

Without attempting to be exhaustive, the following lists some of the more obvious videotex-related economic services that exist elsewhere and that might be made available in this country: (1) in banking, videotex could give customers direct and immediate account information and fund transfer capability; (2) in brokerage, there could be instant evaluation of current portfolios and access to alternative investment opportunities; (3) with respect to customer service by a variety of business enterprises, arrangements could be made for immediate access to information about outstanding balances, order fulfillment, accrued interest, and the like; and (4) with respect to shopping services, videotex could provide direct and immediate access to the prices and descriptions of a wide range of prod-

---

**285.** According to reports, albeit from interested parties, there is no governmental subsidy for the French Teletel service, as the French telephone company expects to recoup its entire investment by 1990 or 1991. Presentation of Intelmatique, U S West Reply, App. Tab 2, at p. 5.

**286.** ANPA Comments at 16 (*citing* Department of Justice press release, at 9–10 (February 12, 1987)).

**287.** Reply Comments of ANPA at 7.

**288.** The United States of course does not suffer from a paucity of information. Newspapers, television and radio stations and networks, cable services, magazines, libraries, and other information sources exist in number and quality unmatched elsewhere. Videotex would fill a distinct niche, however, in that it would enable a participant to acquire specific information at a time when he needs or wants it, and it would permit him to do so without time-consuming, difficult research efforts.

ucts and services that could be purchased electronically.[289]

Outside the economic sphere, videotex is used in France, and could presumably be applied in the United States, for such services as (1) travel information, restaurant reviews and reservations, hotel and rental car information, and airline schedules; (2) instantaneous access to ticketing for sports, musical, cultural, and entertainment events; (3) information concerning meetings of associations, including schedules, performers, and speakers; (4) social messaging; (5) access to federal and local governmental information; (6) language instruction; (7) reprints of newspaper and magazine articles; and (8) employment services.

The Court obviously does not and cannot know which of these or other services would be offered in this country, and, if offered, would prove useful or desirable here. The only question before the Court is whether the decree restriction on the Regional Companies should be lifted in part so as to permit the participation in the information services market of those with an economic incentive and the requisite interest do so.

### D. *Large–Scale Videotex in the United States*

There is a variety of opinion on the question of why videotex services have not grown in the United States [290] as they have in France and to a lesser extent in Japan and Britain. Some, who oppose the lifting of the restriction, suggest that there is simply a lack of consumer demand [291] caused by the difficult technology and the expense involved in operating home terminals [292] as well as low consumer awareness, difficult accessibility, and insufficient service relevance.[293] Others believe that the foreign advantage lies in the basic fact of government ownership of the telephone network and the subsidy it provides for allied services.[294]

The French government's subsidization of the terminals would be difficult to duplicate here either on a government-subsidy or a telephone company-subsidy basis.[295] It is unlikely, however, that the cost of the terminals—now estimated at between $100 and $150 but probably less on an mass market basis—would be an insuperable obstacle if information services could otherwise be distributed to consumers on a broad scale and at reasonable cost. The other problems—consumer awareness, accessibility of service—could presumably be solved by a service that was properly marketed and became available to a substantial segment of the public.

No one knows, of course, which of these problems is critical, and no one knows

---

**289.** At the present time, in order to obtain access, for example, to a stock quotation through an information service, the consumer must go through the following steps:

(1) obtain a personal computer, a modem and communications software;

(2) research which videotex system operator offers the quotation service of interest;

(3) presubscribe to the system, generally for a minimum monthly fee;

(4) learn which value-added communications networks the system operator uses, and the closest telephone number for the system;

(5) obtain from the system its communications access code and a personal identification number;

(6) dial the system's local number and enter the appropriate codes at the appropriate times; and

(7) learn the unique navigation structure of the information network and the unique search structure of the information provider.

VIA Comments at 11; *see also* Motion of U S West at 28.

**290.** As several information service providers correctly point out, and as is noted above, many such services do exist in this country, but what is missing is the easy access that is provided elsewhere by the French Teletel, and therefore a mass market.

**291.** *New York Times,* "Videotex Players Seek a Workable Formula," March 25, 1986, section D, page 1, column 4; Compuserve Comments at 15.

**292.** *Business Week:* "Trinitex: A Rocky Star, An Uncertain Future," December 1, 1986, page 122; *see also* VIA Comments at 10.

**293.** VIA Comments at 10.

**294.** *But see* note 285, *supra.*

**295.** However, if this were a necessary prerequisite to the establishment of a system that clearly would be useful and could be made to pay for itself—as some claim is probable (*see* note 285, *supra*)—it may be that such an initial subsidy would be forthcoming.

whether information services would be accepted by both providers and consumers on a sufficient scale to render it economically feasible as well as socially useful.[296] Indeed, no one could ever know the answer to these questions unless legal obstacles to the provision of the services are removed.

After considering the subject in some detail and with great care, the Court has become convinced, first, that, if the authority of the Regional Companies is carefully limited, the risk of anticompetitive action by these companies, while not insignificant, is, on balance, outweighed by other considerations (*see infra*); second, that the broad scale and the reasonable cost criteria necessary for a successful system can be met only by permitting the Regional Companies to provide the necessary infrastructure components for efficient videotex services on an integrated basis;[297] and third, that it is probable that a well-run, adequately publicized system could perform a useful service, and that it might attract a sufficient number of subscribers so that it could operate on an economically sound basis.[298]

### E. *An Economically Sound System*

If the Regional Companies operated the key infrastructure components, the expense associated with the provision of videotex could be reduced substantially and the services themselves would be more readily accessible. *See* Affidavit of Dr. Almarin

Phillips submitted on behalf of U S West; Affidavit of Professor Jerry A. Hausman on behalf of Pacific Telesis. More specifically, the data indicate that Regional Company ownership of "gateway" facilities similar to French VAPs would decrease the cost of providing videotex.

Gateways[299] would permit the conversion of the asynchronous signals that an inexpensive "dumb" terminal sends and receives to more efficient X.25 packet signals. Since asynchronous transmission is much more expensive and much slower than X.25 packet transmission, wide dispersion of the gateways would decrease the duration of asynchronous transmission and hence overall transmission costs. Such a reduction in transmission costs may be expected also to reduce substantially the cost of the videotex service to the consumer, and the increased demand generated thereby presumably would, in turn, increase the number of information voices available to the public.[300]

Possible alternatives are not similarly attractive. If the gateways did not perform these conversion functions, they would have to be performed either by the individual terminals or by the various providers of information. Conversion by the terminals would necessarily increase significantly the required sophistication and consequently the cost of these terminals. If prospective

**296.** American Newspaper Publishers Association believes that such services have blossomed whenever one or more of the following factors has generated a willingness by the market to pay for the service: (1) a need for highly current information; (2) a need for automated, intensive searches among large amounts of indexed material; and (3) a need to manipulate information, mathematically or otherwise, as well as to obtain information. Comments at 21.

**297.** The ability of the Regional Companies to engage in low-level network functions on an integrated basis, such as those described below, would result in more efficient provision of those services by decreasing the cost and increasing the accessibility of those services. This, in turn, could foster a mass market for videotex services.

**298.** The consensus to that effect reaches all the way from U S West, a Regional Company, to the American Newspaper Publishers Association, a publishing association.

Not everyone agrees, of course. For example, ADAPSO states that the French experience is meaningless in American terms, and that the United States has even now the world's largest, most successful, most sophisticated information services industry. Comments at 46–48. Whether or not that assessment is correct—and this depends primarily upon what is being counted and how—there would appear to be no question that more efficient distribution of the services would significantly increase their availability and hence their usefulness.

**299.** As used herein, the term "gateways" is limited to facilities, similar to the French VAPs, that are described below. It does not include other facilities that under other circumstances may be included within the meaning of that term.

**300.** If the network itself performed certain gateway services, even small data base providers could afford to compete in the information services market.

users would have to spend a substantial amount for full-fledged computer terminals without any assurance that the services to be provided will actually be useful to them, the opportunities for the creation of a true mass market would be substantially reduced.

On the other hand, if the provision of the gateway functions were left to the individual providers of information, it is doubtful that these providers would disperse the gateways as widely as would the Regional Companies, for the simple reason that such dispersion would increase their packet switched transmission costs, as well as the customers' costs of accessing the desired information services.[301] Here again, then, the economies of the system would probably be such that it would not grow as it should if this country is to benefit from a modern, comprehensive information service.

What all of that indicates is that the Regional Companies have built-in incentives not available to others to disperse and multiply gateway facilities [302] and that the relatively extended transmission to such facilities would save money both to the information providers and to consumers.[303]

### F. Necessary Infrastructure Components

For the reasons stated, it appears that it may, on balance,[304] be appropriate to permit the Regional Companies to provide an infrastructure for information services. It is obviously essential, however, that the necessary infrastructure components be defined with as much detail as possible in order to avoid conferring upon the Regional Companies the authority to market content-based information services, a result

that would prohibitively increase the risk of anticompetitive conduct.[305]

As indicated, the infrastructure necessary for the transmission of information services consists primarily of various low-level gateway functions that do not involve control of or interaction with information content. A gateway would operate as a Regional Company interface or connection point between consumers and information service providers, that is, as an interconnecting data transport system, accessible through a single, preferably truncated, telephone number.

The gateway functions, analogous to the functions performed by the French VAP, consist of (1) data transmission, (2) address translation, (3) protocol conversion, (4) billing management, and (5) introductory information content.[306]

The following examination of the scope of the various infrastructure components details how they would operate and how they might be expected to achieve the requisite efficiencies.

#### 1. Data Transmission

Data transmission functions include signal demodulation; error rate measurement; and the generation of characters on the user screen. The demodulation of signals coming from consumers is an essential transmission service necessary to the performance of "telecommunications" functions as defined by section IV(O) of the decree. The measurement of the error rates on the line is a part of facilities testing for "information access" under section IV(I) of the decree. Neither of these functions involves the manipulation of the content, or indeed the form, of the informa-

---

**301.** Relatively long asynchronous transmission of the signals would also have the drawback of impeding the transparency of the communication between providers and consumers.

**302.** Such dispersal would mean income to the Regional Companies since it would necessitate the wide transmission of information over Regional Company lines for which they would, of course, be paid.

**303.** As explained *infra,* and for the reasons there elaborated on, the Regional Companies should additionally be enabled to perform cer-

tain billing management functions, and to furnish limited introductory information services. If this were done, the otherwise complex billing process would be simplified, and the consumer could access the desired information service by using only one telephone number, with separate passwords for each provider.

**304.** *See* Subpart I, *infra.*

**305.** *See generally* Part V, *supra.*

**306.** *See also* Huber Report at 6.16, Table IS.10.

tion sent or received, and neither requires a specific amendment of the decree, or poses a threat to competitive parity.

The generation of characters that appear on the terminal screen constitutes an echoing of consumer-generated keystrokes for the purpose of confirming successful reception as part of the transmission function. Although it is asserted by some that provision of this type of service could affect the content of the information sent or received —for example when the format of the information provider's computer application, which uses color as a necessary component to the interpretation of the message sent, is changed so that the receiving terminal, which has only a "highlight" and "shade" capability and no color capability, can receive that message in a meaningful manner—the degree to which such a transformation could affect content is insubstantial. In the judgment of the Court, performance of this function by the Regional Companies will not create any significant opportunities for anticompetitive conduct.

If the Regional Companies are permitted to provide these services, much of the need for sophisticated hardware and software at the user's end of the system otherwise necessary for the achievement of access to information services would be obviated: the network itself would be performing functions otherwise performed by the user's more sophisticated computer.

### 2. *Address Translation*

Through address translation, the consumer will be enabled to use an abbreviated code or signal provided to him in order to access the information service provider in lieu of dialing the telephone number of the desired provider.[307] Translation of the

consumer's request for service in this manner would obviously facilitate accessibility of the system. Performance of this function by the Regional Companies likewise involves only a minimal manipulation of content, and it, too, poses no significant risk of anticompetitive conduct.[308]

### 3. *Protocol Conversion*

Protocol conversion facilities undertake electronic translation in order to facilitate the communication between information service providers. They perform this task by altering and reconfiguring message content at the machine level, for example, by converting the asynchronous signals that a "dumb" terminal sends and receives to the more efficient X.25 packet signals. Protocol conversion services are essential, low-level network support systems. Huber Report at Table IS.10.

Provision of these conversion functions by the Regional Companies is necessary to take advantage of the decreased transmission costs described above. As there noted, independent providers would not have the incentive to disperse the conversion facilities on a wide basis since such dispersion would increase their packet switched transmission costs.[309]

Protocol conversion, then, is a key infrastructure component necessary to the development of a mass-market for videotex. Some simple forms of protocol processing do not involve any changes in form or content of the information sent, and their performance by the Regional Companies poses no risk whatever. However, a sophisticated and effective system of information transmission requires also that the network perform those protocol conversion

---

307. In the French VAP, this service consists of the translation of a mnemonic code into the telephone number of the desired information service provider.

308. While it has been argued by some that the Regional Companies are entitled to provide this service even now under the decree as part of the permissible "forwarding or routing" functions of "information access," *see* section IV(I) of the decree, the Court has concluded otherwise, particularly since section IV(F) prohibits interexchange routing. Accordingly, the legality of the performance of this function will require an

appropriate amendment of the decree. In any event, provision of this service by the Regional Companies, in conjunction with the other infrastructure components described herein, is a necessary component in the provision of an impetus for growth of a mass-market for videotex services.

309. Limited dispersion would not only preclude the possibility of decreased transmission costs, but it would also constrict the transparency of communication between the consumers and providers.

functions that are necessary to enhance transparency of communication between consumers and information service providers, and the Court is prepared to grant a modification of the decree to meet these requirements. On the other hand, additional protocol conversion services that manipulate content beyond that which is necessary for the transmission of services, would raise significant anticompetitive concerns and, since they are not essential to the operation of a videotex system, the performance of such services will not be authorized. It is expected that the proposed orders and memoranda submitted to the Court (*see* p. 597, *infra*) will describe what the particular parties or intervenors regard as necessary and unnecessary protocol conversion services.

#### 4. *Billing Management*

The current videotex systems require presubscription: the consumer must furnish his name and address, telephone number, a credit card number, and other similar information, as required by a particular information service provider, in exchange for a password that must be retained and entered with each access as a prerequisite to the receipt of data from the provider. This presubscription process obviously decreases the accessibility and distribution of videotex, inasmuch as the consumer's need or desire for information is usually immediate, and often cannot await the grant of special permission from the appropriate provider. Moreover, the presubscription process increases the providers' start-up costs.

The Regional Companies' role as intermediaries between information service providers and consumers, and their built-in ability to charge accurately the calling telephone number for services rendered, suggests that these companies are in a unique position to provide certain billing management functions that would obviate the need for a presubscription process. Further, if these functions were assumed by the Re-

gional Companies, it would obviate the necessity for separate, individual provider-operated management information and billing systems, thereby eliminating a significant entry barrier for small entrepreneurial providers. In short, the vesting of billing services in the Regional Companies is an important, even essential element in the process. It is also one that does not present significant competitive issues.

A more difficult problem is presented by the question of consolidated billing. There is no objection *per se* on anticompetitive grounds to consolidated billing, that is, the mailing by a Regional Company of a single bill covering both its own fees and those of the particular providers. However, if the Regional Companies were permitted to operate a billing arrangement in conjunction with the information service providers that amounted, in effect, to the sharing of revenue, a strong opportunity would be created for anticompetitive conduct, for that type of arrangement would give the Regional Companies an incentive to discriminate in favor of those providers whose revenues it shared. That incentive, coupled with the Regional Companies' undoubted ability to disadvantage competitors, would be enough to raise precisely the concerns that led to the adoption of the decree. Accordingly, while these companies may be permitted to provide consolidated billing arrangements, they will not be permitted to enter such arrangements that provide for the sharing of revenue.[310]

#### 5. *Introductory Information Content*

The provision of limited, introductory information content by the Regional Companies is likewise essential to the operation of a practical, efficient system. It is also likely to promote a mass-market for consumer videotex, for it would both facilitate use of the system and permit quick and easy access to the various information providers. However, here again, in order to avoid the creation of an incentive and abili-

---

310. The French Teletel system instituted a "kiosk" billing system in 1985. Under this system, the telephone company bills the consumer on a flat-rate-per-service basis. Consequently, the consumers of information services pay on a per minute basis for the information services that they use. This kind of system would seem to implicate revenue sharing and will not be permitted here.

ty· to engage in anticompetitive behavior, this introductory content must be strictly limited to (1) the display of a welcoming page and (2) provider listings.

A welcoming page could advise the consumer of the billing arrangement that was established for a particular information service, and it would provide for the prompt entry of the code or the name of the desired information service provider. Neither of these should cause any competitive problems.

A provider listing could, for example, contain in addition to the providers' names, addresses, and telephone numbers, their business, product, or service categories. With this information as a database, the Regional Companies could establish systems which would allow the consumer to search in any of these categories. The companies might wish also to cross-reference the names of the providers, their codes, and the like. Such a cross-reference would not only give broader exposure to the various available providers but it would also facilitate consumer access to the services.

However, service menus, which some of the Regional Companies are seeking, are in a different category. Menus of information services and options within those services are the essential means for navigating about that system, that is, for directing the consumer in its use, such as in obtaining or transmitting the desired information or in performing certain transactions. Menus are a matter of editorial control, specifically tailored by the particular information provider, and as such they tend to be closely interrelated with information content. If the Regional Companies could furnish such menus, there would be a breach in the boundary between information services needed for transmission that only insignificantly affect content, and those that do constitute content and accordingly establish opportunities for anticompetitive conduct. On this basis, the provision of the menu service cannot be permitted consistently with the basic structure and purposes of the decree.

### G. Electronic Directory Service

Several intervenors claim that the provision of electronic directory services by the Regional Companies is a necessary component of the infrastructure, and that it, too, should be permitted.[311]

The basic rationale advanced in support of this assertion is that the consumers will become better acquainted with videotex services generally through use of the electronic directories. That rationale, while it does contain a grain of truth, is not adequate to support removal of the information services restriction with respect to the provision of electronic directory services generally.

The Regional Companies are currently permitted to compile and distribute "Yellow Pages" directories. If they were also allowed to provide their electronic counterpart, they would plainly have the incentive and ability to discriminate both against competing providers of directory services and against the publishers of classified and other advertisements.[312]

As the Court indicated in 1982, with respect to the prohibition on electronic publishing by AT & T, it is too easy and too tempting for a company engaged in both the generation of information, whether political or commercial, and its transmission, to discriminate against competitors who lack the ability to exercise the transmission function. In view of the time-sensitive nature of most such material, discrimination activity by a Regional Company could profitably include the practice of giving priority to its own publishings, and that of using for its own ends information learned in the

311. *See, e.g.,* VIA Comments at 10.

312. Yellow Page-type advertisements transmitted and published electronically could easily be updated weekly or even daily, and on this basis they could and no doubt quickly would compete directly and on favorable terms both with current-type newspaper advertisements, and with those who would use the new information network to publish their own electronic advertisements. Although, for the reasons stated, Regional Companies cannot be permitted to enter this market, there is no reason why others—whether or not they are now in the publishing business—could not do so.

course of transmitting the data generated by others, to cite just two examples that come readily to mind. *See also AT & T,* 552 F.Supp. at 181–82. For these reasons, the prohibition against Regional Company provision of electronic "Yellow Pages" directory services will continue in force. *AT & T,* 552 F.Supp. at 189–90 n. 239 & n. 253.

However, since there would appear to be no economic basis for anticompetitive activity in connection with the production of "White Pages" directories, there is no reason under the decree why the Regional Companies could not offer, in whole or in part, such directories in electronic form. Such an option will accordingly not be prohibited.

### H. *Terminals*

The manufacture of terminals is not a necessary component of the infrastructure to be provided by the Regional Companies.[313] The technology for Minitel-style "dumb" terminals is currently available in the United States.[314] Furthermore, the penetration of personal computers in the United States is proportionately larger than the penetration of Minitel terminals in France, for there may currently be as many as 26 million personal computers in service in the United States that "could readily tap into a videotex system." [315] Accordingly, and for the reasons discussed in Part IV, *supra,* the Court will not remove the decree prohibition on the manufacture of terminals. However, the Regional Companies may, of course, provide, that is, sell terminals manufactured by others.[316]

### I. *Could the Transmission of Information Services By the Regional Companies Impede Competition?*

The discussion above, while suggesting that the danger may not be large, does not provide a final and definitive answer to the question whether the transmission of information services as described above could form the basis for anticompetitive action. The Court is mindful in this regard particularly of the facts (1) that the Regional Companies may be expected, based on past experience, to seek to use any authority granted to them to transmit information services as a springboard to the furnishing of information content, and (2) that a broad videotex operation has never been tried in the United States. The experience of foreign countries is not particularly instructive with respect to competitive questions, since the telecommunications networks abroad are generally government-owned and controlled, and since, in any event, antitrust considerations play little or no role there. The experts cited by the various parties and intervenors differ to an extent in their understanding of such subjects as what constitutes transmission or content,[317] and they differ also with regard to the degree of risk to competition that would exist if the Regional Companies were afforded an exception from the information services restriction so as to allow them to provide transmission services.

The Court is thus faced with the dilemma of either authorizing entry of the Regional Companies into the transmission market without complete certainty regarding the anticompetitive considerations or awaiting clarification of the various technical, logistical, and economic problems until a definitive judgment can be reached.[318] The Court has decided to opt in favor of the former, on the following basis.

As stated in Part VII, *supra,* the Court has in the past taken into account well-defined public policies and benefits, in addition to the effect on competition most narrowly construed, in approving the decree,

---

313. Indeed, even the French telephone company does not manufacture the Minitel.

314. VIA Comments at 10.

315. Motion of U S West at 22–23; Compuserve Additional Opposition at 11.

316. Section VIII(A) of the decree permits the Regional Companies to market CPE.

317. Some, *e.g.,* Tymnet–McDonnell Douglas Network Systems, argues that it is inherently impossible to draw rational lines between content-related and non-content-related information services. Memorandum at 13–22.

318. As stated above, unless the Regional Companies are allowed to enter this field, and actually operate within it, the requisite certainty may never be achieved.

in interpreting it, and in passing upon motions and other requests from the parties. Further, as there stated, notwithstanding the contrary views of the Regional Companies and the Department of Justice,[319] the Court has no doubt of its authority to continue to do so, where there is no inconsistency with the antitrust laws or the factors underlying the approval of the decree as expressed in the Opinion which effected such approval.

Accordingly, the Court will, in the present context, once again take into account values in addition to those stemming exclusively from an environment free of anticompetitive activity, in this case the benefits to the American public from expanded, intelligent, widely available information services transmitted through an infrastructure operated by the Regional Companies. The divestiture of the Bell System, and the decree which brought it about, were not mere exercises in abstract reasoning: they had as their fundamental purpose the promotion of competition in the telecommunications market, to the end that the American public, including the American consumer, might benefit from today's and tomorrow's telecommunications technology in this information age.

The wide dissemination of information services is a key ingredient in that design. As indicated, the French information services scheme permits individual citizens to secure an enormous number and variety of information services with ease and at reasonable cost. While the two nations are not comparable in many other ways, they are surely not dissimilar in regarding as a positive value the access of the citizenry to a variety of sources of information. To the extent that this objective can be promoted through a relaxation of the information services restriction in the decree along the lines outlined above, the Court is prepared to do so.

For the reasons stated, the Court will exempt from the information services restriction the transmission of information generated by others in the manner and to the extent described above. However, in light of the not fully complete descriptions in the record of the various ingredients that are necessary to an information transmission system, juxtaposed against the need for precision (*see* pp. 596–97, *supra*), the parties and interested intervenors are invited to submit proposed orders, accompanied by memoranda, consistent with this Opinion, detailing the necessary ingredients with greater particularity.

# IX

## *Non–Telecommunications Services*

Section II(D)(3) prohibits the Regional Companies from "provid[ing] any other product or service, except exchange telecommunications and exchange access service, that is not a natural monopoly service actually regulated by tariff." *AT & T*, 552 F.Supp. at 228. This catch-all restriction prohibits the companies from participating in "unrelated businesses" in which they might have the ability to obtain improper competitive advantages by leveraging their control over the local monopolies. *Id.* at 195 n. 267.

Unlike the core restrictions, the section II(D)(3) prohibition was not imposed on the basis of any specific evidence of anticompetitive activity in non-telecommunications markets by AT & T or its subsidiaries, nor could it have been: by virtue of the 1956 consent decree, the Bell System was not engaged in non-telecommunications business enterprises. Section II(D)(3) rested instead on the proposition that, when an entity with a significant telecommunications monopoly enters some other, competitive business, there is both an incentive and an ability to act anticompetitively. The restriction also reflected the notion that, by limiting the Regional Companies to traditional local exchange services, the goal of the provision of efficient, economical telephone service would be furthered. *Western Electric Co.*, 592 F.Supp. at 855–58.

---

**319.** The Department has, however, acknowledged the legitimacy of a cost-benefit test. *See* p. 587, *supra*.

Whatever the theoretical basis for the inclusion of this restriction in the decree, the Court made it clear that a Regional Company could petition for removal of that restriction, and the Court would grant that petition—it would "waive" the restriction—if "there was no realistic possibility of abuse of monopoly power." *AT & T*, 552 F.Supp. at 195 n. 267.

The Court assumed at the time of the entry of the decree that the Regional Companies would not have any substantial interest in entering unrelated businesses, and that the line-of-business waiver requests to enter non-telecommunications markets would therefore be rare.[320]

That expectation turned out to be erroneous. Instead of the occasional request for a waiver for the operation of a cafeteria in a telephone company building, dozens upon dozens of far-reaching requests were filed almost immediately after divestiture. The Court accordingly established procedures for the handling of waiver requests, involving initial screening and recommendation by the Department of Justice, with opportunities for opposition or other comment by interested parties, prior to final court decision. *Western Electric Co.*, 592 F.Supp. 846. Since 1984, the Department of Justice has reviewed and favorably recommended over one hundred sixty waiver requests, and the Court has granted every one of these requests. AT & T Comments at 114.[321]

However, the Court has typically imposed four conditions as part of the grants of the requests: that the new competitive business be operated through a separate subsidiary; that the subsidiary obtain its own debt financing on its own credit, as distinguished from that of the Regional Company's telephone affiliate; that the total estimated net revenues for all the non-telecommunications activities engaged in by a Regional Company pursuant to waiver not exceed ten percent of that company's total net revenues; and that the monitoring and visitorial provisions of section VI of the decree shall apply to that subsidiary.

The purposes sought to be accomplished by these restrictions included *inter alia* the facilitation of the policing of the prohibition on cross-subsidization; protection, to the extent possible, of the financial soundness of the local telephone companies; making certain that the Regional Companies maintained adequate resources to complete implementation of equal access; and attempting to ensure that the Regional Companies would not neglect and undermine local telephone service by a concentration on and the allocation of resources to entirely unrelated businesses. *Western Electric Co.*, 592 F.Supp. at 870–72.[322]

The Department of Justice and the Regional Companies now request that the non-telecommunications restriction be entirely removed. Necessarily, this would require that the waiver process also be discarded. It is convenient, for purposes of analysis, to distinguish between the removal *per se* of the restriction and the disappearance of the conditions that the Court has customarily attached to waivers with

**320.** *See Western Electric Co.*, 592 F.Supp. at 853 n. 11, 858.

**321.** The Court has denied only requests that were filed ostensibly pursuant to section II(D)(3) but that actually presented attempted incursions by a Regional Company into businesses covered by one of the three core restrictions. Further, when feasible, the Court imposed conditions on the granting of other requests in order to prevent such incursions. *See, e.g.*, Orders dated August 22, 1985 (U S West) and March 13, 1986 (Ameritech) (financial service waivers conditioned to prevent Regional Company financing of equipment manufacturers, interexchange services, and information services); Opinion dated February 26, 1986 (Pacific Telesis waiver to acquire Communications Industries, Inc., conditioned on divestiture of CI's equipment manufacturing and telephone answering service operations).

**322.** In some cases, in response to concerns of interested persons that have commented to the Court or the Department of Justice, the Regional Companies have also accepted additional conditions, such as to prevent cross-subsidization through asset transfer. Interestingly in light of its current attitude, in July 1984, at the time of the formulation by the Court of the four general conditions discussed in the text *supra*, the Department of Justice recommended that the Court impose eight much more far-reaching conditions with respect to all waivers. *Western Electric Co.*, 592 F.Supp. at 870.

respect to entry into non-telecommunications markets.

It seems fairly clear that the restriction itself may safely be removed pursuant to section VIII(C) of the decree. Almost all of the parties and intervenors that have addressed the section II(D)(3) issue have concluded that there is no substantial risk that Regional Company participation in non-telecommunications business would permit leveraging of exchange monopolies.[323] That conclusion is also supported by the experience that, following review by the Department of Justice and the Court, every one of the waivers requested in this field was granted.

More problematical is the cross-subsidization issue that the Court sought to address in part by the conditions it attached to the waivers. There is no question but that the removal of the restriction on entry of the Regional Companies into non-telecommunications markets does raise the concern that their operations in these markets will be subsidized by revenues extracted from the rates that are being paid ostensibly for local telephone service. Indeed, as discussed in Part VII, particularly pp. 581–83, *supra*, notwithstanding various restrictions and conditions, such diversions appear to be taking place even now.

As against this continuing problem must be weighed that (1) there is little demand from potential competitors for retention of the restriction; and (2) the relative paucity of joint and common costs between exchange operations and non-telecommunications ventures renders it more difficult to cross-subsidize on a continuing basis in large amounts in this area than in telecommunications-related markets.

In the opinion of the Court, while the issue is by no means open and shut, the balance of factors favors the removal not only of the restriction itself but also of the conditions heretofore attached to restriction waivers. That balance is achieved in part by several public policy or cost-benefit factors (Part VII–B): (1) the waiver process with respect to this non-telecommunications field places a substantial burden on Regional Company planning and decision-making; and (2) this process involves the Court on a fairly significant scale in Regional Company business decisions when the final outcome, at least thus far, has always been the issuance of a waiver; and (3) if the restriction itself has become obsolete, the retention of conditions becomes somewhat unrealistic.

Absent weightier competitive considerations than are present here and now,[324] it is appropriate, therefore, that these companies be freed of detailed judicial oversight of their decisions. There is, of course, independent philosophical utility in a departure of a judicial body from the adjudication of matters that are not likely to present substantial problems in terms of compliance with the antitrust laws.[325]

For these reasons, the Court will remove the restriction embodied in section II(D)(3) of the decree on the entry of the Regional Companies into non-telecommunications ventures. Consistently with that decision, the four conditions heretofore imposed as part of past waivers of the section II(D)(3) restriction will also be dissolved.

---

**323.** *See, e.g.,* National Association of Regulatory Utility Commissioners, *Summary Report on the Regional Holding Company Investigations* at 5 (Sept. 18, 1986); *see also Western Electric Co.,* 592 F.Supp. at 853.

**324.** There is, to be sure, also the somewhat more amorphous risk that the Regional Companies, in their zeal to diversify, will neglect the relatively pedestrian, regulated telephone operations, and concentrate their resources and managerial skills instead upon more glamorous, albeit more speculative, business opportunities. At least one of the usual waiver conditions was designed to deal with this issue. However, it is at least conceivable that the FCC, possibly with a mandate from the Congress, will see its way clear to address this problem should it assume substantial significance.

**325.** Some have suggested, *e.g.,* Computer and Business Equipment Manufacturers Association at 28, that termination by this Court of the waiver process could result in the filing of a great number of separate antitrust suits throughout the land. For the reasons stated, the Court does not believe it likely that many meritorious antitrust actions will develop.

## X

### *Conclusion*

The purpose of the decree in this case is not to assist one company or another, nor is it to promote abstract antitrust theory or divestiture as part of some broad ideological scheme. Rather, it is the decree's purpose to allow consumers to reap the benefits of competition in telecommunications that competition has generated for a hundred years or more in a myriad of other fields. It is with that basic philosophy in mind that the Court has approached the present set of motions, requests, and reports.

### A. *Core Restrictions*

Although it may be difficult to recall this now, the fact is that for thirty years prior to 1984, the Congress, the courts, the Federal Communications Commission, and state regulators wrestled with the problem of what to do about the Bell System monopoly, its arrogance in dealing with competitors and consumers, and its power to shut out competition. One Department of Justice lawsuit was filed and aborted; regulators issued edicts that were largely ignored; Congress investigated but could not come to a decision; and a second federal lawsuit and several private actions were filed in the courts where they remained pending for a number of years. In the meantime, competitors languished and the American ideal of free and fair competition remained absent from the telecommunications industry.[326] When ultimately the decree that governs this case was negotiated between the parties and approved by the Court, it resolved the problem of claimed monopolistic conduct in telecommunications by going to its root.

That root was the control by the Bell System of the local telephone switches—in which it had a monopoly—and its simultaneous presence in several other markets (long distance, telecommunications manufacturing, and information services)—in which it had competitors. The competitors in each of these markets were suffering from an insuperable disadvantage: they could reach their ultimate customers only by connecting their circuits and products to the Bell System's local switches, the only technologically available avenue to the homes, offices, and factories of America where the individual telephone instruments are located. It followed that these competitors were at the mercy of the Bell System's managers, who could with ease discriminate against them by such practices as delaying interconnections, providing inferior connections, charging exorbitant prices, or refusing to attach competitors' products altogether. The Bell System was also able to subsidize its competitive products with funds syphoned off from the monies paid in by the ratepayers, thus to undercut the prices charged by independent firms and drive them out of business.

The quite predictable result was that no independent long distance, manufacturing, or information company ever really got off the ground: for practical purposes, the Bell monopoly remained just that. Since exhortations, regulations, and orders requiring a cessation of the Bell System's activities had proved fruitless, the remedy adopted in the decree, as simple as the problem itself, had but two basic aspects: first, the divestiture from AT & T of its local monopoly affiliates (thus forcing AT & T's other enterprises, all competitive, to stand or fall on their own); and second, an order prohibiting the new owners of the local bottlenecks—the Regional Companies—from engaging in the competitive long distance, manufacturing, and information services markets (so as to make it impossible for them to duplicate the Bell practices, now that *they* controlled the bottlenecks).[327]

These simple yet drastic measures have already begun to bear fruit for the benefit of competition and of the users of the telephone. Contrary to much popular belief, the overall trend with respect to telephone rates is down,[328] and the cost of

---

**326.** *See generally,* Part I, *supra.*

**327.** *See* Part II-A, *supra.*

**328.** Long distance rates have declined in the last three years by roughly thirty percent. Local rates are not affected by the decree because, for technological reasons, they have had to remain

telephone instruments is down dramatically.[329] More importantly, competition has brought about innovations in telephone features on a scale and variety unknown before divestiture.[330] While complaints about that divestiture and the ensuing inconveniences have by no means ceased, an understanding is beginning to emerge that these temporary dislocations are a necessary price for what the newly competitive marketplace can achieve.

It is the attempted destruction of that careful design that the motions now before the Court are all about. Almost before the ink was dry on the decree, the Regional Companies began to seek the removal of its restrictions. These efforts have had some success, in that they have tended to cause the public to forget that these companies, when still part of the Bell System, participated widely in anticompetitive activities, and that, were they to be freed of the restrictions, they could be expected to resume anticompetitive practices in short order, to the detriment of both competitors and consumers. Regional Company claims of wishing only to participate with others in long distance and other restricted businesses on a level playing field obscure the

fact that there is no level playing field when one of the participants holds an unassailable franchise on the goal lines that no one else may touch without its permission.

By direction of the decree itself, the restrictions placed on the Regional Companies may be removed only if these companies demonstrate that "there is no substantial possibility that they could use their monopoly powers to impede competition in the markets they seek to enter." The decree rests on the premise that the incentive and the ability to act anticompetitively existed in 1984 when that decree was entered, and the question before the Court therefore is only whether events in the three years since then have changed that situation.[331] Essentially three types of changes are claimed to have occurred.

First, it is argued that the local monopoly bottlenecks have been either wiped out or substantially eroded. However, by the finding of the Department of Justice's own expert, these bottlenecks are still so pervasive that only one in one million telephone users is able to bypass them to communicate with his ultimate customers on his own; the remaining 999,999 users remain

---

in the monopolistic control of the Regional Companies which, as noted at pp. 581–82, *supra,* were able initially to raise these rates. However, as a consequence of greater public and regulatory awareness and resistance, local rates rose only slightly during the current year, while long distance rates continued their substantial decline. Indeed, state regulatory commissions turned local rate increase requests in the first half of 1987 into rate reductions totalling $92.6 million. *Communications Week,* August 24, 1987, at 30.

329. When the Bell System monopoly had full control, it refused to sell its telephones to consumers, or to permit anyone else to sell them, preferring to charge rentals in the neighborhood of $5–7 per month or more, for a total in, say thirty years, of over $2,000. Today, telephone instruments can be purchased in retail stores everywhere for $25–30 and up. Even if new instruments were purchased from time to time, the total cost would still be far below the unending rental fees.

330. There are now on the market at reasonable prices such by now commonplace features as residential telephones that are able to memorize dozens or hundreds of different phone num-

bers; telephones that repeat the last number called until it is no longer busy; cellular phones for business and emergency use; cordless phones; instruments that can be instructed by voice (*e.g.,* in an automobile) to call a certain individual, office, or number; and many others.

Parallel with the development of equipment that provides greater accessibility to the telphone user, devices are being produced and marketed that, in a sense, operate in the opposite direction: some of them display the caller's number before the receiver has been lifted; others provide a distinctive ring when a call is received from a number previously designated as worthy of priority consideration; still others automatically block calls from persons with whom the phone's owner does not wish to speak. For the first time since the invention of the telephone, these devices are returning control to the instrument's owner from every salesman, unwelcome relative, or even crackpot who may decide to call at any hour of the day or night.

It is surely not a coincidence that these features, and many more, have become available since the Bell monopoly was ended by divestiture and competition began to reign in the telecommunications marketplace.

331. *See* Part II, *supra.*

strictly dependent for local connections upon the Regional Company monopolies.[332] Second, it is said that there are now seven Regional Companies instead of one nationwide Bell System. While that is certainly true, it is not a new development; it was foreseen and even mandated by the very decree that requires a *future* change in circumstances before the line of business restrictions may be removed. Moreover, in terms of monopoly power, the combined Regional Companies more or less equal the Bell System.[333] Third, suggestions have been made that, unlike at the time of the entry of the decree, federal regulation can now prevent anticompetitive abuses. But FCC regulation, far from being more stringent than before, is today actually less so, for reasons of reductions in staff and changes in regulatory philosophy, among others. And although new and possibly stricter regulations have been discussed, they have not thus far been adopted; they are not even in final form; and they will not become effective, if at all, until next year or the year after that. Their ultimate impact on anticompetitive activities is therefore entirely speculative.[334]

The Court has accordingly concluded—it could not but conclude—that no significant changes have occurred with respect to the core restrictions—long distance, manufacturing, and the sale of information services—that would justify a radical change in the decree.

When the law and the facts are thus examined dispassionately, it becomes readily apparent that there is less to the Regional Company contentions than meets the eye. Indeed, had it not been for the drumbeat of a wide-ranging public relations campaign, no one would have seriously entertained the proposition that a solution arrived at after a thirty-year struggle, that had caused a major and wrenching change in the structure of the industry and the habits of most American telephone users, should be jettisoned in substantial part after a mere three years, particularly when

the changes that have occurred in the interim in the power of those who control the local switches are insignificant.

If the interexchange and manufacturing motions were granted, the telecommunications industry would be back where it was when these struggles began. The Regional Companies would have the same incentives as well as the same means for discrimination, manipulation, and cross-subsidization that the Bell System possessed before the break-up.

Once before, in 1956, an antitrust suit against the Bell System was aborted precipitously by a Department of Justice decision,[335] and that step laid the groundwork for many years of turmoil and travail in the industry, the courts, the regulatory commissions, and the Congress. That history must not be repeated. This Court cannot and will not lend its authority to so self-defeating an enterprise. It is therefore denying all the requests for the removal of the core restrictions of the decree.

**B. *Transmission of Information and Catch–All Restriction***

At the same time, the Court is ordering the removal of two other restrictions where this will yield significant benefits without serious risk of harm to competition.

First. The wide-ranging yet diffuse "catch-all" restriction on the entry of the Regional Companies into all non-telecommunications markets is being repealed outright. Experience has shown that no substantial purpose is being served by requiring the Regional Companies to petition the Court whenever they wish to enter a business having no direct relationship to telecommunications, and where the risk of anticompetitive activity is relatively small. Indeed, the Court has to date granted over 160 "waivers" of this restriction and refused none. Although some danger of improper cross-subsidization remains, the benefits from a removal of this restriction outweigh that danger in this circumstance. Elimination of the restriction will also have

**332.** *See* pp. 539–40, *supra.*

**333.** *See* pp. 547–48, 555–56, *supra.*

**334.** Part VI, *supra.*

**335.** *See* pp. 529–30, 535–36, *supra.*

the beneficial effect of permitting the Regional Companies hereafter to make decisions with respect to substantial segments of their business without day-to-day involvement or supervision by the Court.[336]

Second. One of the core restrictions of the decree prohibits the Regional Companies from providing information services. The Court is retaining that restriction insofar as it involves the generation of information content, for the same reason that it is retaining the other core restrictions. If the Regional Companies had the authority to sell information in competition with other providers of these services, their control of the networks essential to the distribution of that information would give them the same ability to discriminate against competitors as they have with regard to interexchange services and the manufacture of telecommunications equipment.[337]

That does not mean, however, that the public must be deprived of the revolutionary changes that are possible if information, instead of being transmitted only by current methods,[338] can also be made available to vast numbers of consumers instantaneously by means of the telephone network. Other nations—France in particular, but also Japan and Great Britain—have experimented with such an innovative use of the telephone system, with some considerable success. The French Teletel system —which may for present purposes serve as a rough guide in this regard—has some three million subscribers and is used to supply to these subscribers immediate access to about 4,000 independent services supplying specific information upon request in such fields as banking and brokerage, shopping (availability and price), travel (schedules and reservations), tickets to entertainment and sporting events, employ-

ment availability, language instruction, governmental notices, schedule of meetings of associations, reprints of newpaper and magazine articles, and others.

The Court has concluded that the apparently competing interests—prevention of monopolization of information services versus broad availability of such services to the public—can be reconciled by severing for decree purposes the generation of information content (which will remain prohibited to the Regional Companies) from the transmission of information services (which the Regional Companies will be allowed to provide).[339]

The Court will accordingly lift so much of the information services restriction as prevents the Regional Companies from constructing and operating a sophisticated network infrastructure [340] that will make possible the transmission, on a massive scale, of information services originated by others, directly to the ultimate consumers.[341] No one can know with certainty whether this revolutionary means of transmitting useful, readily-available information will find acceptance in this country to the same extent as it has elsewhere. But the Court believes that it should do what it legitimately can to foster the availability of such a service.

The decisions made herein continue to advance the objectives of the decree as the Court understood them when it approved that decree in 1982, and in its rulings since then: (1) the establishment in the telecommunications industry of conditions of fair competition, freed from of the heavy hand of monopoly; (2) the protection of the goals of universal service and of reasonable rates for those who could not otherwise afford telephone service; and (3) the encouragement of innovation, to the end that the full

---

**336.** Part IX, *supra.*

**337.** Part V, *supra.*

**338.** *E.g.,* by contacting a public library, through the mails, or by advance subscription to one of the existing information services.

**339.** *See* Part VII, *supra.*

**340.** Part VIII, *supra.*

**341.** In order to receive this information in usable form, these consumers will not require, as now, a complex PBX to unscramble and receive it, or even a full-fledged computer terminal; they will only need to have what is called a "dumb terminal"—a relatively inexpensive instrument that could be sold both by the Regional Companies and by more conventional retailers.

benefits of a sophisticated telecommunications industry be made available to all segments of the American public in this Information Age.